# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY, CORBIN DIVISION

| | |
|---|---|
| WILLIAM ANDERSON )<br>            Plaintiff, )<br> )<br>   v.                      )<br> )<br>KNOX COUNTY, Knox County )<br>Sherriff's Department Officers in )<br>their Individual Capacity, JOHN )<br>PICKARD, DEREK EUBANKS, )<br>Kentucky State Police Officers in )<br>their Individual Capacity JASON )<br>YORK, BRIAN JOHNSON, MARK )<br>MEFFORD, JACKIE JOSEPH, and )<br>TYSON LAWSON. )<br> )<br>            Defendants. )<br> )<br> )<br> ) | Case No.<br><br>JURY TRIAL DEMANDED |

NOW COMES Plaintiff, WILLIAM ANDERSON, by his attorneys LOEVY &

LOEVY, and complaining of Defendants KNOX COUNTY, Knox County Sherriff

JOHN PICKARD and Knox County Sheriff's Department Officer DEREK

EUBANKS, Kentucky State Police Officers JASON YORK, BRIAN JOHNSON,

MARK MEFFORD, JACKIE JOSEPH, TYSON LAWSON, and other unknown

officers from the Knox County Sheriff's Department and Kentucky State Police, and

states as follows:

## Introduction

1.      Plaintiff William Anderson lost nearly five years of his life awaiting trial for a murder he did not commit.  On May 25, 2016, Mr. Anderson was exonerated when a jury of his peers acquitted him.

2.      Over the course of his incarceration, Mr. Anderson lived in fear each day that he would be wrongfully convicted and sentenced to death.

3.      This manifest injustice was not the result of mere flaws in the judicial system. Rather, the Defendants named herein conspired to take his liberty by knowingly initiating false charges based on evidence that the Defendants fabricated.  Thankfully, because it was fabricated, the evidence was flimsy and the Defendants did not succeed in obtaining Mr. Anderson's wrongful conviction.

4.      In their quest to frame Mr. Anderson, the Defendants cut a deal with the real murderer, James Sizemore, and others associated with him.

5.      For example, irrefutable evidence implicates Mr. Sizemore's uncle, Jeff Gray, as an accomplice in the murder.  That evidence includes a video showing Mr. Gray and Mr. Sizemore purchasing tools to bury the body. But the Defendants protected Mr. Gray from charges because of his familial ties to Defendant York and his financial arrangement with Defendant Pickard.

6.      Although the system functioned in the sense that Mr. Anderson was acquitted, the Defendants nevertheless succeeded in manipulating the system for years.  As a result, Mr. Anderson was deprived of his liberty as a pretrial detainee just the same as if the Defendants had secured his wrongful conviction.

7.      Mr. Anderson now brings this lawsuit to enforce the Constitutional right to liberty guaranteed to all citizens by the United States Constitution.

## Jurisdiction and Venue

8.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the U.S. Constitution.

9.      This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1367.

10.     Venue is proper under 28 U.S.C. § 1391(b) and (c). On information and belief, all parties reside in this judicial district, and the events giving rise to the claims asserted herein all occurred within this district.

## Parties

11.     Plaintiff William Anderson is a 37 year-old resident of Campbell County, Tennessee.

12.     At all relevant times, Defendants John Pickard and Derek Eubanks were officers with the Knox County Sheriff's Department.  Each of these Defendant Officers is sued in their individual capacity and each acted under color of law and within the scope of their employment in engaging in the actions alleged in this complaint.

13.     Defendants Pickard and Derek Eubanks are referred to collectively as the "Knox County Defendants."

14.     Defendant Knox County is a local governmental entity organized under Kentucky law.  Defendant Knox County is responsible for the policies, practices, and customs of the Knox County Sheriff's Department.

15.     At all relevant times, Defendants Jason York, Brian Johnson, Mark Mefford, Jackie Joseph, Tyson Lawson, were current Kentucky State Police ("KSP") Officers.  Each of these Defendant Officers is sued in their individual capacity and each acted under color of law and within the scope of their employment in engaging in the actions alleged in this complaint.

16.     Defendants Jason York, Brian Johnson, Mark Mefford, Jackie Joseph, Tyson Lawson, are referred to collectively as the "KSP Defendants."

17.     The individual defendants are referred to collectively as the "Defendant Officers."

### The Murder of Bob Wiggins

18.     Bob Wiggins was brutally murdered on November 23, 2011 in Bell County, Kentucky.

19.     Just prior to his death, Kimberly York lured Mr. Wiggins to her home by telling him that she was desperately in need of pills.

20.     Mr. Wiggins was unaware that Ms. York's call was nothing more than a ruse.  As such, Mr. Wiggins fell for the bait and went to Ms. York's residence with the intention of selling her OxyContin 30's.

21.     Mr. Wiggins left Ms. York's home in the company of James Otis Sizemore on the afternoon he went missing.   Mr. Sizemore accomplished this

4

task by falsely informing Mr. Wiggins that someone wanted to purchase pills from him on Red Bird Mountain.  Together, Mr. Sizemore and Mr. Wiggins drove a black Toyota Camry to the top of the mountain.

22.     After exiting the vehicle, Mr. Sizemore struck Mr. Wiggins over the head multiple times.  Mr. Sizemore hit Mr. Wiggins with such force that one of the strikes caused a divot in his skull.

23.     Mr. Wiggins eventually fell to his knees after being struck repeatedly by Mr. Sizemore.  It was then that Mr. Sizemore grabbed Mr. Wiggins' wrists and dragged him to the side of the road.

24.     After searching through Mr. Wiggins' pockets, Mr. Sizemore found a knife and slashed his throat before stabbing him 18 times.

25.     Mr. Sizemore eventually left Mr. Wiggins' body and fled the crime scene.  To do so, Mr. Sizemore stole Mr. Wiggin's black Toyota Camry.

26.     Upon fleeing the murder scene, Mr. Sizemore was dirty, bloody, and needed a place to clean up.  He drove Mr. Wiggins' black Toyota Camry to Jeremy Ferrell's residence, where he arrived around 3:00 p.m.

27.     Mr. Sizemore arrived at Mr. Ferrell's residence alone.  By the time Mr. Sizemore arrived at Mr. Ferrell's residence, he was already intoxicated from pain pills that he had stolen from Mr. Wiggins.

28.     While at Mr. Ferrell's, Mr. Sizemore was able to clean himself off and get new clothing.

29. Later that evening, Mr. Sizemore set Mr. Wiggins' car ablaze in Barbourville, Kentucky.

30. On November 25, 2011, Mr. Sizemore accompanied Jeff Gray to a Lowe's Department Store in Corbin, Kentucky. There, the two men purchased a number of items to assist them in burying Mr. Wiggins' body.

31. Shortly thereafter, Mr. Wiggins was buried on Red Bird Mountain.

## Initial Investigation into Mr. Wiggins' Death

32. A missing person's report filed at noon on December 1, 2011 by Mr. Wiggins' sister, Faye Scott, prompted the Defendants' investigation. Defendant Derek Eubanks filled out the missing persons' report.

33. Kimberly York accompanied Ms. Scott to fill out the missing persons' report. While there, Ms. York revealed to Defendant Eubanks that Mr. Wiggins was last seen at her residence around noon on November 23, 2011.

34. According to Ms. York, Mr. Wiggins left the residence with Mr. Sizemore and had not been seen since.

35. Because the missing persons' report was filed at the Knox County Sheriff's Department, Defendants Pickard and Eubanks led the initial investigation into Mr. Wiggins' death. At the time, Defendant Pickard was the Knox County Sheriff.

36. The Defendants' first action was to interview Ms. York a second time. In this interview, Ms. York informed the Defendants that the last time she saw Mr. Wiggins was at her home on November 23, 2011 around noon. Ms. York

6

further revealed that Mr. Wiggins left her home in the company of Mr. Sizemore and were driving in Mr. Wiggins' black Toyota Camry.

37.     Finally, Ms. York informed the Defendants that William Anderson and Dave Fox may have some information relating to the investigation.

## Mr. Anderson Assists Defendants' Investigation Prior to Being Framed for Murder

38.     On that same date, Defendants Eubanks and Pickard located Mr. Anderson. At the time, Mr. Anderson lived with the Messer family and cared for Elijah, their handicapped son.

39.     Defendants Eubanks and Pickard interviewed Mr. Anderson at the Messer residence regarding Mr. Wiggins' death.

40.     In that interview, Mr. Anderson implicated Mr. Sizemore in the murder.  In doing so, Plaintiff informed Defendants Eubanks and Pickard that he and Dave Fox cared for Elijah Messer on November 23, 2011 prior to leaving for the grocery store.

41.     After arriving at the store around 5:30 p.m., Mr. Anderson accompanied Mr. Fox inside to purchase a pack of cigarettes and a few sodas.

42.     Mr. Anderson revealed that he and Mr. Fox ran into Mr. Sizemore and Jeremy Ferrell at the store.  Shortly thereafter, Mr. Sizemore told Mr. Anderson and Mr. Fox to "[G]o ahead and get what you want, I'll take care of what you ain't got the money for."  Mr. Sizemore then paid for the items.

43.     Upon leaving the store, Mr. Sizemore asked Mr. Anderson to accompany him and Mr. Ferrell to Ferrell's residence.   Mr. Anderson subsequently

7

left with Mr. Sizemore and Mr. Ferrell, while Mr. Fox drove the van back to the Messer residence.

44.     Mr. Anderson informed Defendants Pickard and Eubanks that Mr. Sizemore was driving a black Toyota Camry on the day in question.  He revealed to the Defendants that he questioned Mr. Sizemore about where he got his new car.  In response, Mr. Sizemore stated that his "lady…took over the payments from somebody."

45.     The Defendants also learned from Mr. Anderson that after arriving at Mr. Ferrell's residence, Mr. Sizemore took papers out of the glovebox and burnt them.

46.     After a short period of time, Mr. Sizemore took Mr. Anderson back to the Messer residence.  The Defendants learned that Mr. Fox was at the Messer residence at the time Mr. Sizemore and Mr. Anderson returned.

47.     Upon exiting the vehicle, Mr. Sizemore informed Mr. Anderson that he had a "nice coat" that he was going to give him.  At that point, Mr. Anderson informed the Defendants that Mr. Sizemore walked to the car and retrieved a black coat and a black hat for him to have.

48.     Mr. Anderson voluntarily provided Defendants Eubanks and Pickard with the two clothing items – a coat and a hat - given to him by Mr. Sizemore.

### Third-Party Witnesses Confirm Mr. Anderson's Innocence to Knox County Defendants

49.     After concluding their interview with Mr. Anderson, Defendants Pickard and Eubanks proceeded to question Dave Fox, a local resident.

50.    Mr. Fox confirmed to the Defendants that he was with Mr. Anderson during the day on November 23, 2011.   In fact, on that afternoon, Mr. Anderson accompanied Mr. Fox to a local store where they encountered Mr. Sizemore and Mr. Ferrell.  At the time, Mr. Sizemore was driving a black Toyota Camry.

51.    Mr. Fox also informed the Defendants that Mr. Sizemore offered to pay for food and drinks inside the store.

52.    Finally, Mr. Fox informed the Defendants that Mr. Anderson left the store with Mr. Ferrell and Mr. Sizemore but returned a short time later to Mr. Messer's residence, where Mr. Fox and Mr. Anderson were staying at the time.

53.    About an hour later, Defendants Pickard and Eubanks interviewed another local resident named Jeremy Ferrell.  Mr. Ferrell, too, corroborated Mr. Anderson's story and verified his innocence.

54.    In that interview, Mr. Ferrell confirmed to the Defendants that Mr. Sizemore arrived at his home around 3:00 p.m. on November 23, 2011.  At the time he arrived, Mr. Sizemore was alone and driving a black Toyota Camry.

55.    Mr. Ferrell further revealed that Mr. Sizemore was high on pills when he arrived, was noticeably paranoid, and acting very strange.

56.    The Defendants learned that Mr. Ferrell and Mr. Sizemore took the black Camry to the local store.

57.    There, they saw Mr. Anderson and Mr. Fox, who arrived in a different vehicle.  After purchasing some items, Mr. Sizemore and Mr. Ferrell left the store accompanied by Mr. Anderson.  Together, the three went to Mr. Ferrell's home.

58.     Mr. Ferrell informed the Defendants that Mr. Sizemore began burning papers and other objects from the black Toyota Camry after arriving back at home. The Defendants learned that neither Mr. Anderson nor Mr. Ferrell participated in the burning.

59.     The Defendants also were informed that Mr. Sizemore agreed to take Mr. Anderson back to the Messer residence after a short period of time.

## The Defendants' Interrogation of Mr. Sizemore
## Produced a Dozen False Tales

60.     Defendants Eubanks and Pickard decided to interrogate Mr. Sizemore on December 2, 2011 after conducting interviews with Mr. Anderson, Mr. Fox, and Mr. Ferrell.

61.     By the time of the interrogation, the Defendants knew that Mr. Sizemore was the sole person responsible for murdering Mr. Wiggins.  In fact, Defendant Eubanks revealed as much to Mr. Sizemore at the onset of the interrogation, stating, "The thing is, all my evidence points at you…"

62.     In that interrogation, Mr. Sizemore repeatedly lied to the Defendants about his involvement in Mr. Wiggins' murder.

63.     In a matter of hours, Mr. Sizemore told a dozen different stories about the events leading to Mr. Wiggins' death.

64.     The Defendants knew that Mr. Sizemore was lying about his role in Mr. Wiggins' death.  Indeed, Defendant Eubanks confronted Mr. Sizemore early in the interrogation, "Yeah, well, you're not tellin it [the truth] now…cause we know –

and – and we don't only know it, we can prove it…we've got evidence that proves different than what you're saying."

65.     Defendants Pickard and Eubanks became increasingly frustrated with Mr. Sizemore and his fanciful stories.  However, the Defendants resorted to telling Mr. Sizemore what to say instead of properly probing his knowledge about Mr. Wiggins' death.

66.     In doing so, the Defendants fabricated Mr. Sizemore's false statement that implicated Mr. Anderson in the murder of Mr. Wiggins.

67.     Defendants Eubanks and Pickard's method of fabricating Mr. Sizemore's false statement began in a subtle fashion.  For instance, Defendants Pickard and Eubanks initially urged Mr. Sizemore to claim that "someone else did it and you were just there."

68.     But Mr. Sizemore was unable to comprehend what the Defendants were asking him to do, namely, frame Mr. Anderson for Mr. Wiggins' murder.

69.     Because of Mr. Sizemore's confusion, the Defendants' fabrication requests became more pronounced and were coupled with promises of consideration.

70.     For instance, Defendant Eubanks informed Mr. Sizemore, "If you can take me and show me and give me evidence that points at somebody else, I'm gonna turn left and go down that road."

71.     But Mr. Sizemore needed more direction.  He needed to know exactly what the Defendants wanted him to repeat.

72.     Thus, on multiple occasions, Mr. Sizemore begged the Defendants to feed him their script, "I wish you would just tell me so I can at least tell you something."

73.     The Defendants then fed Mr. Sizemore the false and fabricated story that they wanted him to repeat.  And like a puppet, Mr. Sizemore acquiesced to his master's commands.

74.     The Defendants succeeded in getting Mr. Sizemore to falsely implicate Mr. Anderson.

75.     The Defendants offered praise and words of encouragement for Mr. Sizemore after he agreed to go along with the false and fabricated story that implicated Mr. Anderson in the murder.  For example, in response to Mr. Sizemore's sudden willingness to falsely implicate Mr. Anderson, Defendant Pickard stated, "That'll help you…that'll help."

76.     After successfully convincing Mr. Sizemore to falsely implicate Mr. Anderson, the Defendants set about the task of fabricating the details of his false statement.  In doing so, Defendant Eubanks said "I'm having a hard time sleeping though, knowing that I knew somebody killed somebody and now there's somebody in close proximity that heard it and everything."

77.     After telling Mr. Sizemore to repeat that he was in close proximity to the murder, Defendant Eubanks then instructed him to say what the motive should be, "Let me guess, it was all over stealing pills…all over stealing pills."

12

78.     The Defendants also made significant promises to Mr. Sizemore in the midst of providing him with the details necessary to frame Mr. Anderson for a murder he did not commit.

79.     For instance, the Defendants informed Mr. Sizemore that he could, "make a deal…[and] get eight years at 15 percent."  According to their promise, Mr. Sizemore would "only serve 14 months."

80.     Defendants Eubanks and Pickard rehearsed Mr. Sizemore's false and fabricated story during the remaining portion of this marathon interrogation.

81.     The Defendants knew that Mr. Sizemore's story was false.

82.     At the time of the interrogation, Defendant Pickard knew Mr. Sizemore for nearly a decade and believed him to be a liar.

83.     In fact, Defendant Pickard confessed that at the time he interrogated Mr. Sizemore, he "knew the truth wasn't in him."

**Defendant Pickard Requests Assistance from KSP Defendants**

84.     After obtaining a false statement from Mr. Sizemore, Defendant Pickard contacted Defendant York and requested that officers from the Kentucky State Police assist in the investigation.

85.     In that call, Defendant Pickard also revealed that Mr. Sizemore confessed that Mr. Wiggins' body was located at the top of Red Bird Mountain.

86.     At that point, the Defendant Officers transported Mr. Sizemore to Red Bird Mountain.

87.    Around 12:48 p.m., while on Red Bird Mountain, Mr. Sizemore escaped from custody.  Mr. Sizemore was located a short time later at his family's home located near the bottom of the mountain.

88.    A short time later, the Defendant Officers escorted Mr. Sizemore back to the top of Red Bird Mountain.

89.    Within minutes, Mr. Sizemore assisted the Defendant Officers in locating Mr. Wiggins' buried body.   In doing so, Mr. Sizemore pointed to a pile of dirt and limbs that was located in extremely mountainous terrain.

90.    According to his report, Defendant York observed, "tool marks located on the bank above the location of the body that showed dirt had been dug from the bank to cover the body."  A later autopsy revealed that the body was covered with lime.

91.    After locating the body, Defendants Mefford, Johnson, and Joseph arrived at the scene and assisted in the investigation.

92.    The Defendant Officers subsequently brought Mr. Sizemore to the Knox County Sheriff's Department for further questioning.

## The Defendants Rehearse and Fabricate
## Mr. Sizemore's False Statement after Locating Mr. Wiggins

93.    Shortly thereafter, Defendants York, Eubanks, and Johnson participated in another interrogation of Mr. Sizemore that interrogation lasted approximately three hours.

94.     In that marathon interrogation, through coercion and promises of consideration, the Defendant Officers fabricated a false story for Mr. Sizemore to repeat that implicated Mr. Anderson in the murder of Mr. Wiggins.

95.     The Defendant Officers knew that the story was false, but continued creating it because they were determined to falsely initiate charges against Mr. Anderson for the murder of Mr. Wiggins.

96.     The Defendant Officers memorialized this false and fabricated story in a police report.

97.     The Defendant Officers not only knew that the story was false at the time they were fabricating it, but their later investigation conclusively proved that it was untrue.

98.     As a result of the Defendant Officers' threats and promises of consideration, Mr. Sizemore agreed to go along with the false and fabricated statement created by the Defendant Officers that falsely implicated Mr. Anderson in the murder.

99.     Notably, Mr. Sizemore's false and fabricated story omits information about who was really involved in the murder of Mr. Wiggins.  In fact, the Defendant Officers omitted any information from Mr. Sizemore's false and fabricated statement that implicated Jeff Gray, an accomplice of Mr. Sizemore's in the cover-up of Mr. Wiggins' murder.

15

### The Defendants Protected Mr. Sizemore's Accomplice in the Murder
### Due to His Close Ties to Defendants York and Pickard

100.    Within the first few days of their investigation, Mr. Sizemore informed the Defendant Officers that Mr. Gray assisted him in burying the body.

101.    The Defendant Officers verified this information through irrefutable documentary evidence.

102.    On January 14, 2012, Defendant Johnson obtained a number of video recordings and a receipt from the Lowe's Home-Improvement store in Corbin, Kentucky.  Defendant Johnson took these actions due to the undocumented information provided by Mr. Sizemore.

103.    The video footage and receipt were formed during the evening hours of November 25, 2011, approximately two days after Mr. Wiggins was murdered.

104.    Upon reviewing this footage, Defendant Johnson learned that a "gray colored pickup truck" entered the Lowe's parking lot around 8:36 p.m. on November 25, 2011.

105.    Defendant Johnson recognized the two subjects who exited the vehicle and immediately identified them as Jeff Gray and James Sizemore.

106.    According to Defendant Johnson's report, he watched Mr. Gray and Mr. Sizemore purchase "six bags of lime, a digging shovel, a flash light, and a bag of salt."

107.    According to a receipt recovered by Defendant Johnston, Mr. Gray used cash to pay for the items used to bury Mr. Wiggins.

16

108.    Below is a screenshot of a video that the Defendant Officers obtained that shows Mr. Sizemore and Mr. Gray purchasing tools to bury Mr. Wiggins.



109.    In spite of the significant evidence implicating Mr. Gray, at the very least, as an accomplice in covering up Mr. Wiggins' murder, the Defendant Officers refused to initiate charges.

110.    The Defendant Officers refused to initiate charges against Mr. Gray because of his personal ties to Defendants York and Pickard.

111.    At the time of the underlying investigation, Defendant York was married to Kayla Gray, a close relative of Jeff Gray.  Because of this relationship, Defendant York fabricated evidence, including Mr. Sizemore's false statement that implicated Mr. Anderson and omitted information relating to Mr. Gray, to protect his wife's relative from being criminally charged.

17

112.    Defendant York, though, was not the only Defendant with a motivation to fabricate evidence and protect Mr. Gray.

113.    Defendant Pickard, too, had a personal motivation for framing Mr. Anderson and protecting Mr. Gray.  For approximately five years, Mr. Gray made monthly payments to Defendant Pickard for the right to conduct criminal activity without fear of prosecution.

114.    In exchange for the payments, Defendant Pickard allowed Mr. Gray to continue running his criminal enterprise.

115.    Because of these payments, Defendant Pickard fabricated evidence implicating Mr. Anderson and protected Mr. Gray from being criminally charged.

116.    Defendant Pickard involved other deputies at the Knox County Sheriff's Department in this pay-to-play scheme.

117.    Those deputies not only participated in collecting payments on Defendant Pickard's behalf, but they were also instructed to protect Mr. Gray from the initiation of criminal charges.

118.    Defendant Pickard knew at the time he committed this egregious misconduct, which includes fabricating Mr. Sizemore's statement, that implicating Mr. Gray in the murder would result in his pay-to-play scheme being exposed.

**Defendants Engage in Coercive Interrogation of Dave Fox
in Their Quest to Frame Mr. Anderson**

119.    In spite of the evidence against the true perpetrators – Mr. Sizemore, Mr. Gray, and Ms. York - the Defendant Officers conspired amongst themselves to frame Mr. Anderson for Mr. Wiggins' murder.

18

120.    By December 2, 2011, the Defendant Officers had already reached this agreement to frame Mr. Anderson.

121.    By that time, however, the Defendant Officers knew that Mr. Anderson had an ironclad alibi that was supported by multiple witnesses, including Mr. Fox and Mr. Ferrell.

122.    Because of this, Defendants Joseph, York, and Eubanks conducted a second interview of Mr. Fox on December 3, 2011 that lasted hours.

123.    The purpose for that interview is transparent; the Defendant Officers intended to coerce Mr. Fox into falsely claiming that Mr. Anderson left during the daylight hours of November 23, 2011 with Mr. Sizemore and Mr. Wiggins and thus, was a participated in the murder.

124.    Because of their desire to frame Mr. Anderson, the Defendant Officers made dozens of threats against Mr. Fox in their attempt to fabricate a false statement.

125.    But Mr. Fox continued telling the Defendant Officers that their fabricated story was false.  After two hours, the Defendant Officers plan to coerce and fabricate a false statement against Mr. Anderson was failing miserably because Mr. Fox continued telling the truth.

126.    At that point, the Defendant Officers upped the ante and used a level of coercion that has no legitimate place in law enforcement.

127.    At that point, Defendant York got incredibly close to Mr. Fox and stated, "I know you are very uncomfortable with me being this close to you.  I know

19

that…I do that for a reason.  You know why I get this close?  To make you uncomfortable, it works…"

128.   Shortly thereafter, Defendant York, in the presence of Defendant Eubanks, again attempted to fabricate Mr. Fox's statement by telling him, "You know that that car and Bobby was at Bill-Bill's house before he got killed. You know that. And I know you know that."

129.   Mr. Fox replied by stating that he didn't know what Defendant York was talking about.  Specifically, Mr. Fox retorted, "I never seen the car there during the day.  I seriously did not…"

130.   At that point, Defendant York resorted to physical violence as part of the Defendant Officers plan to coerce Mr. Fox into falsely implicating Mr. Anderson in the murder.

131.   A recording captures Defendant York resorting to physical violence against Mr. Fox while yelling, "I'm going to put you in fucking prison because you God damn lied to me.  I'm so fucking sick of this God damn bullshit. You fucking lied…Fuck you, fuck you, fuck you.  Let's put his ass in the fucking jail."

132.   Shortly thereafter, Defendant Eubanks threatened to charge Mr. Fox with complicity to commit murder due to his refusal to lie against Mr. Anderson.

133.   Having committed egregious misconduct, the Defendants Officers moved forward with their plan to initiate false charges against Mr. Anderson.

## The Wrongful Prosecution of Mr. Anderson

134.   On December 3, 2011, Defendant Mefford signed a criminal complaint and initiated charges against Mr. Anderson for the murder of Mr. Wiggins.

135.   Shortly thereafter, Defendants Mefford, York, and Joseph arrested Mr. Anderson.

136.   The Defendant Officers knew that the statements from Mr. Sizemore that were used to initiate charges against Mr. Anderson were false, fabricated, and the product of improper coercion.  Even still, the Defendant Officers used these statements to falsely initiate charges against Mr. Anderson.

137.   At the time, the Defendant Officers knew that probable cause did not exist to initiate charges against Mr. Anderson.  Nonetheless, the Defendant Officers continued to set Mr. Anderson's prosecution in motion.

138.   In their conspiracy to frame Mr. Anderson, sometimes acting alone and sometimes acting in concert, the Defendant Officers manipulated and manufactured a number of witnesses including Mr. Sizemore, Mr. Gray, Mr. Evans, and others. The Defendant Officers threatened and coached Mr. Sizemore and others, and otherwise induced individuals who otherwise had no knowledge to be false witnesses, with the result that several witnesses made false statements about Mr. Anderson and falsely implicated him in the murder of Mr. Wiggins.

139.   Although no one—not the Bell County court, not the prosecutors, and not Mr. Anderson or his attorneys—was aware of it at the time, the Defendant

Officers fabricated or manipulated all of the evidence of guilt in this case, including the false statements and false testimony of other witnesses.

140.   Prior to Mr. Anderson's acquittal, the Defendant Officers actively concealed the falsity of the evidence they fabricated, the methods by which they fabricated, and the scope of their fabrication.

141.   As a result of the Defendant Officers continued fabrication of evidence, continued withholding of material exculpatory evidence, and continued manipulation of witnesses, Mr. Anderson was subject to continued prosecution on capital murder charges.

142.   Sometimes acting alone, and sometimes acting in concert, the Defendant Officers, over the course of more than four years, also manipulated physical evidence, manufactured false inculpatory evidence, and lost or destroyed material exculpatory evidence.

143.   The evidence that was fabricated, falsified, and manufactured by the Defendant Officers was the only evidence linking Mr. Anderson to the murder that he was charged with and was the only basis upon which prosecutors filed and maintained charges against him.

144.   Sometimes acting alone and sometimes acting in concert, the Defendant Officers, for more than four years, concealed from prosecutors, Mr. Anderson, and his defense counsel both the falsity of the witness statements and the unlawful methods by which they procured and fabricated this evidence.

145.    Sometimes acting alone and sometimes acting in concert, the Defendant Officers, for more than four years, withheld, concealed, or destroyed material exculpatory evidence, keeping that evidence from prosecutors, the court, Mr. Anderson, and his defense counsel.

146.    The Defendant Officers actively misled prosecutors, who relied on the false evidence fabricated by the Defendant Officers to continue to pursue the prosecution of Mr. Anderson.

147.    The Defendant Officers continued this misconduct even after the initiation of charges against Ms. Anderson.  They did so through coercion and promises of consideration to a jailhouse snitch.

**Defendants Fabricate Jeremiah Evans Statement**

148.    On the eve of trial, the Defendant Officers were fearful that that their conspiracy would not result in Mr. Anderson's conviction.

149.    Thus, in April of 2016, the Defendant Officers solicited assistance from Defendant Lawson, another officer at the Kentucky State Police.

150.    At the time of the request, the Defendant Officers were aware that Defendant Lawson previously arrested Jeremiah Evans and that Mr. Evans was previously incarcerated with Mr. Anderson.

151.    As part of the Defendant Officers' plan, Defendant Lawson retrieved Mr. Evans. According to Mr. Evans, he had no choice but to go with Defendant Lawson and felt like a "marked man."

152.    Shortly thereafter, Defendants Lawson and Johnson met with Mr. Evans.

153.    Defendant Johnson met with Mr. Evans on multiple occasions in his quest to create a false and fabricated statement.

154.    As a result of those meetings, the Defendant Officers obtained a false and fabricated statement from Mr. Evans that implicated Mr. Anderson in Mr. Wiggin's murder.  According to Mr. Evans' false statement, Mr. Anderson confessed to participating in the murder.

155.    Mr. Evans statement was false and fabricated by the Defendant Officers.  Indeed, Mr. Anderson never confessed to the murder and had always maintained his innocence.

### Mr. Anderson is Exonerated at Trial

156.    For more than four years, the Defendant Officers contrived to frame Mr. Anderson for the murder of Mr. Wiggins and deprived him of his freedom without due process of law.

157.    On May 25, 2016, the jury hearing Mr. Anderson's trial found him not guilty of Mr. Wiggins' murder.

158.    The jury's verdict and the evidence at trial was a decision on the merits and indicative of his innocence.

### Mr. Anderson's Damages

159.    Mr. Anderson spent more than four years incarcerated in the county jail for a crime he did not commit.  He must now attempt to make a life for himself

24

without the benefit of nearly five years' worth of experiences, which normally equip adults for that task.

160.    Additionally, the emotional pain and suffering caused by losing those years has been substantial.  During his incarceration, he was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right.  Mr. Anderson missed out on the ability to share holidays, births, funerals, and other life events with loved ones, including his wife and five children, and the fundamental freedom to live one's life as an autonomous human being.

161.    As a result of the foregoing, Mr. Anderson has suffered tremendous damage, including but not limited to physical harm, mental suffering, and loss of a normal life, all proximately caused by Defendant Officers misconduct.

### Count I – 42 U.S.C. § 1983
### Malicious Prosecution

162.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

163.    As described more fully above, all of the Defendant Officers, while acting individually, jointly and in conspiracy, as well as under color of law and within the scope of their employment, deprived Mr. Anderson of his constitutional right to be free from unlawful prosecution and continued detention without probable cause.

164.    In the manner described more fully above, the Defendant Officers made, influenced and/or participated in the decision to prosecute Mr. Anderson for

murder, for which prosecution there was no probable cause and which caused Mr. Anderson to suffer a deprivation of liberty. Their misconduct included falsifying evidence and withholding exculpatory and impeachment evidence.

165.     As described more fully above, the prosecution was resolved in Mr. Anderson favor.

166.     The Defendant Officers' misconduct directly resulted in the unlawful prosecution and continued deprivation of Mr. Anderson's liberty in violation of his constitutional rights.

167.     As a result of this violation of his constitutional rights, Mr. Anderson suffered injuries, including but not limited to bodily harm and emotional distress, as is more fully alleged above.

168.     The Defendant Officers' misconduct, as described in this Count, was objectively unreasonable and was undertaken intentionally with malice and willful indifference to Mr. Anderson's constitutional rights.

169.     The misconduct described in this Count was undertaken pursuant to a routine practice of the Knox County Sheriff's Department to pursue wrongful prosecutions and wrongful convictions through reckless and profoundly flawed investigations and coerced evidence. In this way, Defendant Knox County violated Mr. Anderson's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

170.     These widespread practices, so well-settled so as to constitute *de facto* policy in the Knox County Sheriff's Department, were able to exist and thrive

because municipal policymakers with authority over these entities exhibited deliberate indifference to the problem, thereby effectively ratifying it.

171.   The widespread practices described in the preceding paragraphs were allowed to flourish because the municipal defendants declined to implement sufficient training and/or enforce legitimate oversight and punishment.

## Count II – 42 U.S.C. § 1983 – Fourth and Fourteenth Amendments
## Fabrication of False Evidence

172.   Each paragraph of this Complaint is incorporated as if restated fully herein.

173.   In the manner described more fully above, the Defendant Officers, individually, jointly and in conspiracy with each other, fabricated evidence, including without limitation, false police reports, fabricated statements attributed to witnesses, and fabricated testimony offered at grand jury and other pretrial proceedings.  The Defendant Officers knowingly fabricated this evidence and a reasonable likelihood exists that the false evidence affected the decision of the grand jurors and courts that considered this false evidence when determining whether probable cause existed.

174.   The Defendant Officers were acting under color of law and within their scope of employment when they took these actions.

175.   The Defendant Officers' misconduct directly resulted in the unjust continued incarceration of Mr. Anderson, thereby denying him of his constitutional right to due process as guaranteed by the U.S. Constitution.  Absent this misconduct, there would have been no probable cause for Plaintiff's continued

27

detention, and the prosecution of Plaintiff could not and would not have been pursued.

176.    As a direct and proximate result of the Defendant Officers' actions, Mr. Anderson's constitutional rights were violated and he suffered from injuries and damages, including but not limited to the loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**Count III: 42 U.S.C. § 1983 – Fourteenth Amendment**
***Due Process***

177.    Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

178.    In the manner described more fully above, the Defendant Officers, acting individually, jointly, and in conspiracy with each other, destroyed, failed to disclose, and otherwise withheld and/or suppressed exculpatory information and material from the prosecution, Plaintiff, and Plaintiff's defense counsel.

179.    The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

180.    The Defendant Officers' misconduct directly resulted in the unjust criminal conviction of Plaintiff, thereby denying him his constitutional right to a fair trial guaranteed by the U.S. Constitution. By their actions, the Defendant Officers thereby misled and misdirected the criminal prosecution of Plaintiff. Absent this misconduct, the prosecution of Plaintiff could not and would not have

been pursued, and there is a reasonable probability that he would not have been convicted.

181.    Furthermore, in the manner described more fully above, one or more of the Defendant Officers, including Defendants Pickard and York, continued to withhold and/or suppress exculpatory evidence from Plaintiff even after his criminal trial.

182.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the Defendant Knox County as police officers regularly used unconstitutional measures to falsely implicate criminal suspects, including by withholding and/or suppressing exculpatory evidence. For instance, it was a widespread practice and custom of the officers in the Department not to turn over investigative notes, including statements of witnesses, taken during the course of an investigation. As a matter of practice, such memos and notes were destroyed after the creation of typewritten official reports that were placed into an investigation file.

183.    This widespread practice was so well-settled as to constitute de facto policy in the Knox County Sheriff's Department, and it was allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

184.    Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because the Defendant Knox County and the Department declined to implement sufficient policies or training on officers'

29

obligation to disclose exculpatory and impeachment evidence under *Brady v.*

*Maryland*, 373 U.S. 83 (1963), and related case law, even though the need for such

policies and training was obvious. The Defendant Knox County and department also

declined to implement any legitimate mechanism for oversight or punishment of

officers who violated their *Brady* obligations, thereby leading officers to believe that

they could violate citizens' constitutional rights with impunity.

185.    In addition, the misconduct described in this Count was undertaken

pursuant to the policy and practice of the Defendant Knox County and the

department in that the violation of Plaintiff's rights described in this Count was

caused by the actions of policymakers for these Defendants.

186.    Defendant Knox County is liable because the violation of Plaintiff's

rights as described in this Count was caused by the policies, practices, customs,

and/or actions of policymakers for these Defendants.

187.    As a direct and proximate result of the Defendants' actions, Plaintiff's

constitutional rights were violated and he suffered injuries and damages, including

but not limited to loss of liberty, physical sickness and injury, emotional pain and

suffering, and other grievous and continuing injuries and damages as set forth

above.

### Count IV – 42 U.S.C. § 1983
### Supervisory Liability

188.    Each paragraph of this Complaint is incorporated as if restated fully

herein.

189.    The continued wrongful detention of Plaintiff was caused by the deliberate indifference and recklessness of supervisory defendants, including but not limited to Defendant Pickard and Defendant Joseph, when they failed to adequately train and supervise the individual Defendant Officers.

190.    Specifically, these supervisory defendants were personally involved in the case against Plaintiff and knew or, in the absence of their deliberate indifference and recklessness, should have known of their subordinates' unconstitutional actions and related misconduct in the case.

191.    Furthermore, these supervisory defendants failed to supervise the Defendant Officers in constitutionally adequate law enforcement practices, particularly those which concerned interviews of suspects and the production of exculpatory evidence, thereby encouraging and/or permitting these employees and other defendants to engage in a reckless investigation, to coerce and fabricate false inculpatory evidence and to withhold exculpatory and impeachment evidence, which caused the constitutional deprivations suffered by Mr. Anderson.

192.    These interview techniques, failures in producing exculpatory evidence, fabrications and other investigative procedures were contrary to accepted methods used by law enforcement agencies.  The fact that the defendant supervisors failed to train and supervise their subordinates to ensure that they employed proper investigation procedures demonstrates deliberate indifference and reckless disregard for Mr. Anderson's constitutional rights.

193.    The personal involvement of the defendant supervisors, through their actions and omissions, proximately and directly caused the constitutional deprivations and grievous personal injuries suffered by Mr. Anderson, including the above-mentioned injuries and damages.

194.    The misconduct described in this Count was objectively unreasonable, and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Mr. Anderson's clearly established constitutional rights.

### Count V - 42 U.S.C. § 1983
### Failure to Intervene

195.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

196.    In the manner described above, during the constitutional violations described above, one or more of the Defendant Officers stood by without intervening to prevent the misconduct, despite having a reasonable opportunity to do so.

197.    As a result of the Defendant Officers failure to intervene to prevent the violation of Mr. Anderson's constitutional rights, he suffered pain and injuries, as well as emotional distress.

198.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Mr. Anderson's rights.

199.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the Knox County Sheriff's Department in the manner

described more fully in preceding paragraphs, and was tacitly ratified by policymakers for the municipal defendants with final policymaking authority.

## Count VI - 42 U.S.C. § 1983
## Conspiracy to Deprive Constitutional Rights

200.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

201.   After Mr. Wiggins was murdered, the Defendant Officers reached an agreement amongst themselves to frame Mr. Anderson for Mr. Wiggins' murder, and to thereby deprive him of his constitutional rights and his liberty to be continuously taken away from them, all as described in the various Paragraphs of this Complaint.

202.   In this manner, the Defendant Officers, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

203.   In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

204.   As a direct and proximate result of the illicit prior agreement referenced above, Mr. Anderson's rights were violated, and he suffered financial damages, as well as severe emotional distress and anguish, as is more fully alleged above.

205.   The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

206.   The misconduct described in this Count was undertaken pursuant to the policies and practices of the Knox County Sheriff's Department in the manner described more fully in preceding paragraphs, and was tacitly ratified by policymakers for the municipal defendants with final policymaking authority.

## Count VII - 42 U.S.C. § 1983
### *Monell* Claim Against Defendant Knox County

207.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

208.   The actions of Knox County officers in withholding material exculpatory information from Mr. Anderson and his counsel were undertaken pursuant to the policies and practices of the Knox County Sheriff's Department, described above, which were ratified by policymakers for the Knox County Government with final policymaking authority.  These policies and practices included the failure to adequately train, supervise, and discipline officers on the requirements concerning the prompt disclosure of newly discovered evidence that exonerates a defendant following his arrest or conviction.

209.   The policies and practices described in this Count were maintained and implemented by the Knox County Government with deliberate indifference to Plaintiffs' constitutional rights.

210.   As a direct and proximate result of the Knox County Government's actions, Plaintiffs' constitutional rights were violated and they suffered injuries and damages, as set forth in this Complaint.

211.    The Knox County Government is therefore liable for the misconduct committed by its officers.

## Count VIII – State Law Claim
## Malicious Prosecution

212.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

213.    Through their actions as described above, the Defendant Officers caused Mr. Anderson to be improperly subjected to a prosecution for which there was no probable cause.  These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were ultimately terminated in Mr. Anderson's favor and in a manner indicative of his innocence.

214.    The Defendant Officers accused Mr. Anderson of criminal activities knowing those accusations to be without genuine probable cause; fabricated evidence and withheld the manner in which that evidence was fabricated; and made statements and reports to the police and/or prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

215.    The misconduct described in this Count was undertaken with malice, bad faith, and in a wanton and reckless manner, and was undertaken by the Defendant Officers within the scope of their employment and/or official responsibilities.

216.    As a result of this misconduct, Mr. Anderson suffered injuries, including bodily harm and emotional pain and suffering as more fully alleged above.

## Count IX – State Law Claim
## Negligent Supervision

217.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

218.   The municipal defendants, as well as the supervisory defendants, including Defendant Pickard and Defendant Pickrell, had a duty to properly train and supervise officers, detectives, and supervisor employees of the Knox County Sheriff's Department and the Kentucky State Police, and to provide adequate policies to prevent the above conduct, including fabricating evidence, fabricating witness statements, and concealing material impeachment evidence.

219.   The municipal defendants and the supervisory defendants were grossly negligent and negligent in the training, supervision and discipline of the Defendant Officers, resulting in Mr. Anderson being deprived of his right to due process, and his right to be free from false arrest, false imprisonment, and wrongful conviction.

220.   As a result of this misconduct, Mr. Anderson suffered injuries, including bodily harm and emotional pain and suffering as more fully alleged above.

## Count X – State Law Claim
## Intentional Infliction of Emotional Distress

221.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

222.   As described more fully in the preceding paragraphs, by framing Mr. Anderson for a murder he did not commit, the Defendant Officers intended to cause

36

emotional distress, or knew or should have known that their actions would result in serious emotional distress.

223.    In doing so, the Defendant Officers' conduct was extreme and outrageous, going beyond all possible bounds of decency such that it can be considered completely intolerable in a civilized society, and this conduct caused Mr. Anderson to suffer serious emotional distress of the nature no reasonable man or woman could be expected to endure.

224.    The misconduct described in this Count was undertaken with malice, bad faith, and in a wanton and reckless manner, and was undertaken by the Defendant Officers within the scope of their employment.

225.    As a result of this misconduct, Mr. Anderson sustained injuries, including emotional pain and suffering, as is more fully alleged above.

## Count XI
## Respondeat Superior

226.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

227.    In committing the acts alleged in the preceding paragraphs, some of the Defendant Officers were members and agents of the Knox County Sheriff's Department, acting at all relevant times within the scope of their employment.

228.    Defendant Knox County is liable as principals for all state law torts committed by their agents.

WHEREFORE, Plaintiff, WILLIAM ANDERSON, respectfully requests that this Court enter judgment in their favor and against Defendants KNOX COUNTY, Knox County Sheriff JOHN PICKARD and Knox County Sheriff's Department Officer DEREK EUBANKS, Kentucky State Police Officers JASON YORK, BRIAN JOHNSON, MARK MEFFORD, JACKIE JOSEPH, TYSON LAWSON, and other unknown officers from the Knox County Sheriff's Department, and Kentucky State Police, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

## JURY DEMAND

Plaintiff, WILLIAM ANDERSON, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

/s/ Elliot Slosar
*One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Michael Kanovitz
Elliot Slosar
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
(312) 243-5900
Fax: (312) 243-5902