LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



# KENTUCKIANA
## —— COURT REPORTERS ——

## CASE NO.17-CV-133

## WILLIAM ANDERSON

## VS.

## KNOX COUNTY, ET AL.

## DEPONENT:

## BRYAN JOHNSON

## DATE:

## DECEMBER 3, 2019



a courtroom **powerhouse**

✉ schedule@kentuckianareporters.com
☎ 877.808.5856 | 502.589.2273



www.kentuckianareporters.com

1              IN THE UNITED STATES DISTRICT COURT

2                 EASTERN DISTRICT OF KENTUCKY

3                       LONDON DIVISION

4                     CASE NO. 17-CV-133

5                   HON. KAREN K. CALDWELL

6

7                     WILLIAM ANDERSON,

8                         PLAINTIFF

9

10                            V.

11

12                   KNOX COUNTY, ET AL.,

13                       DEFENDANTS

14

15

16

17

18

19

20

21

22

23   DEPONENT:   BRYAN JOHNSON

24   DATE:       DECEMBER 3, 2019

25   REPORTER:   LACEE TOWNSEND



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

2..5

---

Page 2

APPEARANCES

1

2

3  ON BEHALF OF THE PLAINTIFF, WILLIAM ANDERSON:

4  ELLIOT SLOSAR

5  LOEVY & LOEVY

6  311 NORTH ABERDEEN STREET

7  THIRD FLOOR

8  CHICAGO, ILLINOIS 60607

9  TELEPHONE NO.: (312) 243-5900

10  E-MAIL: ELLIOT@LOEVY.COM

11

12  ON BEHALF OF THE DEFENDANT, KENTUCKY STATE POLICE, JASON

13  YORK, JACKIE JOSEPH, TYSON LAWSON, BRYAN JOHNSON:

14  ALEA A. ARNETT

15  CODY WEBER

16  KENTUCKY STATE POLICE GENERAL COUNSEL

17  919 VERSAILLES ROAD

18  FRANKFORT, KENTUCKY 40601

19  TELEPHONE NO.: (502) 573-1636

20  E-MAIL: ALEA.ARNETT@KY.GOV

21         CODY.WEBER@KY.GOV

22

23

24

25

---

Page 3

APPEARANCES CONTINUED

1

2

3  ON BEHALF OF THE DEFENDANTS, KNOX COUNTY, DEREK EUBANKS

4  AND JOHN PICKARD:

5  JOHN KELLEY

6  WILLIAMS FARMER & TOWE

7  303 SOUTH MAIN STREET

8  P.O. BOX 3199

9  LONDON, KENTUCKY 40743

10  TELEPHONE NO.: (606) 877-5291

11  E-MAIL: JOHN@WFTLAW.COM

12

13  ALSO PRESENT:  STEPHANIE NALLEY, VIDEOGRAPHER

14

15

16

17

18

19

20

21

22

23

24

25

---

Page 4

INDEX

|  |  | Page |
|---|---|---|
| 3 | PROCEEDINGS | 7 |
| 4 | DIRECT EXAMINATION BY MR. SLOSAR | 8 |
| 5 | CROSS EXAMINATION BY MR. KELLEY | 226 |
| 6 | REDIRECT EXAMINATION BY MR. SLOSAR | 237 |

EXHIBITS

| Exhibit |  | Page |
|---|---|---|
| *1 | SUPPLEMENTAL REPORT DRAFTED BY BRYAN JOHNSON | 15 |
| *2 | SUPPLEMENTAL CRIME REPORT | 28 |
| *3 | COLLECTIVE LOWES VIDEO FOOTAGE PHOTOGRAPHS | 41 |
| *4 | ORIGINAL KYIBRS REPORT | 45 |
| *5 | BRYAN JOHNSON ANSWERS TO INTERROGATORIES | 240 |
| *6 | SUPPLEMENTAL CRIME REPORT | 57 |
| *7 | REQUEST FOR EVIDENCE EXAMINATION | 240 |
| *8 | FORENSIC LABRATORY REPORT | 61 |
| *9 | FORENSIC LABRATORY REPORT | 62 |
| *10 | FORENSIC LABRATORY REPORT | 240 |
| *11 | TRANSCRIPT OF JEFF GRAY STATEMENT - ANDERSON 37147 - 37211 | 72 |
| *12 | AUDIO FILE RECORDING OF JEFF GRAY INTERVIEW | 72 |

---

Page 5

EXHIBITS CONTINUED

|  |  | Page |
|---|---|---|
| *13 | FORENSIC LABRATORY REPORT | 74 |
| *14 | BRYAN JOHNSON GRAND JURY TESTIMONY - ANDERSON 9795 - 9807 | 77 |
| *15 | TRANSCRIPT OF RECORDED STATEMENT OF JAMES OTIS SIZEMORE - ANDERSON 37070 - 37146 | 80 |
| *16 | COLLECTIVE DOCUMENTS | 91 |
| *17 | AUDIO RECORDING OF INTERVIEW OF JAMES OTIS SIZEMORE | 102 |
| *18 | HANDWRITTEN NOTES - ANDERSON 9371 | 138 |
| *19 | UNIFORM CITATION | 148 |
| *20 | STATEMENT OF RIGHTS - KSP 96 | 149 |
| *21 | AUDIO RECORDING OF INTERVIEW OF WILLIAM ADERSON | 153 |
| *22 | AUDIO RECORDING OF INTERVIEW OF DAVE FOX | 172 |
| *23 | PRELIMINARY HEARING TRANSCRIPT | 198 |
| *24 | CRIME SUPPLEMENT REPORT | 186 |
| *25 | FORENSIC LABRATORY REPORT | 191 |
| *26 | CRIME SUPPLEMENT REPORT | 203 |
| *27 | JEREMY FERRELL STATEMENT TRANSCRIPT | 240 |
| *28 | BRYAN JOHNSON ENTIRE WRITTEN REPORT | 240 |

*WILL FORWARD UPON RECEIPT

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

6..9

---

**Page 6**

STIPULATION

The VIDEO deposition of BRYAN JOHNSON taken at HOLIDAY INN EXPRESS & SUITES, 506 MINTON DRIVE, LONDON, KENTUCKY 40741 on TUESDAY, the 3RD day of DECEMBER, 2019 at approximately 9:28 a.m.; said deposition was taken pursuant to the FERDERAL RULES of Civil Procedure. It is agreed that LACEE TOWNSEND, being a Notary Public and Court Reporter for the State of INDIANA, may swear the witness.

---

**Page 7**

PROCEEDINGS

VIDEOGRAPHER: My name is Stephanie Nalley. I'm the videographer today, and Lacee Townsend is the court reporter. Today is the 3rd day of December 2019, the time is 9:28 a.m. We're located at the Holiday Inn Express & Suites in London, Kentucky to take the deposition of Bryan Johnson in the matter of William Anderson versus Knox County, et al., pending in the United States District Court, Case number 17-CV-133. Will counsel please identify themselves for the record?

MR. SLOSAR: Elliot Slosar for the plaintiff.

MS. ARNETT: Amber Arnett for the Kentucky State Police defendants, including Detective Johnson.

MR. WEBER: Cody Weber for the Kentucky State Police defendants, including Detective Johnson.

MR. KELLEY: My name is John Kelley. I'm here on behalf of Sheriff John Pickard, Deputy Derek Eubanks, and Knox County, all of whom are defendant's in the lawsuit.

VIDEOGRAPHER: Mr. Johnson, would you please raise your right hand for the court reporter?

COURT REPORTER: Do you solemnly swear or affirm the testimony you are about to give will be

---

**Page 8**

the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes, I do.

COURT REPORTER: Thank you.

DIRECT EXAMINATION

BY MR. SLOSAR:

Q    Good morning, Mr. Johnson.

A    Good morning, sir.

Q    What's your current rank at the Kentucky State Police?

A    I'm a Detective, but it's -- it's the equivalent of a trooper.

Q    Okay.

A    Just a specialized duty.

Q    I just want to make sure that I'm not -- I don't want to refer to you as something if you had a higher rank than that, so I'll call you Detective Johnson, if that's okay.

A    That'd be perfectly fine, sir.

Q    Okay. I know -- I believe that you and I did a deposition before in the Hoskin's case. I just want to go over some of the rules again before we get started; is that okay?

A    Yes, sir.

Q    Okay. If at any point in time you want to

---

**Page 9**

take a break and get something to eat or drink or talk to your lawyer, please just let me know, okay?

A    Yes, sir.

Q    As you may have remembered from before, there are a lot of attorneys here, and the attorneys have the right to make objections. On almost every occasion, you're still going to answer the question. So you may hear some objections from them. A judge will determine later whether those are valid or not. But I'm still going to ask you some questions, and on almost every occasion, you'll still answer it, unless your attorney instructs you not to, okay?

A    Yes, sir.

Q    As you may remember, I'm not perfect at asking questions. So if there's a question that I ask you and you don't understand it, please let me know. I won't be offended, but what I will do is I'll ask it a better way; is that okay?

A    Yes, sir.

Q    And that same respect, if I ask you a question and you answer it, I'm going to assume that you understood what was being asked of you; is that okay?

A    Yes, sir.

Q    Is that fair? You're doing a great job, just continue. There's a video, but, you know, the court

---

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

10..13

Page 10

1 reporter, Lacee, she got tough job to do. So I'm going
2 to do my best to remind you to answer questions
3 verbally, instead of, like, nodding the head or "uh-huh"
4 or something like that, just so the record's clear. So
5 I'm going to try to do a good job of keeping you to
6 that, and if you can do your best as well, that'll help
7 me, okay?
8     A   Yes, sir. I will.
9     Q   All right. Now, Detective Johnson, where are
10 you currently assigned in the Kentucky State Police?
11    A   I'm currently assigned to the electronic crime
12 branch.
13    Q   What do you do in that capacity?
14    A   In that capacity, we are a member of the
15 Internet Crimes Against Children Task Force, and our job
16 mainly involves sexual exploitation and loitering of
17 children online.
18    Q   How long have you been in that unit, sir?
19    A   Since January 1, 2017.
20    Q   And prior to being assigned to that unit,
21 where were you at within the Kentucky State Police?
22    A   Prior to serving in electronic crime branch, I
23 was assigned to Post 10 and Harlan.
24    Q   And what years would you have been -- would
25 you have been assigned to Post 10 and Harlan?

Page 11

1     A   I was there from the completion of the
2 Kentucky State Police Academy, which was December the --
3 I believe the 20, 2005 up until December 31, 2016, would
4 be.
5     Q   Why did you leave Post 10 to go to the
6 Internet Crimes task force?
7     A   It's an interest that I have. I've always --
8 have being a part-time member of the Internet Crimes
9 Against Children Task Force since 2007. I just think
10 the mission that they are doing is extremely important,
11 and I just want to try to protect our children.
12    Q   That -- did that unit sort of resonate more
13 with you than the type of work you were doing at Post
14 10?
15    A   I'm going to ask you just to describe
16 "resonate."
17    Q   Sure. Did you feel that the type of work that
18 you're doing in the internet crimes division to protect,
19 you know, innocent children, did that call to you more
20 than the type of work you were doing at Post 10?
21    A   That's -- that's -- that's a difficult
22 question, because I mean, every phase of my employment,
23 you know, I feel is equally as important. You know,
24 working the road, you know, doing traffic enforcement, I
25 think that is an extremely important job for -- for us

Page 12

1 to do. Investigations, same thing. So I've had --
2 again, since I've been a part-time member, I've had an
3 interest in the electronic crime branch. But up until
4 2017, it was a centralized unit out of Frankfort. And
5 my family situation, I'm not able to move to Frankfort
6 to do that position. But they opened up regional
7 positions, which started in 2017, and that's why the
8 opportunity was there for me to -- to take that.
9     Q   Is it fair to say that one of the more
10 valuable aspects of working the internet crimes task
11 force is the ability to protect innocent children?
12    A   Absolutely.
13    Q   And as a law enforcement officer, would you
14 agree that protecting innocent people is an important
15 part of your day-to-day work?
16    A   Yes.
17    Q   Yeah. Can you think of a more tragic thing to
18 happen than the initiation of charges against an
19 innocent person?
20        MR. ARNETT: Object to form.
21    A   Again, that's -- that's a difficult --
22 difficult question to ask, because I see a lot of
23 horrific things happened to a lot of horr -- you know,
24 innocent people. And it's -- don't want to see it
25 happened to nobody.

Page 13

1     Q   You certainly, as a law enforcement officer,
2 would never want to be responsible for the initiation of
3 charges against an innocent person; is that right?
4     A   Correct.
5         MR. ARNETT: Object to form.
6     Q   And you certainly -- as a law enforcement
7 officer, you wouldn't want to be responsible for the
8 initiation of charges against an innocent person and the
9 key as for which the death penalty was sought. Would
10 you agree with that?
11        MS. ARNETT: Object to form.
12    A   Yes.
13    Q   And is it fair to say, Detective Johnson, that
14 the Wiggins homicide investigation, this is an
15 investigation that you think about often?
16    A   As much as any other investigation I've
17 worked. I mean, they're -- they all have -- you know,
18 yeah, they're -- there all things I think about. It --
19 I mean, it's -- it's work. It's my job.
20    Q   But in your career, have you had another case
21 that you've worked on where somebody was charged with
22 capital murder and acquitted at trial?
23    A   No, sir.
24    Q   That's the only one, right?
25    A   Yes, sir.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

14..17

---

Page 14

1    Q    And is it fair to say that prior to trial, you
2  had concerns about whether Mr. Anderson was involved in
3  the murder of Bobby Wiggins?
4        MS. ARNETT:  Object to form.
5    A    I'm not sure what you mean, I "had concerns."
6    Q    Well, is it fair to say that -- we're going to
7  go through a lot of statements.  But is it fair to say
8  that during the underlying investigation into the death
9  of Bobby Wiggins, that James Otis Sizemore lied about
10  his involvement in the Wiggins homicide investigation?
11  Would you agree with that?
12        MS. ARNETT:  Object to form.
13    A    Yes.
14    Q    Mr. Sizemore, to -- you've -- you had the
15  opportunity to participate in, I believe, at least two
16  interviews with James Otis Sizemore; is that right?
17    A    I don't remember if it was exactly two, but I
18  had a -- couple or a few, yes.
19    Q    Yeah.  And there's a recording that's been
20  tendered to us in this case that was obtained
21  on December 3, 2011.  Do you recall participating in a
22  questioning of Mr. Sizemore in or around December 3,
23  2011, after returning back from Redbird Mountain?
24    A    Yes, sir.  I believe that's so.
25    Q    Okay.  And then I believe that there was --

---

Page 15

1  there's a case report, and we're going to -- actually
2  I'm going to hand you what's marked as Exhibit number 1.
3  I have given a copy to counsel.  And, sir, I'm going to
4  refer you to page -- it's got the little "page 9 of 11"
5  at the bottom, if you want to turn there.  And I guess
6  before we dig too far into this, this report that you're
7  looking at, this is a report that you drafted.  Is that
8  right, sir?
9        (EXHIBIT 1 MARKED FOR IDENTIFICATION)
10    A    Yes, sir.
11    Q    Okay.  And is this a supplement -- a
12  supplemental report that you drafted in the Wiggins
13  homicide investigation?
14    A    (No verbal response.)
15    Q    The only reason why I asked that is, on the
16  first page, it says, "Supplement," and I don't know if
17  that's what you would char -- what would you
18  characterize this report as?  That's a better question.
19    A    Just my investigation notes, sir.
20    Q    Okay.  These are your investigation notes.
21  Does this have any sort of formal name at KSP or...
22    A    It's just the KYIBRS report.
23    Q    Okay.
24    A    And this is just the case notes that -- that
25  are inputted at the end of that report.

---

Page 16

1    Q    Okay.  On page 9, it says on December 5, 2011,
2  that you went to the Knox County Detention Center and
3  recontacted Mr. Sizemore; is that right?
4    A    Yes, sir.
5    Q    Okay.  And on December 5, 2011, did you go to
6  the Knox County Detention Center to question Mr.
7  Sizemore about the Wiggins homicide?
8    A    Yes, sir.  I have the minutes in my notes.
9    Q    Wouldn't have written it in here if it wasn't
10  true, right?
11    A    Well, I don't want to say that, because if I
12  made a unintentional, you know, typographical error and
13  put the wrong date, then -- then I don't want to say
14  it's true just because I listed it, but I'm -- I'm
15  almost certain that on the 5th I did go to the Knox
16  County Detention Center and recontact Mr. Sizemore, as
17  stated.
18    Q    Do you recall who questioned Mr. Sizemore with
19  you that day?
20    A    No, sir.
21    Q    Do you recall whether any other KSP officers
22  were with you?
23    A    I don't recall.
24    Q    Do you recall how long you met with Sizemore
25  that day?

---

Page 17

1    A    No, sir.
2    Q    Now, according to your report, Mr. Sizemore
3  gave you a statement on December 5, 2011; is that right?
4    A    Yes, sir.
5    Q    And according to your report, the statement
6  that Mr. Sizemore gave to you on December 5, 2011, was
7  recorded and placed in the case file; is that right?
8    A    Yes, sir.
9    Q    Yeah.  I'll represent to you that we have --
10  in this litigation, we have not been tendered a
11  recording of the December 5, 2011 statement.  Do you
12  know what happened to that recorded statement that you
13  obtained from Mr. Sizemore on December 5, 2011?
14    A    No, sir.
15    Q    Do you know why it wouldn't be maintained as
16  part of the Wiggins homicide file?
17    A    No, sir.
18    Q    Did you review any documents, Detective
19  Johnson, in preparing for today's deposition?
20    A    I think I've reviewed a couple paragraphs of
21  my investigative notes, but that's -- that's about it.
22    Q    Did you listen to any of the audio recorded
23  statements that were obtained in the case?
24    A    Not to prepare for today, no, sir.
25    Q    Okay.  When's the last time you listened to

---

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

18..21

Page 18

1   any of the audio recorded statements?
2       A    The first couple times that we had a
3   deposition scheduled, I spent a lot of time going
4   through and trying to do, and as those kept getting
5   delayed, it's been so -- a year or so, I guess.
6       Q    I'm sorry about that, a lot.
7       A    It's okay.
8       Q    When you -- about a -- you know,
9   approximately-- at least since the filing of the
10  lawsuit, you have had an opportunity to review some of
11  the audio recorded statements in this case, correct?
12      A    Yes, sir.
13      Q    Okay.  And did you go back and listen to any
14  of Mr. Sizemore's statements?
15      A    I'd listened to some.
16      Q    Okay.  Did you listen to -- today we have --
17  I'll represent to you that we have two audio -- well, we
18  have two different audio recordings that contain a
19  single interview that was done of Mr. Sizemore by
20  Sheriff Pickard and Deputy Eubanks.  Do you recall
21  whether you listened to any of those after the filing of
22  the lawsuit?
23      A    I don't know if I've listened to those after
24  the filing of the lawsuit.  I don't recall specifically.
25      Q    Do you recall whether you listened to those

Page 19

1   prior to trial?
2       A    Yes, sir.
3       Q    Okay.  Now, the other recording that we have
4   that involves Mr. Sizemore, that is the recording that
5   contains interview that Detective York primarily led.  Do
6   you recall that?
7       A    Is that the one you're referring to on
8   December 3?
9       Q    Yeah, yeah.
10      A    Yes, sir.
11      Q    I think, at least when I listened to it, the
12  majority of the voices that I hear are either Mr.
13  Sizemore or Mr. York.  Is that another recording that
14  you listened to prior to today's deposition at some time
15  over the past year?
16      A    If it's the statement with Mr. Sizemore that
17  was conducted at the -- after we departed from Redbird
18  Mountain, Detective York, I believe, did lead most of
19  that, yes.
20      Q    Okay.  And to your -- to the best of your
21  recollection, on December 3, 2011, did you -- were you
22  present for the entire recorded statement obtained from
23  Mr. Sizemore that day?
24      A    I'm not sure.
25      Q    Okay.  Sitting here today, do you have any

Page 20

1   independent recollection of ever leaving the room?
2       A    Not specifically, but I mean, it's possible I
3   could have stepped out momentarily, but I don't recall.
4       Q    Now, is it fair to say that you have a
5   different style of questioning witnesses and suspects in
6   criminal investigations than Detective Jason York?
7       MS. ARNETT:  Object to form.
8       A    I use my -- have my own techniques, what I
9   feel that, through my training and experiences, works
10  for me.
11      Q    And would you agree that your techniques in
12  questioning witnesses and suspects are -- that those are
13  different techniques than the ones that Detective York
14  used in this case?
15      A    I guess some portions of it, yes.
16      Q    Yeah.  Let me ask you this:  At trial, do you
17  recall -- prior to trial, do you recall having a
18  conversation with Jackie Pickrell who now goes by the
19  name of Jackie Joseph, about a recorded interview of
20  Dave Fox?
21      A    Before trial?
22      Q    I think it was either before or during trial.
23      A    It was during.
24      Q    During trial?  What do you recall about this
25  conversation that you had with Ms. Pickrell?

Page 21

1       A    We took a lunch break during court, and we had
2   went to -- went to eat.  And while we were at lunch, a -
3   - Jackie made a -- a statement that -- something on the
4   lines of she dreads when they play the interview with
5   Dave Fox of Jason York, and I told her that I'd -- I've
6   not heard anything that I feel would be bad or dreadful.
7   And she said that there was an interview to where the
8   language was there, and I told her I wasn't aware of
9   that.  And she said that there was one.  And once we
10  concluded there was a interview -- a statement that I
11  was not aware of, that had not been provided to the --
12  prosecutor or for discovery, that we -- needed to be
13  reported.  So we left lunch and went back and confronted
14  the prosecutor, Karen Greene Blondell.  And she was
15  Sergeant Joseph at the time, Sergeant Pickrell.  Told
16  her what we discovered at lunch, and Ms. Blondell said
17  that the judge needs to be made aware.  So we went
18  before the judge, and the judge said that if that
19  recording exists, it needs to be provided.  So Sergeant
20  Pickrell went and -- she had it in her car, but I don't
21  know if it was on a digital recording device or if it
22  was on a CD.  I don't know.  I believe it was on a
23  digital recording device, I believe, but -- and she
24  brought that back.  Copies were made and provided to the
25  prosecution and the defense.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

22..25

**Page 22**

1    Q    Prior to this conversation that you had with
2  Ms. Pickrell, had you ever been made aware that Dave Fox
3  was questioned by Detective York or Ms. Pickrell?
4    A    I did not know that interview had been
5  conducted, no, sir.
6    Q    Yeah. And to this day, have you ever seen a
7  single police report that was drafted by Detective York,
8  Ms. Pickrell, or Derek Eubanks about that particular
9  interview of Dave Fox?
10    A    No, sir. I don't recall one.
11    Q    And so during trial, when Ms. Pickrell
12  revealed that there was this concerning recording out
13  there, that would have been the first time that you were
14  made aware that a recorded interview of Dave Fox existed
15  outside of the Knox County Sheriff's Department
16  interview of Mr. Fox on December 1, 2011; is that fair?
17    A    Yes, sir.
18    Q    And when you were made aware that this
19  recording existed, you immediately took steps to recover
20  that recording and disclose it to the court; is that
21  right?
22    A    Yes, sir.
23    Q    Now, do you recall where that Dave Fox
24  recording -- where that was recovered from?
25    A    Again, I know -- again, Sergeant Pickrell said

**Page 23**

1  she had it. She believed she had a copy of it in her
2  car. But I wasn't with her when she went to retrieve
3  that. So I can't say specifically.
4    Q    Okay. But you didn't go back to the post to
5  find it; is that fair?
6    A    That's correct.
7    Q    Okay. Now, did Ms. Pickrell ever inform you
8  as to why that recording wasn't maintained as part of
9  the case file?
10    A    I believe Ms. Pickrell stated that she -- when
11  she reviewed the case file at post, she seen a statement
12  that had been obtained of Mr. Fox. And she -- I believe
13  she had said that she was not aware that there was a
14  statement the Sheriff's Office had took of Dave Fox that
15  was in the case. So when she seen that interview in the
16  case file, she thought that it was of the one that, you
17  know, we were talking about. That's -- that's what she
18  had disclosed.
19    Q    Prior -- well, prior to trial, did Detective
20  York ever inform you that he had interviewed Dave Fox
21  about the Wiggins homicide?
22    A    I don't recall that.
23    Q    Now --
24    A    I don't -- I don't recall.
25    Q    At some point -- we're going to start at the

**Page 24**

1  beginning. So at -- and we'll go chronologically. But
2  at some point, you became the lead detective on the
3  Wiggins homicide investigation; is that right?
4    A    Yes, sir.
5    Q    Okay. Do you recall approximately when it
6  would have been that you became the lead detective on
7  this case? And use this report if that would help you,
8  sir.
9    A    On Friday, December 2, 2011. I'm looking to
10  try to find the time. I don't remember. I know it was
11  in the afternoon, but --
12    Q    It looks like on page 4 it has the -- it
13  starts with December 2nd. Oh, it looks like that's
14  where you -- so it seems like you got to the scene at
15  15:41 hours?
16    A    I arrived -- the location to where the body of
17  Mr. Wiggins was recovered was up in the woods. It was
18  difficult terrain to navigate to, and my vehicle at the
19  time was not capable of making it. And at 15:41 hours
20  on December the 2nd, myself and Detective Abner, we
21  arrived at the end of Kentucky 718, which is where the
22  logging road then goes up into the woods. And at that
23  point, the -- Sheriff Pickard, he had a four-wheel drive
24  vehicle, picked us up and then took us to the scene. And
25  I arrived at to where the body was located at 15:53.

**Page 25**

1    Q    And I know at 16:00 hours, it looks like you
2  arrived at the location of the body with Detective
3  Abner, Detective York, and Deputy Eubanks; is that
4  right?
5    A    Yes, sir.
6    Q    And when you got to the body, what did you
7  begin to do up there?
8    A    Once we arrived, I began taking photographs of
9  the area and just conducting a search of the area for --
10  for any items of evidence.
11    Q    And ultimately, was a belt recovered about 47
12  feet from the edge of the logging road?
13    A    Yes, sir.
14    Q    Okay. And while you were up on the mountain,
15  were coordinates taken to determine what county the body
16  was located in? Do you recall that?
17    A    The coordinates were, I believe, obtained
18  prior to me becoming involved. The -- which is how
19  based upon those coordinates they were able to determine
20  which county that Mr. Wiggins' remains were in. And
21  being in Bell County, that is why I was contacted.
22    Q    Fair enough. So it's your belief -- and I
23  know it's been eight years. But it's your belief that
24  the coordinates from where the victim's body was
25  recovered would've been obtained prior to you arriving

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

Page 26

1   at the scene; is that right?

2        A    Yes.  They did obtain the coordinates prior to

3   me arriving.

4        Q    Okay.  And it's your belief that the

5   coordinates would've been obtained prior, because if the

6   body was located in Knox County, then you likely would

7   not have ever have had to go to the scene; is that

8   right?

9        A    I don't -- I don't think I could say I would

10  not have went to the scene, but I -- it's likely that I

11  would not have been the lead detective assigned the

12  case.

13       Q    Fair enough.  If the body was recovered in

14  Knox County, would Detective York have remained the lead

15  in this case?

16            MS. ARNETT:  Objection.  Calls for

17       speculation.

18       A    I'm not sure.  That would've been up to -- to

19  one of the supervisors to -- to decide who was going to

20  be the investigator, but...

21       Q    Now, at some point, Detective York -- was

22  Detective York removed from the investigation because of

23  his familial connections to a suspect in the

24  investigation or a person of interest?

25            MS. ARNETT:  Object to form.

Page 27

1            MR. KELLEY:  Objection.

2        Q    You can answer.

3        A    I have no -- I had no knowledge of any

4   connection, at this point.  I was assigned to the

5   investigation due to the location of the remains of Mr.

6   Wiggins, but...

7        Q    At what point did you learn that Detective

8   York was married to a cousin of Jeff Gray?

9        A    I want to think it was after the -- reading

10  the complaint from the -- the lawsuit.

11       Q    So it's your belief that -- well, let me ask

12  you a better way.  Let me withdraw that question.  Prior

13  to Mr. Anderson's criminal trial, do you recall

14  Detective York ever informing you that he was married to

15  a relative of Jeff Gray?

16       A    I don't -- I don't recall.

17       Q    Okay.  Not saying it didn't happen, just,

18  don't remember?

19       A    Yeah, I just -- yeah, I don't -- don't

20  remember.

21       Q    And Jeff Gray certainly is a person that you

22  did some investigation into relating to the Wiggins

23  homicide, correct?

24       A    Did I contact Mr. Gray?  Is that what -- I

25  mean, what do you mean the "investigation into"?  I just

Page 28

1   want to make sure that I'm answering --

2        Q    Fair enough.  Fair enough, Detective.  I

3   appreciate that.  I told you earlier to tell me when I'm

4   not asking a great question.  I appreciate you doing

5   that.  Well, did you conduct any investigation into

6   whether Jeff Gray was involved in the murder or cover up

7   of Bobby Wiggins?

8        A    I did obtain a statement to -- of Mr. Gray.

9        Q    You also obtained video footage from a Lowe's

10  Department Store in Corbin, Kentucky; is that right?

11       A    Yes, sir.

12       Q    Yeah.  And let me show you what we'll mark as

13  Exhibit number 2.  Now, sir, when you were working on

14  the Wiggins homicide investigation, is it fair to say

15  that at times you would document your investigative

16  steps in a formal report?

17            (EXHIBIT 2 MARKED FOR IDENTIFICATION)

18       A    Yes, sir.

19       Q    Okay.  And I've just handed you what we'll

20  mark as Exhibit number 2.  Do you recognize this

21  document?

22       A    Yes, sir.

23       Q    And what is this document, generally?

24       A    This document is a -- what I refer to as a

25  supplemental report.

Page 29

1        Q    Is it fair to say that when working on a

2   criminal investigation that it's important to document

3   steps that you're taking?

4            MS. ARNETT:  Object to form.

5        Q    You can answer.

6        A    Yes.

7        Q    Yeah.  And would you agree that it's

8   especially important to document investigative steps

9   taken in a homicide investigation?

10            MS. ARNETT:  Object to form.

11       Q    Would you agree with that?

12       A    I think it's important in every investigation.

13       Q    And in this case, did you document some of the

14  investigative steps you took in a report dated January

15  11, 2012?

16       A    Yes, sir.

17       Q    Okay.  Now, is it fair to say, if you look at

18  the last -- the second page of this, it looks like the

19  last piece of information you obtained for inclusion in

20  this report was on January 16, 2012; is that right?

21       A    Yes, sir.

22       Q    Okay.  Is it fair to say that this report

23  wasn't written on January 11, 2012 as the first page

24  indicates?  It must have been written -- this must have

25  been written sometime after January 16, 2012.  Would you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

30..33

Page 30

1  agree with that?

2      A    This report, a crime supplemental report, we

3  open up and create and I begin documenting, and that

4  report stays opened until I submit that, and then that

5  report is finalized.  So I initiated this report around

6  January the 11th, but I continued it over several days

7  before I fin -- finished the report, sir.

8      Q    Fair enough.  I appreciate that.  That's

9  helpful for me.  And according to this report, on

10  January 12, 2012, did you contact a woman named Jennifer

11  at Lowe's in Corbin Kentucky?

12      A    Yes, sir.

13      Q    And was Jennifer the loss prevention manager

14  at the time?  Or I'm sorry, let me withdraw that.  Was

15  she the loss prevention representative of that Lowe's

16  store at the time you contacted her?

17      A    She was a representative for loss prevention,

18  yes, sir.

19      Q    Yeah.  And did you inform Jennifer in this

20  January 12, 2012 conversation that you received

21  information that two male subjects came into the store

22  and purchased several bags of lime and a shovel?

23      A    Yes, sir.

24      Q    And in that same conversation, did you ask to

25  review the video footage in an attempt to verify this

Page 31

1  information?

2      A    Yes, sir.

3      Q    Now, if you look at Exhibit number 1, so

4  that's the larger report.  According to Exhibit number

5  1, you would have -- and I'm going to refer you to the

6  specific page number, but according to Exhibit number 1,

7  you would have participated in questioning Mr. Sizemore

8  on December 3, 2011 with Detective York and Deputy

9  Eubanks.  I'm looking at page 6.  So let me withdraw

10  that question.  I'll ask you it again.  On December 3,

11  2011, did you join Mr. York and Mr. Eubanks in

12  questioning James Otis Sizemore at the Knox County

13  Sheriff's Department?

14      A    And did you say December 3?

15      Q    Yes, sir.  It looks like you-all left Redbird

16  Mountain at 11:02 p.m.

17      A    On the 2nd.

18      Q    On the 2nd.

19      A    So the interview would've been conducted after

20  that, so possibly very late or early on the 3rd -- very

21  late on 2nd or early on the 3rd.

22      Q    The questioning with Mr. Sizemore certainly

23  would've, at least, concluded in the early morning hours

24  of December 3, 2011, would you agree with that?

25      A    Yes, sir.

Page 32

1      Q    And did you question Mr. Sizemore on that date

2  with Detective York and Deputy Eubanks at the Knox

3  County Sheriff's Department?

4      A    Yes, sir.

5      Q    Okay.  So according to your report, you

6  participated in a questioning of Mr. Sizemore that

7  concluded on December 3, 2011 regarding the Bobby

8  Wiggins homicide; is that right?

9      A    Yes, sir.

10      Q    Okay.  And I'd refer you to page 5, Detective

11  Johnson.  I'm going to ask you a question where you can

12  find the answer where it says 16:59 hours.  But on

13  December 2, 2011, is it fair to say that you knew by

14  about 5:00 p.m. that there was a white pasty material

15  around the body of the victim recovered on Redbird

16  Mountain?  It's at 16:59 on page 5.

17      A    Yes, sir.

18      Q    Okay.  So you knew before leaving Redbird

19  Mountain that there was a white pasty material recovered

20  from the victim; is that right?

21      A    Yes, sir.

22      Q    And you -- and by that time, you believed that

23  the body recovered was that of Bobby Wiggins, correct?

24      A    Yes, sir.

25      Q    And you -- the questioning of Mr. Sizemore

Page 33

1  that took place at the Knox County Sheriff's Department,

2  between December 2, 2011 and December 3, 2011, when it

3  concluded, that questioning was recorded; is that right?

4      A    Yes, sir.  I believe it was.

5      Q    And, in fact, you've listened to the recorded

6  statement that was obtained from Mr. Sizemore that day

7  prior to trial, right?

8      A    Yes, sir.

9      Q    Yes.  And according to your police report -- I

10  believe we just went over this a little bit ago, but

11  according to your police report, you also participated

12  in questioning James Otis Sizemore on December 5, 2011,

13  correct?  And this is -- you can find this answer on

14  page 9 of 11.

15      A    Yes, sir.

16      Q    And sitting here today, you don't have an

17  exact recollection of who was present during that

18  questioning with you and Mr. Sizemore on December 5,

19  2011, correct?

20      A    No, sir.

21      Q    But according to your report, you obtained a

22  recorded statement from Mr. Sizemore, right?

23      A    Yes, sir.

24      Q    And, sir, isn't it -- well, I'm going to ask

25  you to refer back to this Exhibit number 2.  It's this

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

34..37

Page 34

1   report that documents some of your communication with
2   Jennifer from Lowe's. But, sir, isn't it true that in
3   your December 5, 2011 questioning of Mr. Sizemore that
4   he revealed to you that he purchased tools that were
5   used to bury Bobby Wiggins with his uncle Jeff Gray?
6       A    I don't recall.
7       Q    Well, isn't it true that you contacted
8   Jennifer at Lowe's in Corbin to obtain the video footage
9   based upon information that you received from James Otis
10  Sizemore?
11      A    No, sir.
12      Q    Then why did you do that?
13      A    Because I had received information that Mr.
14  Gray and Mr. Sizemore went to Lowe's to receive it or
15  to-- to purchase those items, so that's why I went to
16  check on that.
17      Q    Sure. And the information that you received
18  that -- the inform -- was James Otis Sizemore the person
19  that you learned that information from?
20      A    No, sir.
21      Q    Who was?
22      A    I believe Sheriff Pickard contacted me and
23  said that he was informed that items may have been
24  purchased from there. So upon receiving that, I went to
25  Lowe's to check on it.

Page 35

1       Q    Now, did -- in this conversation that you had
2   with Sheriff Pickard, did you ask him when -- where he
3   got that information from?
4       A    No, sir.
5       Q    Did Sheriff Pickard tell you that he got that
6   information from James Otis Sizemore?
7       A    No. I want to -- I believe he said it --
8   I was never provided a name, but a female -- a female
9   had contacted him, I believe, is what he said on the
10  phone.
11      Q    Okay. Did you document any of this in a
12  report or a note?
13      A    Just that I went to Lowe's. But no, sir. I
14  didn't document that he -- he'd called me and told me
15  that.
16      Q    Did Sheriff Pickard join you on December 5,
17  2011 in questioning James Otis Sizemore?
18      A    No, sir. I'm almost certain I conducted the
19  interview myself. But if someone went with me, it --
20  Sheriff Pickard would not have went with me on that
21  interview.
22      Q    Why not?
23      A    Mainly because I'd -- I had very little ties
24  to Knox County. I was not a Knox County investigator. I
25  had not worked Knox County. I didn't know Sheriff

Page 36

1   Pickard. You know, other than him being the sheriff and
2   what -- during the first few days I got to interact with
3   him. But -- but if I would've went, it -- it -- it
4   would've been another trooper or another detective from
5   the State Police. But -- but I'm -- I'm certain that I
6   done that by myself. But I -- but I can't say for sure.
7   I don't recall.
8       Q    Okay. Cause certainly you didn't have any
9   ties to Derek Eubanks before you participated in
10  questioning Mr. Sizemore with him on December 3, 2011,
11  correct?
12      A    No. I probably heard of him, but I didn't --
13  no.
14      Q    And that's because one of the reasons why you
15  didn't have a relationship with Mr. Pickard or Mr.
16  Eubanks is because you were assigned to Harlan County,
17  right?
18      A    At that time, I was assigned to Bell County as
19  the general detective, but I had worked before that in
20  Harlan County. So I had no -- no dealings down there
21  with them.
22      Q    Is it fair to say that -- well, let me
23  withdraw that question. On December 3, 2011, yourself,
24  Detective York, and Derek Eubanks all participated in
25  the questioning of Mr. Sizemore; is that right?

Page 37

1       A    On December 3? Yes, sir.
2       Q    And at least, at that point in the
3   investigation, Mr. Eubanks was continuing to assist in
4   the ongoing investigation; is that fair?
5           MR. KELLEY:  Objection as to form.
6       A    Once we returned from Redbird Mountain and Mr.
7   Sizemore was brought over to the sheriff's office for
8   further questioning, I asked Mr. Eubanks and Detective
9   York to assist me in that interview, because I had just
10  become involved in the investigation, and where they
11  initiated the missing persons report and had spoke to
12  individuals including Mr. Sizemore previously, I felt
13  they could help in that -- in that statement, because I
14  just didn't have the background knowledge to really know
15  what to ask.
16      Q    Fair enough.
17      A    So -- and that's why they were there that day.
18      Q    So you requested assistance from Mr. Eubanks
19  and Mr. York in the homicide investigation because of
20  their knowledge and participation in the prior missing
21  persons investigation; is that fair?
22      A    Yes, sir. A statement from Mr. Sizemore, yes.
23      Q    And you thought that their presence and
24  participation in questioning Mr. Sizemore could assist
25  you; is that fair?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

38..41

Page 38

1    A    Yes, sir.
2    Q    And so it's your -- it's your recollection
3  that Mr. Pickard was the one that informed you that
4  James Otis Sizemore and Jeff Gray purchased items that
5  were used in the Wiggins homicide at a Lowe's in Corbin,
6  Kentucky; is that right?
7         MS. ARNETT:  Object to form.
8    Q    You can answer.
9    A    It was Sheriff Pickard that contacted me and
10  told me that those -- items may have been purchased
11  there from them, yes.
12    Q    Do you recall the date that Sheriff Pickard
13  provided that information to you?
14    A    I don't, but I -- I would imagine it was
15  January 12.  Because once I received that information, I
16  would've went, if not that day, the next day, to -- to
17  certainly try to acquire those items.  But I don't -- I
18  don't remember if it was that day or the day before.
19    Q    So you don't have an independent memory,
20  sitting here today, of when exactly Sheriff Pickard
21  provided this to you, correct?
22    A    No.
23    Q    And sitting here today, do you have an
24  independent memory of how long you questioned James Otis
25  Sizemore for on December 5, 2011?

Page 39

1    A    No, sir.
2    Q    During your conversation with James Otis
3  Sizemore on December 5, 2011, did he talk to you at all
4  about Jeff Gray?
5    A    I -- I don't recall.
6    Q    Given that you already had a statement from
7  James Otis Sizemore by December 5, 2011, why did you
8  want to question him again?
9    A    To see what information he was -- would -- he
10  would provide.
11    Q    Now, by that point, James Otis Sizemore had
12  already provided a statement to you and these other law
13  enforcement officers on December 3, 2011, correct?
14    A    Yes, sir.
15    Q    And I want to talk to you about that
16  statement.
17    A    Go ahead.
18    Q    Before we get there, let me show you
19  something.  I'll mark this -- keep going through the --
20  let's keep going through the Lowe's stuff.  Now, on
21  January 13, 2012, did you receive a phone call back from
22  this Jennifer person at Lowe's?
23    A    January 13, 2012?  Yes, sir.
24    Q    Okay.  And did Jennifer inform you that she
25  located video footage of two males purchasing six bags

Page 40

1  of lime, a digging shovel, a flashlight, and a bag of
2  salt?
3    A    Yes, sir.
4    Q    And did she inform you that the purchase was
5  made on November 25, 2011 around 8:45 p.m.?
6    A    Yes, sir.
7    Q    And did you inform Jennifer, in this
8  conversation, that you needed the video to be released
9  to you?
10    A    Yes.
11    Q    And did you also inform her that you would
12  stop by the next day to pick it up?
13    A    I did advise her -- I think she needed a -- a
14  request on a State Police letterhead, and I -- I
15  provided that the next day and dropped it off.  And I
16  believe the next day she also did provide me with a...
17    Q    Now, the next day --
18    A    I didn't pick it up the next day.  I dropped
19  off the letter, and she stated it would take a few days
20  to copy from the thing, but I did view it.
21    Q    On January 14, 2012, did you go to the Lowe's
22  in Corbin, Kentucky to meet with Jennifer?
23    A    Yes, sir.
24    Q    Did you provide her with a letter requesting
25  the video footage?

Page 41

1    A    Yes, sir.
2    Q    And did she show you the video footage?
3    A    Yes, sir.
4    Q    And when you saw the video footage, were you
5  able to identify the two male subjects at the Lowe's in
6  Corbin, Kentucky on November 25, 2011?
7    A    I did.
8    Q    And who were those people?
9    A    It was Jeff Gray and James Sizemore.
10    Q    And were these the two individuals that you
11  were -- who were purchasing the tools in question?
12    A    The items you previously listed, yes.
13    Q    I'm going to show you what we'll mark as
14  Exhibit number 3, and I'm going to make it into a group
15  exhibit, sir.  So this is going to just include black
16  and white photographs.  They're still shots that were
17  taken from the video at footage.  So I apologize they're
18  not in color, but I think you'll be able to recognize
19  the people well enough.  Just bear with me one second.
20  All right, sir.  I've handed you a copy.  This will be
21  Exhibit 3.  Please take a look at these photographs and
22  let me know when you're finished, sir.  Thank you.
23         (EXHIBIT 3 MARKED FOR IDENTIFICATION)
24    A    Okay.
25    Q    Did you have a chance to look through those,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

42..45

**Page 42**

1  detective?

2  A    Yes, sir.

3  Q    Okay. And do these fairly and accurately

4  represent still shots of some of the footage that you

5  obtained on or about January 14, 2012?

6  A    Yes, sir. Appears to.

7  Q    And do these photographs depict James Otis

8  Sizemore and Jeff Gray purchasing a shovel, six bags of

9  lime, a flashlight, and a bag of salts on November 25,

10  2011 at a Lowe's department store in Corbin, Kentucky?

11  A    Just from the pictures, I can't identify what

12  the bags are, but there is a shovel being purchased and

13  the shopping cart containing several items.

14  Q    And you also -- in addition to the

15  surveillance footage, you also recovered a receipt; is

16  that correct?

17  A    Yes, sir.

18  Q    And that receipt revealed that six bags of

19  lime, a shovel, a flashlight, and a bag of salts were

20  purchased by Mr. Gray and Mr. Sizemore, correct? It's

21  not in the report.

22  A    Right. I know those items -- I believe that

23  was the correct number of each that you stated.

24  Q    Okay. Now, by the time you saw the

25  surveillance footage in January of 2012, you were aware

**Page 43**

1  that a white pasty material was found to have been

2  covered over the victim's body, right?

3  A    Yes, sir.

4  Q    Yeah. And is it fair to say that as an

5  experienced law enforcement officer, that you believed

6  that that white material may have been crushed lime?

7  A    Could you repeat that? Did I --

8  Q    Sure. Is it fair to say that -- let me ask

9  the question in a better way. Let me withdraw it. Is

10  it fair to say that when you saw this video footage from

11  the Lowe's store, that you came to suspect that the

12  crushed lime that Mr. Gray and Mr. Sizemore was

13  purchasing was the substance used to cover the victim's

14  body on Redbird Mountain?

15  A    I know we had the items tested, the -- the

16  white pasty substance. I don't know if the lab had

17  finished their examination to let us know exactly what

18  it was. So...

19  Q    You were investigating that, though, right?

20  A    Investigating what, sir?

21  Q    You were investigating this theory that Jeff

22  Gray assisted James Otis Sizemore in burying Bobby

23  Wiggins, correct?

24  A    Yes. I guess that'd be an accurate statement.

25  I was --

**Page 44**

1  Q    Well, it would be surprising to me if you

2  didn't investigate --

3  A    Uh-huh.

4  Q    -- it in light of the video footage.

5  A    Yeah.

6  Q    So outside -- well, where -- do you remember

7  eventually questioning Jeff Gray?

8  A    I did get a statement from Jeff Gray, yes,

9  sir.

10  Q    Yeah. And outside of questioning Jeff Gray,

11  did you ever conduct a search of his residence to

12  recover the shovel?

13  A    No, sir.

14  Q    Did you ever conduct a search of his residence

15  to obtain any of the crushed lime that he maintained

16  there, to see whether it was the same or similar

17  substance that was found on the victim's body?

18  A    No, sir.

19  Q    Did you ever go to Mr. Gray's residence after

20  questioning him to search for any evidence that could've

21  linked him to the murder of Bobby Wiggins?

22  A    No, sir.

23  Q    Why not?

24      MS. ARNETT:  Object to form.

25  A    Mr. Gray had told me that he had purchased

**Page 45**

1  those items because of some yard work that he had done

2  at his house. And I remember when I was at his

3  residence, before the -- after I became involved in the

4  murder of Bobby Wiggins, that there had been some yard

5  work that had been done at a ditch in front of the

6  residence, that had -- looked like it had been

7  previously dug and covered up.

8  Q    Sir, you never documented in any way that you

9  ever went to Jeff Gray's house during the investigation

10  of Bobby Wiggins' death, correct?

11  A    (No verbal response.)

12  Q    You can look through that report, and I'll

13  also give you what we'll mark as Exhibit number 4, which

14  is another -- which is your original KYIBRS report in

15  this case.

16      (EXHIBIT 4 MARKED FOR IDENTIFICATION)

17  A    I didn't document that we went to --

18  Q    Look at this one, too, sir.

19  A    I didn't document that I was at Jeff Gray's

20  residence, but I did document that on December 4, 2011

21  at 16:14 hours, which is page 9 of 11 on Exhibit 1, that

22  myself and Detective Mefford was up Alex Creek

23  conducting a neighborhood search, which is where Jeff

24  Gray's residence was located, up Alex Creek. But it

25  doesn't say that we was at his house. It just says we

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

46..49

Page 46

1   was up that area.

2      Q   And you're saying -- this is Exhibit 1, page
3   9, 16:14 hours, "While myself and Detective Mefford was
4   up on Alex Creek conducting a neighborhood search,
5   Sheriff Pickard and Deputy Eubanks pulled up and say
6   that they've located a cell phone"?

7      A   Yes, sir.

8      Q   On December 4, 2011, why were you conducting a
9   neighborhood search at that time?

10     A   To further my investigation.

11     Q   By then you had already -- or let me withdraw
12  that.  By then William Anderson had already been charged
13  with murder, correct?

14     A   Yes, sir.

15     Q   Yeah.  In fact, at 2:00 a.m. on December 4,
16  2011, there was a search warrant executed at the Buckeye
17  Branch residence, where Mr. Anderson stayed, correct?

18     A   What day did you say, sir?

19     Q   On December 4.  Is that the same day it says
20  here?

21     A   Yes, sir.  Early that morning, yes, sir.

22     Q   Why was a neighborhood search not conducted on
23  December 3, 2011 after the body was recovered?

24     A   Once we -- on December the 2nd, when the body
25  was recovered that evening, it was a little after 11:00

Page 47

1   p.m. before we left, went and interviewed Mr. Sizemore,
2   as we have discussed, at the Bell County Sheriff's
3   Department.  After that interview, I went home, got some
4   sleep, and I had to be up in Frankfort the next morning
5   at around 8:00 or so to attend the autopsy of Mr.
6   Wiggins.  And just not enough time to do it, you know,
7   honestly.

8      Q   I'm not -- I understand that, sir.  I
9   understand you had a lot on your plate.  But there were
10  other law enforcement officers assisting in the
11  investigation, correct?

12     A   Uh-huh.

13     Q   Is that a "yes"?

14     A   I don't know if I would say there was a lot
15  that was assisting in my investigation.  There was
16  several involved from the Knox County missing persons
17  case that during the next couple of days transitioned to
18  my murder investigation.  But after a day or two of that
19  transition, there -- there was not a lot that was
20  assisting.

21     Q   But I'm saying you had other law enforcement
22  officers, even from the Kentucky State Police, that were
23  assisting within the first few days of the Wiggins
24  homicide investigation, correct?

25     A   Detective York and Detective Mefford.  Outside

Page 48

1   of the -- I call them road units, the uniformed
2   troopers--

3      Q   Well, as far as that goes --

4      A   -- that was at the scene, and Sergeant
5   Pickrell, she was a supervisor that was there.

6      Q   Detective Abner assisted, too, right?

7      A   At the scene, yes.

8      Q   Okay.  And you now know that Sergeant Pickrell
9   was involved even in questioning people like Dave Fox
10  outside of the scene, right?  That's not on here.  That
11  interview is not on this, right?

12     A   I was just looking at dates just to try to --

13     Q   Okay.

14     A   I mean --

15     Q   Fair enough.

16     A   Yes, she was involved in that, but I believe
17  that was the day before the December 3 or --

18     Q   Who --

19     A   -- but I was just trying to get my dates.  I
20  wasn't looking for that statement in my report.

21     Q   Okay.  Who did you talk to on Alex Creek on
22  December 4?

23     A   I know while at Jeff Gray's residence, Mr.
24  Gray was not there.  And I believe while we were there,
25  Mr. Gray's wife and Mr. Sizemore's wife pulled up in a

Page 49

1   vehicle, and we spoke to them briefly there.

2      Q   So you spoke briefly to Wendy Gray and Ruth
3   Sizemore while they were in a car; is that right?

4      A   They were in a vehicle, yes, sir.

5      Q   Yeah.

6      A   In the driveway.

7      Q   And where did they say Jeff Gray was?

8      A   I don't recall.

9      Q   But they informed you that he was out of town,
10  right?

11     A   I don't remember if they said he was out of
12  town.  I believe that's correct, but I just know they
13  said he wasn't there.  But I don't remember exactly what
14  they said.

15     Q   How long did you speak to Ruth Sizemore and
16  Wendy Gray for?  As best you can remember.

17     A   Best I could recall, around ten minutes maybe.

18     Q   And what did -- by then -- do you know whether
19  they were aware that Sizemore had already confessed?

20     A   I don't know, sir.

21     Q   Okay.  What did you and Ruth and Wendy talk
22  about in this conversation?

23     A   Best I can recall, I just asked them if they
24  knew anything and if they knew where Mr. Gray was.

25     Q   And what information did you receive from

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

50..53

Page 50

1   them?
2       A   Mr. Gray wasn't there.
3       Q   Did she inform you that Mr. Gray was out of
4   town?
5       A   I know she said he wasn't there, but I -- I
6   don't remember if that's -- she said specifically out of
7   town.  I don't recall.
8       Q   All right.  I'm going to refer you to Exhibit
9   number 5, this is your interrogatories in this case,
10  sir?
11      A   Uh-huh.
12      Q   I want you to read through a paragraph that
13  begins on page 21, and it finishes at the top of 22.
14  It's just one paragraph.  I'm going to turn you right to
15  it.  See if this refreshes your memory at all.
16          MS. ARNETT:  Pages?  Are you -- page 21?
17          MR. SLOSAR:  21.
18          MS. ARNETT:  Okay.  You said, I thought,
19      paragraph.
20  BY MR. SLOSAR:
21      Q   Does that refresh your memory at all,
22  Detective Johnson, about whether you learned in this
23  interaction with Ruth Sizemore and Wendy Gray that Jeff
24  Gray was out of town?
25      A   No.  I mean, I -- I don't recall if she said

Page 51

1   he was out of town or -- or what.  I just know he wasn't
2   at the residence when we were there.
3       Q   Do you recall going through the interrogatory
4   responses with your attorney?
5       A   Yes, sir.  I did.
6       Q   And do you recall ultimately signing any sort
7   of verification stating that those were under oath?
8       A   I did sign, yes, sir.
9       Q   Okay.  And you have no reason to dispute the
10  information that you provided in those interrogatories,
11  correct?
12          MS. ARNETT:  Actually, if I can -- I don't
13      think that he's actually -- I think this was one
14      that -- it slipped through the cracks, because I
15      was getting ready to do it before his deposition.
16      So I don't think you have one that's signed by him.
17          MR. SLOSAR:  Okay.
18          MS. ARNETT:  Just for clarification.
19  BY MR. SLOSAR:
20      Q   Do you remember --
21      A   Or it was the Hoskin's (phonetic) I signed.
22  But I'd signed something before, but...
23      Q   Okay.  You had no reason to dispute the
24  information that's in there, correct?
25      A   You just asked me if I recalled if they said

Page 52

1   he was out of town, and I'm -- I just can't say that I
2   recall them specifically saying that.  I just remember
3   he was not at the residence, sir.
4       Q   What other information did you learn in this
5   interaction with Ruth and Wendy?
6       A   Nothing that I can recall.
7       Q   Did they volunteer to you, in that
8   interaction, that they had had conversations with James
9   Otis Sizemore?
10      A   I don't recall them mentioning it.
11      Q   Did they tell you whether they had talked to
12  him over the phone since he had been in custody?
13      A   No, I don't recall.
14      Q   Prior to trial, did you ever listen to any of
15  the recorded conversations between James Otis Sizemore
16  and Wendy Gray regarding the murder of Bobby Wiggins?
17      A   The jail phone calls?  Is that what you're
18  referring to?  I believe I did listen to some, yes.
19      Q   Did they concern you?
20      A   I don't remember the context of part of the
21  phone calls.  I don't.
22      Q   Well, do you recall listening to portions of
23  Mr. Sizemore's -- do you recall listening to recordings
24  between James Otis Sizemore and Wendy Gray, where he
25  revealed that a person by -- named Jethro (phonetic) was

Page 53

1   much more involved than Bill Bill in the murder of Bobby
2   Wiggins?
3       A   I don't recall the Jethro.  I don't recall
4   hearing that name.
5       Q   Is it fair to say that when you listened to
6   the recordings from James Otis Sizemore when he was in
7   jail, that some of the admissions that Mr. Sizemore made
8   in those recordings were inconsistent with the
9   information that he had provided in his statement
10  implicating William Anderson?
11      A   I don't recall the exact content of -- of the
12  recordings I did listen to.  I did listen to --
13      Q   To --
14      A   -- some, but I don't --
15      Q   After listening --
16      A   -- I don't recall that.
17      Q   After listening to the recordings, did you
18  take any steps to stop the murder charges against
19  William Anderson?
20      A   After listening to the recordings I listened
21  to, no, sir.
22      Q   Did you take any steps after listening to the
23  recordings that you listened to, did you take any
24  steps to further investigate Jeff Gray and his
25  involvement in the murder of Bobby Wiggins?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

54..57

**Page 54**

1  A  Again, no, I mean, not after the recordings
2  that I listened to.
3  Q  Even after recovering the surveillance footage
4  implicating Jeff Gray, the only investigative step you
5  took was to question Mr. Gray, correct?
6  A  I did, yes.
7  Q  Outside of questioning Jeff Gray, did you take
8  any other investigative steps to ascertain whether he
9  was involved in the murder or covering up of the death
10  of Bobby Wiggins?
11  A  I went to speak with Mr. Sizemore again, which
12  he -- because I was going to ask him regarding this. But
13  I believe that's the time that he said his lawyer was --
14  had instructed him not to speak without them there, so
15  that -- no.
16  Q  Did you make any attempts to -- so outside of
17  that attempt to speak to Mr. Sizemore, no other
18  investigation into Jeff Gray and any involvement that he
19  had in the murder or covering up the death of Bobby
20  Wiggins, correct?
21  A  What do you mean, "investigation"? I mean,
22  what -- what are you -- because I'm -- I'm certain that
23  we asked -- I mean, you know, we would ask people if
24  they had knowledge regarding the case and, I mean, we
25  continued to look to try to find information for that,

**Page 55**

1  but...
2  Q  I'm asking you, sir: Tell me what
3  investigation, any witness you spoke to, any pieces --
4  physical evidence you sought to obtain, any search
5  warrant you attempted to get, anything. Anything at all
6  that you did to investigate Jeff Gray outside of a
7  single interview with him?
8  A  Again, just asking if any -- if anyone knew
9  anything, but nobody had information to provide.
10  Q  Who did you ask?
11  A  I'm not -- I don't know. Just during
12  neighborhood canvasses, we would ask whoever.
13  Q  When did you -- outside of the single
14  neighborhood canvass that you pointed to on December 4,
15  2011, can you name a single other occasion that you did
16  a canvas during the underlying homicide investigation?
17  A  I mean, it's -- it's -- it's -- it's not just
18  the neighborhood canvass, but during other
19  investigations and information you -- you just deal with
20  various people, and you just ask whoever. I mean, it's
21  just a common thing in our investigations that I will
22  ask other people that I'm involved with if they -- just
23  if they've heard anything. But I never received any
24  information to supp -- to pursue it, I mean, to pursue
25  it any further.

**Page 56**

1  Q  Sitting here today, can you think of a single
2  name of any witness that you spoke to during an
3  investigation and -- to determine whether Jeff Gray was
4  possibly involved in the murder or covering up the death
5  of Bobby Wiggins?
6  A  I know people I've spoke to regarding the
7  investigation, but to say exactly which ones I've asked
8  specifically concerning Mr. Gray, no, sir.
9  Q  Who are the people that you recall
10  interviewing in the Wiggins homicide investigation? And
11  you know what? Before you answer that question, let me
12  give you the only other police report that I've seen
13  that was drafted in this case by you.
14  MR. KELLEY: Elliott, can we take a break now?
15  MR. SLOSAR: Yeah, let me just get this on the
16  record, and then we'll --
17  MR. KELLEY: Sure.
18  MR. SLOSAR: -- for sure.
19  MR. KELLEY: Sure.
20  MR. SLOSAR: You know what? Let's take a
21  break. You're right. Let's do it. Sorry.
22  VIDEOGRAPHER: The time is 10:57. We're off
23  the record.
24  (OFF THE RECORD)
25  VIDEOGRAPHER: We are on the record at 11:03.

**Page 57**

1  BY MR. SLOSAR:
2  Q  Sir, I'm handing you what we'll mark as
3  Exhibit number 6. This is another report that you did
4  in this case. It appears to be from October 18, 2012;
5  is that right?
6  (EXHIBIT 6 MARKED FOR IDENTIFICATION)
7  A  Yes, sir.
8  Q  Okay. And this report, does this relate to an
9  investigation you did into a Honda red ATV that was
10  located at the Messer residence?
11  A  Yes, sir.
12  Q  Okay. And is it fair to say that you were
13  conducting the investigation into the ATV as a result of
14  the statement that Mr. Sizemore had provided in December
15  of 2011?
16  A  Yes, sir.
17  Q  Okay. Because according to Mr. Sizemore's
18  statement, the red ATV that was located at the Messer
19  residence was the one that was used to facilitate the
20  murder of Bobby Wiggins; is that correct? And by "is
21  that correct," I mean is that what Mr. Sizemore
22  generally described in his statement?
23  A  Yes, sir.
24  Q  Okay. All right. And, in fact, in October of
25  2012, you went to the Messer residence and conducted

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

58..61

**Page 58**

1  some luminol testing; is that right?

2    A    Yes, sir.

3    Q    Okay.  And after conducting some luminol

4  testing, you requested that the ATV be towed for a more

5  thorough search to be conducted; is that right?

6    A    Yes, sir.

7    Q    And when you were at the Messer residence, did

8  you also obtain buccal swabs from Elijah Messer?

9    A    Yes, sir.

10    Q    And why is it that you wanted to obtain a

11  buccal swab from Elijah Messer?

12    A    States that Elijah said that he had wrecked

13  his truck a few days earlier, and he got into the ATV.

14  So there potentially could be his blood on there, so

15  obtained his sample so it could be used as -- something

16  the forensic personnel could compare.

17    Q    Just wanted to see if there was blood located

18  whether that's attributable to the Messers or whether

19  it's related to the murder; is that fair?

20    A    Yes, sir.  To see if it was his or not his.

21    Q    Okay.  And is it fair to say that these

22  investigative steps were conducted as an attempt by you

23  to corroborate Sizemore's statement?

24    A    Yes, sir.

25    Q    And, in fact, after going to the Messers and

**Page 59**

1  having swabs obtained, did you eventually send those

2  swabs off to the Kentucky State Police Laboratory for

3  analysis?

4    A    Yes, sir.

5    Q    And when you sent that evidence off for

6  analysis, did you fill out a form requesting that

7  evidence be examined?

8    A    Yes, sir.

9    Q    Okay.  And is it fair to say that in 2011,

10  that it would've been your practice to complete forms

11  prior to sending evidence off for analysis?

12    A    Complete the forms before the evidence is sent

13  to the lab?

14    Q    Yeah.

15    A    Yes, sir.

16    Q    Okay.  And is it -- would you agree that it's

17  important to do that so that you can document what

18  evidence you sent off?

19    A    Yes, sir.

20    Q    Okay.  And the form you're looking at now, did

21  you complete aspects of this form?

22    A    Yes, sir.

23    Q    Okay.  So do you recognize your handwriting on

24  here, Detective Johnson?

25    A    Yes, sir.

**Page 60**

1    Q    Did you complete this form on October 18,

2  2012?

3    A    Yes, sir.

4    Q    And what evidence did you send to the Kentucky

5  State Police Laboratory on that date relating to the

6  Wiggins homicide investigation?

7    A    I completed the form on the 18th.  However, it

8  was the next day, October 19, before the items were

9  actually transferred to the state police lab.

10    Q    Sure.  What did you send them?

11    A    I sent Exhibit 1, two cotton tipped

12  applicators used to swab the steering wheel of a Honda

13  ATV searching for blood DNA belonging to Bobby Wiggins.

14  Two is a cotton tipped applica -- applicator used to

15  obtain a buccal swab sample from Elijah Messer to

16  eliminate from the DNA swab obtained from subject's

17  father's ATV.  And three, a DNA standard from Bobby

18  Wiggins, the victim.

19    Q    Is it fair to say that you requested an

20  examination of this evidence to see if the blood of the

21  victim or the DNA of the victim was on the ATV?

22    A    Yes, sir.

23    Q    And did you ultimately receive results back

24  from the testing that you requested?

25    A    Yes, sir.

**Page 61**

1    Q    I'm going to show you Exhibit number 8.  Do

2  you recognize this document, sir?

3        (EXHIBIT 8 MARKED FOR IDENTIFICATION)

4    A    Yes, sir.

5        COURT REPORTER:  (sneezes)

6        MR. SLOSAR:  Bless you.

7    Q    What is this document?

8    A    This is a report from the forensic lab.

9    Q    And --

10        COURT REPORTER:  (Sneezes.)

11        MR. SLOSAR:  Bless you.

12    Q    According to the laboratory report, was any

13  blood found on -- from the swabs taken from the steering

14  wheel of the ATV?

15    A    No, sir.

16    Q    According to the forensic biologist from the

17  Kentucky State Police Laboratory, was there any forensic

18  evidence on the ATV that linked that vehicle to the

19  murder of Bobby Wiggins?

20    A    According to the report, just -- no blood was

21  found on item 7.

22    Q    And this is something that you would have

23  learned on or around November 8, 2012; is that right?

24    A    Yes, sir.

25    Q    Okay.  And this document would have been

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

62..65

---

Page 62

1  maintained as part of the investigative file; is that
2  right?
3      A    Yes, sir.
4      Q    And on -- I'm going to hand you what we'll
5  mark as Exhibit number 9.  On July 10, 2013, did you
6  receive another forensic report from the Kentucky State
7  Police Laboratory?
8          (EXHIBIT 9 MARKED FOR IDENTIFICATION)
9      A    Yes.
10     Q    And according to this report, were swabs
11 obtained from various places on the Honda Red ATV
12 recovered at the Messer residence?
13     A    Yes, sir.
14     Q    And it -- and was the Kentucky State Police
15 Laboratory able to link that ATV to the Wiggins homicide
16 in any manner?
17     A    They listed no blood was found on the items I
18 sent of the swabs.
19     Q    So according to KSP, no blood was recovered
20 from the Honda Big Red ATV; is that right?
21     A    From the swabs that was conducted on October
22 18, 2012, as well as the secondary swabs that was
23 conducted later, after that -- after the initial report
24 was completed.
25     Q    So there was no physical evidence recovered

---

Page 63

1  from the Kentucky State Police Laboratory that
2  corroborated Sizemore's claim that the Red ATV left at
3  the Messer residence was used in the murder of Bobby
4  Wiggins, correct?
5      A    Yeah.  No blood was found on it, correct.
6      Q    And to this day, there's never been any
7  forensics that has corroborated Mr. Sizemore's statement
8  implicating William Anderson.  Do you agree with that?
9          MS. ARNETT:  Object to form.
10     A    Are you just referring to the DNA samples
11 swabs that was examined on the items of evidence, the
12 belt and stuff that was found at the --
13     Q    And the knife.
14     A    -- and the knife.  Yeah.  And I don't -- I
15 don't think -- yeah.  I don't recall of any DNA coming
16 back matching anybody other than the victim on anything.
17 So...
18     Q    And, you know, one of the things that Mr.
19 Sizemore informed you in the December 3, 2011 statement
20 was that the pocketknife that Bill Anderson kept on him,
21 the one that was recovered during his arrest, was the
22 one used to kill Bobby Wiggins.  Do you recall Mr.
23 Sizemore telling you that?
24     A    Yes.
25     Q    Okay.  And because of Mr. Sizemore's

---

Page 64

1  allegation, did you request to have that knife sent off
2  to the Kentucky State Police Laboratory for testing?
3      A    Yes, sir.
4      Q    And did you ultimately receive results back
5  from that testing from the Kentucky State Police
6  Laboratory on or around February 27, 2012?
7      A    Yes, sir.
8      Q    And what were the results of that testing,
9  sir?
10     A    It says no blood was found on item 6, being
11 the Smith & Wesson knife.
12     Q    And in addition, none of the fingernail
13 clippings obtained from the victim linked William
14 Anderson in any way to the murder of Bobby Wiggins; is
15 that right?
16     A    I'm sorry.  The fingernail clippings from Mr.
17 Wiggins --
18     Q    Did not link William Anderson to the murder,
19 correct?  You know what --
20     A    Unless there's another report.
21     Q    That might be --
22     A    This doesn't specifically reference --
23     Q    Yes, that might --
24     A    -- the fingernail clippings.  It only
25 references the blood.  No blood on the knife.

---

Page 65

1      Q    You're right.  There is another report.  I
2  apologize.  Okay.  But according to this report, as of
3  February 27, 2012, the Kentucky State Police Laboratory
4  concluded that the knife recovered from Mr. Anderson had
5  no blood on it and could not be linked to the murder of
6  Bobby Wiggins; is that correct?
7      A    Yeah.  It did test negative for blood, yes.
8      Q    And you would have learned that information on
9  or around February 27, 2012; is that right?
10     A    Sometime after that date, yes.  Uh-huh.
11     Q    And you would have maintained this report as
12 part of the investigative file; is that right?
13     A    It would've been printed out of the lab
14 website and placed in the file, yes.
15     Q    And, again, this report illustrates that
16 there's yet another inconsistency with the statement
17 that Sizemore provided on December 3, 2011?
18         MS. ARNETT:  Object to form.
19     Q    Is that right?
20     A    No, sir.  You mean it -- the -- the lab test
21 just says there's no blood.  There's nothing to say that
22 it wasn't used, it's just saying there's no blood there.
23     Q    Sir, do you see where it says, "If DNA
24 analysis is required, please resubmit items 2, 3, and 4,
25 along with blood and vehicle standards from William

---



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

66..69

---

**Page 66**

1  Anderson and James Sizemore for comparison"?  We're
2  still looking at Exhibit 10.
3        A    Yes, sir.
4        Q    Yeah.  And you ultimately did submit standards
5  for Mr. Anderson and Mr. Sizemore for comparison, right?
6        A    I did provide samples to the lab from them,
7  yes.
8        Q    And surely -- well, it's my understanding you
9  were present in the autopsy for Mr. Wiggins on December
10  3, 2011; is that right?
11       A    That is correct, sir.
12       Q    At that autopsy you would've visually observed
13  the approximate 18 stab wounds, right?
14       A    Yes, sir.
15       Q    It's a pretty violent murder, would you agree
16  with that?
17       A    Yes, sir.
18       Q    And certainly as an experienced law
19  enforcement officer, you would expect for blood to be on
20  the knife that was used to stab Bobby Wiggins
21  approximately 18 times?
22            MS. ARNETT:  Object to form.
23       Q    Is that right?
24       A    Well, I know that believing the murder had
25  occurred nearly ten days prior to that, that I can't

---

**Page 67**

1  account for items of evidence from the time of Mr.
2  Wiggins' murder up until the time that we take it into
3  our custody.  I'm only testing it to what's on it when I
4  have it.  I can't account for anything before that.
5        Q    Fair enough.  You had no evidence indicating
6  that William Anderson had any -- had destroyed evidence,
7  right?
8        A    I'm sorry?
9        Q    Do you have -- did you have any reason to
10  believe that William Anderson destroyed evidence
11  relating to the murder of Bobby Wiggins?
12       A    Do I have any evidence?
13       Q    Yeah.  Anybody ever tell you that?
14       A    No, sir.
15       Q    Anybody ever tell you, hey, Detective Johnson,
16  I saw William Anderson cleaning off blood from his
17  pocketknife?  Anybody ever tell you anything like that?
18       A    No, sir.
19       Q    Anybody ever tell you that William Anderson
20  had any indication that he was going to be arrested in
21  the early morning hours of December -- was it 3rd or 4th
22  of 2011; do you remember?  Let me ask you -- let me ask
23  you about it right here.
24       A    Okay.
25       Q    After your -- you finished your interview with

---

**Page 68**

1  Sizemore on December 3, 2011, correct?
2        A    Yes, sir.
3        Q    Okay.  And after that, you went to the
4  autopsy, right?
5        A    Yes, sir.
6        Q    And after leaving the autopsy, that's when
7  charges were initiated against Bill Anderson on December
8  3, 2011; is that right?
9        A    Yes, sir.
10       Q    Okay.  Mr. Anderson would've been -- was
11  picked up sometime in the evening of December 3, 2011,
12  around 6:58 p.m.; is that right?
13       A    Yes, sir.  Around that time.
14       Q    And Mr. Anderson was already charged with
15  murder by the time that he was arrested, correct?
16       A    Yes, sir.
17       Q    And let me ask -- actually, let me ask that
18  question a better way.  By the time Mr. Anderson was
19  questioned on December 3, 2011 in the evening hours, he
20  had already been charged with murder, correct?
21       A    There was an arrest warrant out for him for
22  murder, yes.
23       Q    Certainly, to your knowledge, Mr. Anderson was
24  always cooperative with yourself during the underlying
25  investigation, correct?

---

**Page 69**

1        A    The only time I dealt with Mr. Anderson during
2  this was during our interview, the evening of December
3  3.
4        Q    Was he cooperative then?
5        A    Yes, sir.
6        Q    Yeah?  Did he request a lawyer?
7        A    No, sir.
8        Q    In fact, Mr. Anderson sat there and was
9  aggressively interrogated by Detective York in your
10  presence, correct?
11            MS. ARNETT:  Object to form.
12       A    I don't recall aggressively.  He may have
13  screamed and cussed a little, but I don't -- I don't --
14  don't recall aggressive.
15       Q    Did you ever take any steps to intervene when
16  Detective York was questioning Mr. Anderson on December
17  3, 2011?
18       A    No, sir.
19       Q    Did you ever take any steps to stop Mr. York
20  during that questioning of Mr. Anderson?
21       A    Stop him from what, sir?
22       Q    Making certain statements or threats to Bill?
23       A    I don't recall any threats, but no, I never --
24  I never stopped him.
25       Q    Did you have any reason to believe that

---

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

Kentuckiana
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

70..73

Page 70

1   William Anderson was tipped off somehow that members of
2   your law enforcement agency were going to arrest him in
3   the evening hours of December 3, 2011?
4       A   Do I have any evidence to show that he had
5   been tipped off?  Is that what you're asking?
6       Q   Yeah.
7       A   No.  I have no evidence.
8       Q   No.  You have no witnesses that would ever
9   provide any support for the theory that William Anderson
10  carried the murder weapon on him that was used to kill
11  Bobby Wiggins, and cleaned it, but just kept it on him
12  at the time of his arrest, right?  Nothing to support
13  that theory?
14      A   I have no evidence, other than Mr. Sizemore's
15  statement.
16      Q   And as you acknowledged, Mr. Sizemore's
17  statements against Mr. Anderson, at least with regard to
18  the Red ATV, proved to be false, right?
19      MS. ARNETT:   Object to the form.
20      A   Again, I can't say that it is false.  Because,
21  again, the blood swabs was taken in October.  That's ten
22  months after the murder.  I mean, I knew it was probably
23  a slim chance any DNA was there, but...
24      Q   You didn't take any steps to find DNA on the
25  shovel maintained at Jeff Gray's residence, right?

Page 71

1       A   I -- I don't know the shovel was maintained at
2   Jeff Gray's residence.  I don't know.
3       Q   I mean, sir, when you're interviewing
4   somebody, do you listen to them?  Just generally.
5       A   I try to, yes.
6       Q   Try to?
7       A   Yeah.
8       Q   It's probably pretty important as a law
9   enforcement officer to listen to a witness in a criminal
10  investigation, correct?
11      A   Yes, sir.
12      Q   Yeah.  Because you're supposed to follow
13  investigative leads as a law enforcement officer, right?
14      A   That's correct.
15      Q   Yeah.  Sir, if Jeff Gray told you that the
16  shovel was still at his house, would there be any reason
17  why you would not have tried to go -- have -- obtain
18  that shovel and send it off for testing?
19      A   I just can't say I recall him saying that.  I
20  don't.
21      Q   But you certainly didn't take any steps to go
22  recover the shovel, right?
23      A   I did not recover the shovel.
24      Q   We're going to go through this even more in
25  depth later, Detective.  I'm going to refer you to a

Page 72

1   specific part of the Jeff Gray transcript right now.
2   This'll be Exhibit number 11.  I'm going to turn you to
3   the page I'm going to ask you about.  It's page number
4   20.  If -- if you'll look at line 388, it says --
5       (EXHIBIT 11 MARKED FOR IDENTIFICATION)
6       MS. ARNETT:   What page?
7       Q   20.  They're double-sided, though.  The page
8   number's on the bottom right-hand corner.  Do you see
9   the line -- are you on that page, sir?
10      A   I -- I'm not yet.  If you just give me just a
11  second.  I just want to try to just review the outline
12  of this, just to verify this transcription, because I
13  didn't transcribe it, and I just like to review it
14  before I start reading.
15      Q   Sir, I can actually play you the audio part.  I
16  think -- we'll mark the audio exhibit as number
17      12.(AUDIO RECORDING PLAYED)
18      Q   Sir, do you recognize your voice there?
19      (EXHIBIT 12 MARKED FOR IDENTIFICATION)
20      A   It sounds like me, yes, sir.
21      Q   Sounds like you.  I'm going to go to time
22  stamp 00:20:44.  I want to play this part for you, Mr.
23  Johnson, and ask you some questions after, okay?
24      A   Okay.
25      Q   I'll begin at 00:20:38.

Page 73

1       (AUDIO RECORDING PLAYED)
2       Q   Did you hear that, sir?
3       A   I did, yes, sir.
4       Q   So it's -- you're -- and you're on page number
5   20?
6       A   Yes, sir.
7       Q   Okay.  Now -- so this is -- I don't have a
8   Bates stamp, but KSP produced this, and it's just the
9   Jeff Gray recording, the MP3 that was last modified on
10  February 2, 2012 at 4:16 p.m., so I'll get it to the
11  court reporter.  So according to Mr. Gray, in your
12  interview with him in February of 2012, he told you that
13  he still had the flashlight and the shovel at his
14  residence, right?
15      A   Yes, sir.
16      Q   And you still didn't take any steps to recover
17  that to see if forensically you can link it to the
18  murder of Bobby Wiggins, correct?
19      A   I did not retrieve those items, no, sir.
20      Q   And this would have been about 12 weeks after
21  Bobby Wiggins' death, right?
22      A   Yes, sir.  There about.
23      Q   So even though, in February of 2012, Mr. Gray
24  revealed to you that he had the shovel and these other
25  items at his house, you didn't take any steps to recover

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Page 74**

1  that evidence, correct?

2      A    They were not recovered, no, sir.

3      Q    And then your criticism here today of the

4  results of the ATV was that this evidence was recovered

5  in October of 2012 or November of 2012, so who knows if

6  evidence could've been, you know, tampered with or

7  destroyed by that time, right?

8      A    No, sir.

9      Q    But we'll never know if the shovel that Jeff

10 Gray purchased with his nephew has the DNA on it from

11 the victim, because KSP never recovered it, right?

12     A    The shovel was not recovered, correct.

13     Q    Now, other forensic evidence was also sent off

14 to the laboratory during the course of your

15 investigation, correct?

16     A    Yes, sir.

17     Q    Yeah.  I'll show you what we'll mark as

18 Exhibit 13, and this is a laboratory report that was

19 completed on July 2, 2014.  Do you recognize this

20 document, sir?

21                (EXHIBIT 13 MARKED FOR IDENTIFICATION)

22     A    Yes, sir.

23     Q    And did you send this physical evidence off to

24 be tested during the underlying investigation?

25     A    These items were sent to the lab, yes.

**Page 75**

1      Q    And did you send those items to the lab, sir?

2      A    I don't recall if I delivered them myself or

3  if they were transferred up by someone else, but I would

4  have initiated the proper forms to have it sent.

5      Q    Because you were still the lead detective at

6  that point, right?

7      A    Yes, sir.

8      Q    Okay.  And according to this report, the

9  materials submitted included four different items of

10 evidence; is that right?  I'm sorry, eight different

11 items of evidence.  I'm going to withdraw the question.

12 According to this report, were eight different items of

13 evidence submitted to the lab?

14     A    Yes, sir.

15     Q    Okay.  And was one of those items a "head

16 hair, standard," from the victim?

17     A    Yes, sir.

18     Q    Where fingernail clippings from the left and

19 right hands submitted from the victim?

20     A    Yes, sir.

21     Q    Were buccal standards from Bobby Wiggins

22 submitted?

23     A    It was a blood standard, not a buccal

24 standard.

25     Q    I apologize.  I apologize.  Was a blood

**Page 76**

1  standard from the victim submitted?

2      A    Yes, sir.

3      Q    Was a buccal standard from William Anderson

4  submitted?

5      A    Yes, sir.

6      Q    Was a buccal hand -- standard from James

7  Sizemore submitted?

8      A    Yes, sir.

9      Q    Okay.  And was a belt submitted?

10     A    A belt, yes.

11     Q    And this would have been that belt that was

12 recovered in close proximity to the victim's body on Red

13 River Mountain; is that right?

14     A    Yes, sir.

15     Q    And were shoes submitted?

16     A    Yes, sir.

17     Q    And were the shoes recovered from the victim's

18 body?

19     A    They were in the same location as the victim's

20 body, but I don't believe they were on his feet.

21     Q    Okay.  And none of the DNA testing that

22 occurred linked William Anderson to the murder, correct?

23     A    Correct.  The DNA profiles did not match

24 William Anderson.

25     Q    Sir, why didn't you request that a buccal

**Page 77**

1  standard from Jeff Gray be submitted?

2      A    I believe -- I want to think that Mr. Gray --

3  I want to think that he had been a convicted felon and

4  they already had DNA samples collected in the -- in the

5  system, in CODIS.

6      Q    Well, sir, on the second page, it says, "No

7  DNA profiles were entered into CODIS."  So CODIS

8  apparently was not searched.  Can you explain why not?

9      A    No, sir.

10     Q    You certainly have the ability to request that

11 a CODIS search be conducted, correct?

12     A    I probably could, yes, sir.

13     Q    Okay.  And according to this -- well, do you -

14 - did you obtain a buccal standard from Jeff Gray when

15 you met with him?

16     A    I don't recall if I did.

17     Q    Certainly James Otis Sizemore was a convicted

18 felon prior to this case, right?

19     A    I can't recall.

20     Q    And, sir, my -- well, let me see if I can

21 refresh your memory.  Do you recall testifying at a

22 grand jury?

23     A    Yes, sir.  I did.

24     Q    Okay.  And I'll mark your grand jury

25 transcript as Exhibit number 14.  Here you go, sir.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
—COURT REPORTERS—

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

78..81

**Page 78**

1    (EXHIBIT 14 MARKED FOR IDENTIFICATION)
2        A    Thank you.
3        Q    Sir, I'm going to refer you to page 3 of the
4    transcript. That's just got the P -- page 3 in the
5    lower right, and it says, "DJ," which at the top,
6    they're claiming means Detective Bryan Johnson, but
7    according to this transcript, you were seeking charges
8    "a murder, or complicity to commit a murder, and
9    persistent felony offender in the second degree" against
10   William Anderson; is that right?
11       A    Yes, sir.
12       Q    Yeah. So given the nature of those charges,
13   Mr. Anderson would have already been convicted of a
14   felony prior to this, correct?
15       A    Yes, sir.
16       Q    And you were seeking those same charges
17   against James Otis Sizemore as well, correct?
18       A    That's correct, yes.
19       Q    So according to this document, both Mr.
20   Sizemore and Mr. Anderson had previously been convicted
21   of felonies, right?
22       A    Yes, sir.
23       Q    And I believe you testified earlier that maybe
24   you just didn't submit Jeff Gray's DNA because he had
25   already been convicted of a felony. Is that what you

**Page 79**

1    testified to earlier?
2        A    That is what I testified to, that -- that may
3    be what it was, but I don't recall specifically as to --
4    even if I took one from him on his -- his thing, which
5    if I did, I didn't submit it to the lab, but...
6        Q    Yeah. And according to these documents, Mr.
7    Anderson and Mr. Sizemore were previously convicted of
8    felonies, but you still took their buccal standards and
9    submitted them for comparison to physical evidence,
10   right?
11       A    Yes, sir.
12       Q    But you didn't do that with Jeff Gray?
13       A    He did not have a DNA sample submitted, that's
14   correct.
15       Q    So there was nothing in this forensic report
16   that corroborated Mr. Sizemore's statements either,
17   correct?
18       A    I'm sorry?
19       Q    There is nothing in this Forensic Report, from
20   2014, that corroborated Mr. Sizemore's statement that
21   Mr. Anderson was involved in the murder of Bobby
22   Wiggins, correct?
23       A    It just says, "The profile does not match
24   William Anderson or James Sizemore."
25       Q    So again, no corroboration, right?

**Page 80**

1        A    (No verbal response.)
2        Q    I'm sorry? Did you -- I'm sorry, did you
3    answer it? I didn't -- my question was, again, no
4    corroboration?
5        A    Oh, I'm sorry. Yeah. I -- I said -- yeah,
6    the report said the DNA profile did not match William
7    Anderson or James Otis Sizemore.
8        Q    Let's talk about James Otis Sizemore, sir. I'm
9    going to hand you what we'll mark as Exhibit 15. This is
10   a transcript of a -- of the recorded statement that you
11   obtained from Mr. Sizemore on December 3, 2011. Have you
12   -- prior to today, have you ever reviewed any of the
13   transcriptions of that statement?
14       (EXHIBIT 15 MARKED FOR IDENTIFICATION)
15       A    I don't recall if I've reviewed the
16   transcribed copy of this statement.
17       Q    Okay. Here you go, sir.
18       A    Thank you.
19       Q    I'm also going to play clips --
20       A    Okay.
21       Q    -- and I'm going to do my best to -- I'm going
22   to do my best to give you a page number when I ask you
23   questions and to play clips. But bear with me, because
24   it doesn't always go smoothly. Now, sir, would you
25   agree that Mr. Sizemore was in custody at the time of

**Page 81**

1    the December 3, 2011 questioning?
2        A    Yes, sir.
3        Q    In fact, it took place at the Knox County
4    Sheriff's Department, right?
5        A    Yes, sir.
6        Q    And do you recall how long Mr. Sizemore was
7    spoken to before a recorder was turned on?
8        A    No, sir.
9        Q    Do you recall what you told Mr. Sizemore prior
10   to the recorder being turned on?
11       A    No. Mr. Sizemore was read his rights.
12       Q    How do you remember that?
13       A    It is in my investigative notes.
14       Q    And you're talking about Exhibit number 1?
15       A    Yes, sir. On page 6. It's the third line
16   down, the first paragraph starting.
17       Q    Do you know why that wasn't recorded?
18       A    No, sir.
19       Q    And is it your understanding that Mr. Sizemore
20   is actually illiterate? Namely, that he is incapable of
21   reading or writing?
22       A    I don't know if he can't completely read or
23   write. I don't -- I don't know that.
24       Q    Okay. Well, from your experience with Mr.
25   Sizemore, was it -- did it become apparent to you that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

82..85

Page 82

1  he was unable to read or write?
2      A    I can't remember. He -- he may not be able to
3  read or write at all, or it may be limited. I -- I
4  don't remember.
5      Q    Do you remember how Mr. Sizemore was given his
6  rights?
7      A    My note says I read him his Miranda warning --
8  or his Miranda warning was read to him.
9      Q    It says, "We sat down with Mr. Sizemore and
10 read him his Miranda warning"?
11     A    Correct.
12     Q    Do you know whether he personally read it or
13 whether he listened to it?
14     A    It would have been read to him.
15     Q    Now, is it fair to say that when you
16 questioned Mr. Sizemore, that you had a goal in mind?
17     A    What do you mean "a goal"? I mean, I --
18     Q    Sure. So by -- let me put it in context. By
19 the time that you're questioning Mr. Sizemore, he had
20 already led you to the body of Bobby Wiggins on Redbird
21 Mountain, correct?
22     A    Correct.
23     Q    Okay. So is it fair to say by the time you're
24 questioning Sizemore back at the Knox County Sheriff's
25 Department, that the goal -- the questioning would've

Page 83

1  been to obtain a statement from Mr. Sizemore to use in
2  the criminal investigation?
3      A    Just to obtain information into the
4  investigation, yes. Sure.
5      Q    You wanted to get a statement from Mr.
6  Sizemore about whatever knowledge he had regarding Bobby
7  Wiggins' death, correct?
8      A    Yes.
9      Q    Prior to questioning Sizemore, what
10 conversations took place at the police station as to who
11 was going to be involved in the questioning?
12     A    Again, myself and Detective York and Deputy
13 Eubanks and, you know, me asking them to assist on the
14 investigation, just because I had none of the prior
15 knowledge as to what events occurred over the past
16 couple days.
17     Q    Was there a conversation about who would take
18 the lead in the questioning?
19     A    I don't recall saying who would take the lead.
20     Q    Well, how is it that Detective York ended up
21 doing the majority of the questioning?
22     A    Because he's the one who started talking
23 first. I mean, I -- I don't know. I just...
24     Q    The last time you listened to this particular
25 interview in its entirety would've been about a year

Page 84

1  ago, correct?
2      A    Roughly. I guess so.
3      Q    Would you agree with me that out of the three
4  law enforcement officers that participated in
5  questioning Sizemore that you spoke the least of all?
6      A    I'm sure I did.
7      Q    In fact, Mr. Eubanks and Mr. York communicated
8  with Mr. Sizemore much more frequently than you did
9  during this interview. Would you agree with that?
10     A    Yes, sir.
11     Q    And it's your testimony that there wasn't any
12 conversation that occurred prior to questioning Sizemore
13 where those roles were determined?
14     A    Again, other than me just asking them to
15 assist me with the obtaining of the statement just
16 because I didn't have any of the background information,
17 and -- and they had been involved on the missing person
18 side for a couple of days, and that they would have that
19 information to -- to add, so...
20     Q    But do you agree that every comment you made
21 to Sizemore during the questioning was with the ultimate
22 goal of obtaining a statement?
23     A    I'm sorry. You'll have to -- to reword that.
24 I don't understand.
25     Q    Would you agree that the comments that you

Page 85

1  made to Mr. Sizemore during this questioning would've
2  been comments made towards your ultimate goal of
3  obtaining a statement from him?
4          MS. ARNETT: Object to form.
5      A    I obtained a statement from him to get, again,
6  knowledge as to the events that occurred for the
7  investigation. I mean, that's why --
8      Q    Sure. Wouldn't you agree that any comments
9  you made to Mr. Sizemore would've been intentionally
10 made in an effort to get a statement from him?
11     A    That I made to Mr. Sizemore? I'm not sure I
12 really understand.
13     Q    Well, whatever you were telling Mr. Sizemore
14 was to try to get a statement, right?
15     A    Uh-huh. Yes, sir.
16     Q    And is it fair to say that an objective of
17 this questioning was to obtain a statement from Sizemore
18 that implicated himself in the murder of Bobby Wiggins?
19         MS. ARNETT: Object to form.
20         MR. KELLEY: I'm sorry. I didn't hear the
21 question. Implicates who?
22         MR. SLOSAR: Himself.
23         MR. KELLEY: I'm sorry.
24     A    Just to get a statement of what he did and
25 what he knows in regards to the -- the investigation.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

Kentuckiana
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019          86..89

Page 86

1  BY MR. SLOSAR:
2      Q    Is it fair to say that your theory of the case
3  at the time that you questioned Sizemore was that he
4  could not have done the murder alone, because he was not
5  smart enough to do this on his own?
6          MS. ARNETT:  Object to form.
7      A    Is that something that I said?  During --
8      Q    It's something that was said to Sizemore
9  during the examination.
10     A    By me?
11     Q    Yeah.
12     A    Because I -- I don't remember that exactly,
13  no.  Not saying it didn't -- wasn't said, but I just
14  don't remember that.  But what's your question about
15  that?
16     Q    We're going to go to specific parts.
17     A    Uh-huh.
18     Q    Right now I'm just asking you some general
19  questions before we dig into this.
20     A    Sure.
21     Q    But would you agree that the theory of the
22  case was that Sizemore could not have done this murder
23  alone, because he was not smart enough, by the time he
24  was questioned on December 3, 2011?
25         MS. ARNETT:  Object to form.

Page 87

1      A    Well, I'm -- I'm not sure I had a theory at
2  that point.  I mean, this was very early in my
3  investigation and my involvement, and I was -- I was
4  just trying to obtain information.
5      Q    Do you know whether that was York's theory?
6      A    I can't tell you what York's theory was, no,
7  sir.
8      Q    Prior to questioning James Otis Sizemore on
9  December 3, 2011, did you have any reason to believe
10  that William Anderson was involved in the murder of
11  Bobby Wiggins?
12     A    Prior to obtaining a statement from Mr.
13  Sizemore?  Is that what you said?
14     Q    Uh-huh.
15     A    I know I had been told that property belonging
16  to the victim had been recovered from Mr. Anderson, and
17  that Mr. Anderson and Mr. Sizemore were seen in the
18  vehicle belonging to the victim.
19     Q    But when you were informed of that
20  information, was that from other law enforcement
21  officers?
22     A    Yes, sir.
23     Q    Were those officers from the Knox County
24  Sheriff's Department?
25     A    I believe it was Deputy Eubanks.

Page 88

1      Q    And did Deputy Eubanks inform you that Mr.
2  Anderson voluntarily provided the coat and hat from the
3  victim to law enforcement?
4      A    I don't recall.
5      Q    Did Deputy Eubanks inform you that Mr.
6  Anderson volunteered to law enforcement that James Otis
7  Sizemore had drove him and Jeremy Ferrell in the black
8  Camry on the night in question?
9      A    I -- I don't recall if he told me that.
10     Q    Did Mr. Eubanks tell you that Mr. Anderson was
11  cooperative with law enforcement when they met with him
12  on December 1, 2011?
13     A    All I recall is he said that he received the
14  items from the victim from Mr. Anderson.  But I don't
15  recall him saying if he was cooperative or
16  uncooperative, so I mean, I can't say.  He didn't say he
17  wasn't cooperative.
18     Q    Certainly none of the information that you
19  just described implicated William Anderson as being part
20  of the murder, correct?
21         MS. ARNETT:  Object to form.
22     A    When taken into the statement from Mr.
23  Anderson, the injuries of Bobby Wiggins, and the
24  information that I've been told is the items of the
25  victim being recovered from Mr. Anderson and them having

Page 89

1  been seen in his car, I mean, yeah, I felt that's
2  clearly probable because for that.
3      Q    After the creation of Sizemore's statement,
4  you felt that you had probable cause?
5         MS. ARNETT:  Object to form.
6      A    After the autopsy --
7      Q    Yeah.
8      A    -- and the statement and receiving the other
9  items.
10     Q    Would you agree that the autopsy confirmed
11  that James Otis Sizemore had personal knowledge about
12  the murder of Bobby Wiggins?
13     A    What do you mean he "had personal knowledge"?
14     Q    The autopsy merely corroborated the fact that
15  James Otis Sizemore certainly had personal knowledge
16  about Bobby Wiggins' murder, that he was involved in
17  some way, correct?
18     A    Yes, sir.  I mean, based on the statement he
19  provided us and the results of that, yes.
20     Q    There is nothing you learned in the autopsy
21  that confirmed that a second person was involved in the
22  murder of Bobby Wiggins, correct?
23         MS. ARNETT:  Object to form.
24     A    I don't recall the -- I mean, the autopsy, we
25  attended it, and seeing what the injuries was, but I

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

Page 90

1  don't think there's anything to say it's one or ten
2  people involved.
3      Q   Well, certainly, if there was more than one
4  type of a knife used, that would be an indication that
5  there was more than one person involved.  Would you
6  agree with that?
7      A   If there was more than one type of knife
8  involved, but who's to say there was or wasn't?  I mean,
9  autopsy results are unable to say that.
10     Q   I mean, Detective Johnson, you're under oath
11 here today, okay?  Did the medical examiner or the
12 coroner ever tell you during the autopsy that there was
13 any evidence indicating that more than one knife was
14 used to stab Bobby Wiggins to his death?
15     A   They didn't -- no, sir.  It would be in their
16 report what their conclusions -- their findings are.
17     Q   Sure.  And there's nothing like that in the
18 autopsy report, correct?
19     A   Nothing like what?  How many people were
20 involved?
21     Q   Or if there was even more than one knife used?
22     A   I'd -- I'd have to refer to their report.  I
23 don't recall.  I mean, I don't know what they said about
24 the stab wounds, other than there was numerous.
25     Q   I'll hand you a group exhibit that I will

Page 91

1  label number 16.
2              (EXHIBIT 16 MARKED FOR IDENTIFICATION)
3      A   Thank you.
4      Q   Just want to make sure I had -- sorry.  Do you
5  recognize that document, sir?
6      A   Yes, sir.
7      Q   Okay.  And I have stapled it as a group
8  exhibit, because I believe that according to the cover
9  page that Jay Steele, the Bell County Coroner, mailed
10 you this entire packet on or around February 13, 2012,
11 which included the toxicology report, an autopsy report,
12 coroner's report, and a copy of the death certificate.  I
13 have not included the photographs.  But would you have
14 received all this information together, sir, as best you
15 can recall?
16     A   Yes, sir.
17     Q   Okay.  And if you look at page 6, where it's
18 talking about the neck.  Do you see where it says, "Both
19 wounds are blunted on the posterior end and slightly
20 sharp on the anterior end"?
21     A   Yes, sir.
22     Q   And if you look at the next page, where it's
23 talking about the trunk.  Do you see where it says, "The
24 wounds altogether are nearly horizontal but point
25 slightly upward and to the left.  Most of the wounds are

Page 92

1  blunted on the left-hand side and are sharp on the
2  right.  The sharp ends of the wound show small abrasions
3  with excoriation of the somewhat decomposed skin, and
4  the wound at the top of the cluster points slightly
5  upward and to the right and is somewhat curved with a
6  blunt end on either side.  Either side shows a small
7  abrasion."  Do you see that sir?
8      A   Yes.
9      Q   So according to the coroner, these wounds on
10 the trunk are nearly all together and point slightly
11 upward and to the left; is that right?
12     A   Based on the -- ends up, yes.  Slightly upward
13 to the left.
14     Q   There certainly is nothing in here that would
15 lead you to believe that more than one person was
16 stabbing the victim, correct?
17          MS. ARNETT:  Object to form?
18     A   Could you reword your question?  Most of these
19 are -- there's nothing that would show me what?
20     Q   I mean, there's -- if you're looking at the
21 trunk, which is where the majority of the stab wounds
22 are contained, right?
23     A   Yes, sir.
24     Q   If you're looking at the trunk, according to
25 the autopsy report, these wounds are all together and

Page 93

1  nearly horizontal, made in the same shape and on the
2  same horizontal plane.  Would you agree with that?
3      A   Yes, sir.
4      Q   In the same area?
5      A   Yeah.
6      Q   Same region of the body?
7      A   Yes, sir.
8      Q   Yeah.  And the wounds are leaning slightly
9  upward and to the right, and they're somewhat curved,
10 with a blunt end on either side.  That's what the
11 coroner found, right?
12     A   Uh-huh.
13     Q   Is that right?
14     A   This -- this was the medical examiner's.  This
15 is not the coroner.  It's --
16     Q   The medical examiner.
17     A   I think.
18     Q   But certainly, that would be consistent with a
19 single person, using the same weapon, to make these
20 nearly identical wounds on the same horizontal plane of
21 Mr. Wiggins' body.  Would you agree with that?
22     A   It appears that way, yes.
23     Q   There certainly is nothing in this report that
24 would indicate that multiple knives were used to kill
25 Bobby Wiggins, correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

94..97

Page 94

1    A    Nothing that I -- yeah, nothing that I've seen
2  that says that.
3    Q    So when James Otis Sizemore says that Bobby
4  Wiggins was stabbed to death, and you go to the autopsy
5  and you see that there are stab wounds, would you agree
6  that that does not indicate that there was a second
7  person involved in the murder?
8        MS. ARNETT:  Object to form.
9    Q    Do you want me to read that --
10    A    Yeah, please.  Yeah.  I'm sorry I didn't --
11    Q    Would you agree that when you go to the
12  autopsy and you see that there are stab wounds on Bobby
13  Wiggins, that the only thing that that confirms is that
14  James Otis Sizemore has personal involvement and
15  knowledge of the murder of Bobby Wiggins.  Do you agree
16  with that?
17    A    I mean, he has personal knowledge and likely
18  involvement.  He -- he led them to where the body was
19  at.
20    Q    Sure.  For sure.  I agree with that.  What I'm
21  saying is, though, wouldn't you agree that the fact that
22  there were stab wounds on Bobby Wiggins body, that that
23  doesn't corroborate that there was a second person
24  involved who stabbed Bobby Wiggins, right?
25    A    No, sir.  I mean -- I guess not.

Page 95

1    Q    Yeah.  It could have very well been that James
2  Otis Sizemore hit Bobby Wiggins with a rock twice and
3  then stabbed him to death, right?
4    A    I don't know.
5    Q    Because you weren't there, right?
6    A    Correct.
7    Q    But when you're investigating, would you agree
8  that it's important to corroborate before initiating
9  charges against somebody for a crime?
10    A    Again, taking all the information that I had
11  and the results -- I mean, the autopsy may not have said
12  one person could have done this, but it doesn't say
13  that two people couldn't have done this.  It -- I mean,
14  it's still early on in the investigation, and it's a
15  serious investigation.  And I made charges because I had
16  probable cause to do so.
17    Q    Mr. Johnson, outside of James Otis Sizemore,
18  can you tell me a single other witness who you spoke to
19  before initiating charges against William Anderson for
20  the murder of Bobby Wiggins?
21    A    What do you mean any other person?
22    Q    A single other witness in the investigation.
23    A    Just the law enforcement officers that had
24  been involved for the days leading up to.
25    Q    But prior to initiating charges against

Page 96

1  William Anderson, you didn't speak to Dave Fox, right?
2    A    I did not, no.
3    Q    Prior to initiating charges against William
4  Anderson, you didn't speak to Jeremy Ferrell, correct?
5    A    That's correct.
6    Q    Prior to speaking to -- prior to initiating
7  charges against Bill Anderson, you didn't speak to
8  Leonard Messer, correct?
9    A    I had not.
10    Q    Prior to initiating charges against William
11  Anderson, you didn't speak to Elijah Messer, correct?
12    A    I did not, no.
13    Q    Prior to initiating charges against William
14  Anderson, you didn't speak to Ruth Sizemore, correct?
15    A    No, sir.
16    Q    Prior to initiating charges against William
17  Anderson, you didn't speak to Wendy Gray, correct?
18    A    No, sir.
19    Q    Prior to initiating charges against William
20  Anderson, you didn't even question Mr. Anderson, right?
21    A    He had not been, no.
22    Q    Prior to initiating charges against William
23  Anderson, did you listen to any of the audio recorded
24  interviews that the Knox County Sheriff's Department
25  obtained on December 1, 2011 from Dave Fox, Kim York,

Page 97

1  Jeremy Ferrell, or William Anderson?
2    A    Before charges?  No, sir.  Probably not.
3    Q    Prior to initiating charges against William
4  Anderson, did you review any reports that related to the
5  interviews conducted by the Knox County Sheriff's
6  Department on December 1, 2011?
7    A    No, sir.
8    Q    Prior to initiating charges against William
9  Anderson, did you listen to any of the two recorded
10  statements that Sheriff Pickard and Deputy Eubanks
11  obtained from James Otis Sizemore before taking him to
12  the mountain on December 2, 2011?
13        MR. KELLEY:  Objection as to form.
14    Q    You can answer.
15    A    Did I listen to the statements that Sheriff
16  Pickard and Deputy Eubanks had obtained before --
17    Q    Prior to initiating charges.
18    A    I don't -- I don't recall -- I don't think so,
19  but I don't recall.
20    Q    You've since listened to those statements,
21  correct?
22    A    They have been listened to, yes.
23    Q    And do you recall -- actually one of those
24  statements where Mr. Sizemore implicates a group of
25  Mexicans in Eastern Kentucky as being responsible for

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

98..101

Page 98

1  the murder?

2      A    Yes, sir.

3      Q    Fair to say that Mr. Sizemore's statements to

4  Sheriff Pickard and Mr. Eubanks contradicted the

5  statement that he gave to you, Mr. Eubanks, and

6  Detective York on December 3, 2011?

7      A    What is the question?

8      Q    Fair to say that his statements were

9  inconsistent with each other?

10     A    Yeah, his statements changed.

11     Q    Even -- Mr. Sizemore's statement even on

12  December 3, 2011 when you were with him, his statement

13  was changing, right?

14     A    Yes, sir.

15     Q    Yeah.  And you -- yet you didn't review any of

16  that other evidence or speak to any of those witnesses

17  prior to initiating murder charges against William

18  Anderson on December 3, 2011, correct?

19     A    I did not, no.

20     Q    Detective Johnson, is it fair to say that the

21  Wiggins homicide investigation was one of your first

22  ever homicides that you worked on?

23     A    It was my first murder investigation as a

24  detective, yes.

25     Q    Is it fair to say that if you can go back to

Page 99

1  2011 and do this over, that you would've done this

2  investigation a little bit differently?

3          MS. ARNETT:  Objection.  Calls for

4  speculation.

5      A    If I had done it today?  Possibly.  I mean,

6  every investigation, you learn.  You learn new

7  techniques, new tactics.  So possibly.

8      Q    Is it fair to say that it would've been --

9  would you agree that it would've been important to speak

10  to Dave Fox or Jeremy Ferrell about the events that

11  occurred on November 23, 2011 in an effort to

12  corroborate Mr. Sizemore's allegations?

13         MS. ARNETT:  Object to form.

14     A    Those individuals had been spoke to, and the

15  information was relayed to me.

16     Q    But you don't -- sitting here today, you've

17  already testified that you don't remember what

18  information was relayed to you prior to the initiation

19  of charges, correct?

20     A    No, but -- I mean, I know that those

21  individuals had been spoken to by law enforcement before

22  my involvement.  Now, to tell you today exactly what

23  information they relayed to me at the end, I mean, I

24  can't -- I can't say specifically.  I mean, I know we

25  talked about the belongings of Mr. Wiggins -- know about

Page 100

1  them in Mr. Wiggins' car.  I know that information was

2  relayed to me, but -- among other stuff.  But -- but

3  those individuals had been spoken to, just not by me.

4      Q    And you had not listened to any other recorded

5  interviews that were obtained prior to your December 3,

6  2011 interview of James Otis Sizemore, correct?

7      A    Before the charges against Mr. Anderson?

8      Q    Uh-huh.

9      A    I don't think I had, no.

10     Q    And even though some information may have been

11  conveyed to you about these witnesses being interviewed

12         -- well, let me ask you this:  Did you ever

13  request from Deputy Eubanks or Sheriff Pickard to listen

14  to any of the audio recorded interviews that they

15  conducted in the investigation prior to initiating

16  charges against Mr. Anderson on December 3, 2011?

17     A    Did I ask them to listen to them?

18     Q    Yeah.  Did you ever say, hey, Sheriff Pickard

19  or Deputy Eubanks, can you give me the cassette tapes or

20  the recordings that you have so I could listen to this?

21     A    I don't recall that I ever asked them.  But

22  they said they would provide them to me for my

23  investigation.  But I don't think I asked them.

24     Q    Sure.

25     A    At that point.

Page 101

1      Q    And you actually interviewed -- you questioned

2  James Otis Sizemore at the Knox County Sheriff's

3  Department on December 3, 2011, correct?

4      A    Yes, sir.

5      Q    So like, the recorded interviews to the best

6  you know, they would actually have been maintained in

7  that same police department where you were questioning

8  Mr. Sizemore, right?

9      A    Possible.

10     Q    Yeah.  And you don't have any independent

11  memory of making a request to listen to those recordings

12  prior to initiating charges against Mr. Anderson,

13  correct?

14     A    Correct.

15     Q    Detective Johnson, I want to focus on this

16  December 3, 2011 recorded questioning of Mr. Sizemore,

17  okay?  Is it fair to say that you came to believe during

18  this questioning with Mr. Sizemore that he was lying to

19  you about his knowledge of the Wiggins homicide?

20     A    I didn't know.  I mean, I did -- did I think

21  he was lying?  I don't -- I don't know.

22     Q    Well, certainly Detective York, in your

23  presence, expressed to Mr. Sizemore repeatedly that he

24  thought he was lying.  Do you recall that happening?

25     A    Not specifically.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019          102..105

**Page 102**

1    Q    All right.  Let me play you some clips and see
2  if it refreshes your memory at all.  We should probably
3  just label the Sizemore December 3, 2011 recorded
4  interview as Exhibit 17.  Let me make sure --
5            (AUDIO RECORDING PLAYED)
6    Q    So I will submit the entire audio as Exhibit
7  17.  I'm just going to be playing clips.  And I will
8  identify those clips by the time stamp on the record.
9  Sir, I'm going to play you the first clip, and I'm going
10  to ask you some questions about it right after, okay?
11           (EXHIBIT 17 MARKED FOR IDENTIFICATION)
12   A    Yes, sir.
13           (AUDIO RECORDING GPLAYED)
14   Q    Sir, did you hear that clip?  And it's on --
15  sorry.  It's on page 3.  I told you I was going to get
16  you -- do you want me to play it again for you?
17   A    No, sir.
18   Q    Okay.  You were present when Detective York
19  made that comment to Mr. Sizemore on December 3, right?
20   A    I was there, yes.
21   Q    Yeah.  And in that comment, Detective York
22  told Mr. Sizemore that Mr. Anderson had been spoken to,
23  and he refers Mr. Anderson as Bill Bill.  Do you recall
24  that occurring?
25   A    From hearing it, yeah.  I mean, it occurred.

**Page 103**

1    Q    Yeah.  And Mr. York tells Sizemore, "And you
2  the one that done it."  And then proceeds to inform him,
3  "You don't think we've talked to Bill Bill?"  So at the
4  very onset of this questioning, is it fair to say that
5  Detective York told Sizemore that Mr. Anderson was
6  implicating him in the murder of Bobby Wiggins?
7    A    I don't see that.
8    Q    Well, when you put it together, "You the one
9  that done it."  "Don't 'huh' me."  "You don't think
10  we've talked to Bill Bill?"  I think the implication is
11  that Mr. Anderson provided information to law
12  enforcement that implicated James Otis Sizemore in the
13  murder.  Would you agree with that?
14   A    Again, I -- I can't say what the implication
15  was there.  I didn't say that, but...
16   Q    Well, you didn't stop -- you didn't tell
17  Detective York that he was wrong, right?
18   A    No, sir.  He didn't say that Bill Bill said
19  he'd done it.  He just said, "You don't think we've
20  talked to him?"
21   Q    That clip was from 54 seconds to one minute
22  four seconds.  Let me play you another clip from page 4,
23  sir.  And it's lines 59 through 61, and the clip is 239
24  to 245.  See if this refreshes your memory.
25           (AUDIO RECORDING PLAYED)

**Page 104**

1    Q    Is it fair to say that at the beginning of
2  this questioning, that you had reason to believe that
3  Sizemore was the one that killed Bobby Wiggins and not
4  William Anderson?
5        MS. ARNETT:  Object to form.
6    A    What was your question?
7    Q    Is it fair to say that at the onset of this
8  questioning of Mr. Sizemore on December 3, 2011, that
9  you had reason to believe that he murdered Bobby Wiggins
10  and not William Anderson?
11   A    I don't know.  I mean, I didn't know what had
12  happened.  Now, did I suspect involvement?  Sure.
13  Because he had took them to the body.  But I didn't know
14  what had happened there.
15   Q    If you didn't know what happened, then why
16  would it be appropriate to tell a witness what to say?
17   A    I didn't.
18   Q    Would it be appropriate for Detective York to
19  tell Mr. Sizemore to say something if he didn't know
20  what happened?  It's not on the transcript.
21   A    I -- I don't -- I don't know how to answer
22  that question.  I mean, I don't know.
23   Q    Have you ever told a witness what to say?
24   A    Do I tell them what to say?  No.
25   Q    Have you ever said, I know that you killed

**Page 105**

1  this person, without having reason to believe that they
2  killed that person?
3    A    Don't recall ever saying that.
4    Q    Is it fair to say that Sizemore's statement
5  repeatedly changed during your December 3 questioning?
6    A    His statement changed.  Uh-huh.
7    Q    Is that fair to say that during portions of
8  the questioning, that you came to believe that Mr.
9  Sizemore was not being truthful with law enforcement
10  about his knowledge of the murder of Bobby Wiggins?
11   A    Possibly.  I mean, possibly thought there were
12  things that wasn't the truth.
13   Q    One of the things that Mr. Sizemore continued
14  to do throughout your questioning was try to minimize
15  his involvement in the murder of Bobby Wiggins.  Do you
16  recall that?
17   A    Not specifically, no.
18   Q    Well, let me refer you to page 6, line 106.
19  And I'm going to play 521 through 548 and see if this
20  refreshes your memory about Sizemore trying to minimize
21  his involvement.
22           (AUDIO RECORDING PLAYED)
23   Q    Did you have a chance to hear that, sir?
24   A    Yes, sir.
25   Q    And is it fair to say that at this portion in



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

106..109

Page 106

1  the questioning, Mr. Sizemore was trying to minimize his
2  role in the death of Bob Wiggins?
3       A   I'm sorry?
4       Q   Would you agree that at this point in that
5  questioning, you came to believe that Mr. Sizemore was
6  trying to minimize his role --
7            MR. KELLEY:  Objection as to form.
8       Q   -- in Wiggins' death?
9       A   I can't say that that's what I thought at the
10  time.
11       Q   What did you think at the time?
12       A   Just trying to grasp an understanding of what
13  information he had, because I -- again, I -- didn't
14  know.
15       Q   Well, weren't you informed prior to this
16  interview by Sheriff Pickard or Deputy Eubanks that Mr.
17  Sizemore was a known liar?
18       A   I don't recall if they ever told me that
19  specifically.  I know they talked about he's a thief and
20  in trouble here and there.
21       Q   And you knew from the very moment that you
22  became involved in this investigation that Sizemore was
23  somebody that couldn't be trusted, because he tried
24  escaping on the mountain, right?
25       A   He did.

Page 107

1       Q   Yeah.  You knew before you questioned Mr.
2  Sizemore in an interview room at the Knox County
3  Sheriff's Department that he couldn't be trusted,
4  correct?
5       A   I can't say that.  I had no dealings with him.
6  I mean, everything that I had was just what was relayed
7  to me prior to this interview, and I'd never dealt with
8  him.
9       Q   You had no reason to disbelieve any of the
10  information that these law enforcement officers are
11  providing to you about Mr. Sizemore's propensity for not
12  telling the truth, right?
13            MS. ARNETT:  Object to form.
14       Q   He can answer.
15       A   Again, I don't remember him ever telling me
16  he's specifically saying he's a liar.  I know they said
17  that they've dealt with him a lot through different
18  things.  But I don't -- I don't remember that.
19       Q   By "different things," you mean different --
20       A   Just criminal charges.
21       Q   -- criminal actions?  Yeah.
22       A   Different thefts and whatnot.
23       Q   Different crimes that he committed in the
24  community --
25       A   Uh-huh.

Page 108

1       Q   -- right?
2       A   Uh-huh.  Yes, sir.
3       Q   And you knew that he escaped on Redbird
4  Mountain and had to be apprehended by colleagues of
5  yours, right?
6       A   He did.  Yes.  That had happened before my
7  involvement, but they had told me that happened.
8       Q   And it's your testimony here today that when
9  you were questioning James Otis Sizemore, you're going
10  in there with a blank slate, and you're ignoring all of
11  this other information that law enforcement officers
12  provided to you about their past interactions with
13  Sizemore.  Is that your testimony, sir?
14       A   I never said I was ignoring it.
15       Q   Well, you certainly knew that this person had
16  credibility issues before taking his statement, correct?
17            MS. ARNETT:  Object to form.
18       A   Because they -- he was a known thief.
19       Q   And he escaped?
20       A   He ran off.
21       Q   Uh-huh.
22       A   I conduct a lot of interviews, and
23  unfortunately people ain't always honest upfront.
24       Q   Sure.
25       A   And it's a lot of the time, so...

Page 109

1       Q   As a law enforcement officer, it's critical --
2  it's so critical to be able to investigate in order to
3  verify whether somebody is being reliable.  Would you
4  agree with that?
5       A   Yes, sir.  You've got to investigate.
6       Q   Uh-huh.  Yeah.  Need to take steps to
7  corroborate statements given by a witness in order to
8  determine whether charges are appropriate.  Do you agree
9  with that?
10            MS. ARNETT:  Object to form.
11       A   You invest -- yeah.  You investigate to
12  ultimately try to get to the truth.
13       Q   Would you agree that James Otis Sizemore's
14  December 3, 2011 statement by itself would not be enough
15  to form probable cause to initiate charges against
16  William Anderson for the murder of Bobby Wiggins?
17            MS. ARNETT:  Object to form.
18       A   Again, going off of his statement and the
19  injury report at the autopsy and -- and the other
20  information provided to me, that is where my probable
21  cause come from.  It wasn't just from this, but it's
22  this and the other item.
23       Q   And we're going to get to that.  My question
24  to you is:  Would you agree that James Otis Sizemore's
25  statement by itself would not have been enough to form

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

Page 110

1  probable cause to initiate charges against William
2  Anderson for murder?
3       MS. ARNETT:  Object to form.
4    A   I don't know.
5    Q   You had never investigated a homicide before
6  this, right, sir?
7    A   As a detective, no.
8    Q   And prior to this case, you had never been in
9  the position of having to assess whether a statement
10 provided by a witness was enough to form probable cause
11 against someone for murder, correct?
12      MS. ARNETT:  Object to form.
13   A   Yeah, I don't know.  It wasn't just his
14 statement that -- that led me there, though.
15   Q   Well, we've already discussed you didn't
16 listen to any other recorded statement by a witness in
17 this case prior to initiating charges against Mr.
18 Anderson, correct?
19   A   Yes.
20   Q   You hadn't reviewed a single other police
21 report in this case by any law enforcement agency prior
22 to initiating charges against Mr. Anderson, correct?
23   A   That's correct.
24   Q   The only information you had personal
25 knowledge of was the information that Mr. Sizemore

Page 111

1  provided at his December 3, 2011 statement and the
2  information you learned from the autopsy, correct?
3    A   And the information from the other officers
4  who have been involved in this.
5    Q   And you have no idea, sitting here today, what
6  information they provided to you, right?
7       MS. ARNETT:  Can you repeat?  What was the end
8  of that?
9    Q   What information they provided to you.
10   A   I mean, other than what we've discussed.  I
11 mean, I can't recall everything that was said, but...
12   Q   You don't recall whether those officers
13 informed you that Mr. Anderson voluntarily provided the
14 clothing, right?
15   A   No.
16   Q   Don't recall that?  Don't recall whether those
17 officers told you that Mr. Anderson advised that he got
18 the clothing from James Otis Sizemore, right?
19   A   Yeah.  I don't recall.
20   Q   You don't recall whether those officers told
21 you that Mr. Anderson had an alibi for the time of the
22 murder, correct?
23   A   No.  I don't recall.
24   Q   Don't recall whether those officers told you
25 that Dave Fox and Jeremy Ferrell verified Mr. Anderson's

Page 112

1  alibi, correct?
2    A   I don't know what you mean by, "Jeremy Ferrell
3  and Dave Fox verified his alibi."  I don't...
4    Q   Well, you've since listened to the recorded
5  statement that Dave Fox gave to you, Mr. Eubanks, and
6  Mr. Pickard, right?
7    A   Yes.
8    Q   And in that statement -- generally summarizing
9  it, Dave Fox says that he was with Mr. Anderson on
10 November 23 at the Messer's house watching Elijah all
11 day until they left to go to Desi's and dropped off some
12 food, right?  Is that generally what you recalled Dave
13 Fox providing to law enforcement December 1?
14   A   I think he said that he --
15      MR. WEBER:  Objection to form.
16   Q   You can go.
17   A   Yeah, but he was in and out.  He wasn't there
18 all day.  That's my understanding.  But, again, I
19 haven't listened to those in a long time.
20   Q   You haven't listened to the Dave Fox tape in a
21 long time?
22   A   In a while, right.
23   Q   Okay.  Dave Fox certainly -- you can listen to
24 it and refresh your own memory.  The record is what it
25 is.  According to Dave Fox and Jeremy Ferrell, the first

Page 113

1  time that day that Mr. Anderson would have come into
2  contact with Sizemore was at the Indian store.  Do you
3  generally recall when you listened to those recordings
4  after the initiation of charges learning that --
5       MS. ARNETT:  Object to form.
6    Q   -- information?
7    A   I remember that they met at the Indian store.
8  I remember that information.
9    Q   And do you remember -- and sitting here today,
10 you have no independent memory of whether Sheriff
11 Pickard or Deputy Eubanks advised you that Mr. Ferrell
12 and Mr. Fox told them that Sizemore first saw Anderson
13 that day at the Indian store?
14   A   I don't recall.
15      MS. ARNETT:  I don't know if you have a
16 natural stopping point, but we -- I would like to
17 break for lunch.
18      MR. SLOSAR:  Yeah.  We can stop now.  Do you
19 want to stop now?
20      THE WITNESS:  Whatever.  Whatever you-all
21 want's fine with me.
22      MS. ARNETT:  Okay.
23      MR. SLOSAR:  We can stop now.
24      VIDEOGRAPHER:  The time is 12:37.  We are off
25 the record.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

114..117

Page 114

1        (OFF THE RECORD)
2        VIDEOGRAPHER:  We're on the record at 1:06.
3   BY MR. SLOSAR:
4        Q    Sir, would you agree that James Otis
5   Sizemore's statement by itself would not have been
6   enough to form probable cause to charge William Anderson
7   with the murder of Bobby Wiggins?
8        MR. KELLEY:  Objection as to form.
9        A    Possibly.  But, again, I mean, that's not the
10  only thing I used for my probable cause.  But...
11       Q    Now, in fact, Mr. Sizemore's December 3, 2011
12  statement that he gave had a number of inconsistencies
13  as it related to the murder of Bobby Wiggins.  Would you
14  agree with that?
15       A    Yes.  There's some changes in his statement.
16       Q    Yeah.  And we're going to try to talk about
17  some of those inconsistencies.  Do you recall Mr.
18  Sizemore attempting to blame William Anderson for
19  burning Mr. Wiggins' car?
20       A    Yes, sir.
21       Q    Yeah.  And, in fact, isn't it true that when
22  Mr. Sizemore -- and would you agree that Mr. Sizemore
23  was trying minimize his role in burning the victim's
24  car?
25       A    Possibly, I guess.  I don't -- I don't know

Page 115

1   exactly what happened with the car, so it's hard for me
2   to say at that time what I was thinking he was doing.
3        Q    Well, certainly Mr. York confronted Mr.
4   Anderson with the fact that -- well, let me play you a
5   clip.  This is from 10:58 to 11:15, and see if this
6   refreshes your memory at all, sir.  This is on page 11.
7        (AUDIO RECORDING PLAYED)
8        Q    Did you hear that, sir?
9        A    I did hear that, yes.
10       Q    Okay.  At that part of the interrogation, Mr.
11  York is accusing Mr. Sizemore of burning the car; is
12  that right?
13       A    Yes, sir.
14       Q    And if you keep -- if you look at page 12,
15  after -- so if you're reading page 11, and you go to
16  page 12, you'll see that Mr. Sizemore is trying to
17  change his story again.  At that point, Detective York
18  confronts him once again.  Do you see that?  I'm looking
19  at 219 through 234.  And I'll play this part of it for
20  you.  It begins at 11:16.
21       (AUDIO RECORDING PLAYED)
22       Q    So you hear that, sir?
23       A    Yes, sir.
24       Q    And were you present during that portion of
25  the questioning of Sizemore?

Page 116

1        A    Probably.  Most likely.
2        Q    Did you disagree with anything that Detective
3   York was telling Mr. Sizemore there?
4        A    I didn't, no.
5        Q    And is it fair to say that Mr. Sizemore's
6   story about Mr. Anderson burning the car wasn't
7   necessarily credible based upon witness statements from
8   other witnesses about Sizemore burning things out of the
9   car?
10       MS. ARNETT:  Object to form.
11       A    I don't know.
12       Q    Now, it's your testimony here today that prior
13  to questioning Mr. Sizemore, that you did not review the
14  witness statements provided by Kim York, Jeremy Ferrell,
15  Dave Fox, or William Anderson on December 1, 2011,
16  correct?
17       A    Yes, sir.
18       Q    And it's your testimony here today that you
19  also did not review any of the audio recorded statements
20  that Sizemore gave to law enforcement officers prior to
21  December 3, 2011, correct?
22       A    Yeah.  I don't recall if I did.
23       Q    Like, for instance, the recorded multiple
24  hours-long statement that Mr. Pickard or Mr. Eubanks
25  obtained.  You have no independent memory of ever

Page 117

1   listening to that prior to questioning James Otis on
2   December 3, correct?
3        A    I don't think so.
4        Q    Okay.  And you would agree that Sizemore's
5   story, throughout your December 3, 2011 questioning,
6   continued to change?
7        A    Yes, sir.
8        Q    Okay.  Do you recall a portion of Sizemore's
9   story where he claimed that Mr. Anderson came up from
10  behind Wiggins and stabbed him?  I could refer you to
11  the page.  That's page 27.  I could play 27 -- it's
12  27:27 through 28:07 and you can follow on cue.
13       (AUDIO RECORDING PLAYS)
14       Q    Did you have a chance to hear that?
15       A    I did hear that, yes, sir.
16       Q    Now, at first, Sizemore's -- well, now
17  Sizemore, at this point in the questioning, he's saying
18  that Mr. Anderson came up from behind the victim and
19  stabbed him; is that right?
20       A    Yes, sir.
21       Q    Okay.  And you went to the autopsy after
22  obtaining Mr. Sizemore's statement.  Do you recall going
23  to the autopsy?
24       A    I did, yes, sir.
25       Q    Okay.  And when you went to the autopsy, you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 118

1 had a chance to see the victim's body; is that right?
2     A     Yes, sir.
3     Q     And isn't it true that the victim was never
4 stabbed in the back?
5     A     Yeah.  He was not stabbed in the back.
6     Q     And, in fact, the victim wasn't stabbed -- let
7 me withdraw that question.  Isn't it also true that the
8 victim was not stabbed less than ten times, but, in
9 fact, was stabbed approximately 18 times?
10     A     Yes, sir.
11     Q     Yeah.  So in that way, the autopsy actually
12 established inconsistencies with Sizemore's account on
13 December 3, 2011, correct?
14     A     Yeah.  He was stabbed in the front.
15     Q     Yeah.  So when Sizemore says that Mr. Anderson
16 came from behind and stabbed the victim, that certainly
17 conflicted with the information you learned in the
18 autopsy, correct?
19     A     Yes.
20     Q     And when Sizemore told you that he was -- the
21 victim was stabbed less than ten times, that conflicted
22 with the number of stab wounds that the victim had on
23 his body, correct?
24     A     I'm sorry.  You have to repeat that.
25     Q     Sure.  So Sizemore, when he says on page 27 --

Page 119

1     A     Uh-huh.
2     Q     -- that Mr. Anderson stabbed the victim with
3 his pocketknife less than ten times, that conflicted
4 with what you saw in the autopsy or learned from the
5 autopsy, which was that the victim had been stabbed 18
6 times, correct?
7     A     He'd been stabbed 18 times, yes.
8 Approximately.
9     Q     Yeah.  And would you agree that in the
10 criminal investigation experience that you had prior to
11 2011, that based on your law enforcement experience at
12 that point, that it would have been strange for you to
13 investigate a crime where the perpetrator held the
14 weapon in their non-dominant hand?
15     A     It's uncommon.
16     Q     Yeah.  And during the questioning of Mr.
17 Sizemore, do you recall him acknowledging that he was
18 left-handed?  And by "he," I mean James Otis.
19     A     Yes.
20     Q     Yeah.  You knew on December 3, 2011 at the
21 time you questioned James Otis Sizemore, that Sizemore
22 was left-handed, correct?
23     A     Yes, sir.
24     Q     Yeah.  And you also knew, during that
25 questioning, that Mr. Anderson was right-handed,

Page 120

1 correct?
2     A     That's correct.
3     Q     And Mr. Sizemore told you, in this interview,
4 that Mr. Anderson used the knife in his left hand to
5 stab Bobby Wiggins to death; is that right?
6     A     That's what he said, yes.
7     Q     Yeah.  As a reasonably trained law enforcement
8 officer, would you agree that Mr. Sizemore's assertion
9 that Mr. Anderson used his non-dominant hand to stab
10 somebody to death, that that is a piece of information
11 that is concerning and should be investigated?
12         MS. ARNETT:  Object to form.
13     A     It's a piece of the information.
14     Q     That cause you to question his credibility?
15 Let me withdraw that question.  Did that -- did Mr.
16 Sizemore's assertion that the victim was killed by
17 somebody stabbing them with their left hand, should that
18 have been investigated?
19         MS. ARNETT:  Object to form.
20     A     Yeah.  At the autopsy, I know it was brought
21 up if there's a way to determine if the stab wounds were
22 conducted with a right or a left hand.  But I don't
23 think they were able to conclusively say due to numerous
24 factors, but...
25     Q     But isn't it true that the medical examiner

Page 121

1 informed you that given the direction of the wounds, the
2 entrance wounds, that it likely was committed by
3 somebody using their left hand?
4     A     I don't recall him ever saying that, no.
5     Q     What do you recall him saying?
6     A     I recall him saying that they were not able to
7 say which hand, because they are not able to -- because
8 they don't know the exact positioning of the person
9 doing the stabbing or the victim.  I don't recall him
10 ever being able to say which hand he was stabbed with.
11     Q     Well, if you look back at Exhibit 16, the
12 autopsy report, and go to page 7.
13         MS. ARNETT:  Which page?
14         MR. SLOSAR:  7.
15     Q     You see where it's highlighted, where it says,
16 "Most of the wounds are blunted on the left-hand side
17 and are sharp on the right"?
18     A     I do see that, yes.
19     Q     Do you see above that where it says, "The
20 wounds altogether are nearly horizontal but points
21 slightly upward and to the left"?
22     A     I do see that.
23     Q     Yeah.  And you're saying --
24     A     I don't interpret that as being which hand
25 used the knife.  I think it's just the orientation of

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

122..125

Page 122

1  the wounds and which way they -- the medical examiners
2  defined their pointing.  I don't --
3      Q    You're saying that you don't have any
4  independent recollection, sitting here today, of the
5  medical examiner telling you that the direction of the
6  wounds indicate that somebody stabbed Mr. Wiggins with
7  their left hand?
8      A    No.
9      Q    Would you agree that if a medical professional
10  came to the opinion that Mr. Wiggins was stabbed by
11  somebody using their left hand, that that would be
12  consistent with James Otis Sizemore having done the
13  stabbing himself?
14      MS. ARNETT:  Object to form.
15      A    It would definitely be something that we would
16  look into.  I mean, it wouldn't necessarily say that he
17  did it.  But it -- I mean, it -- if they could
18  conclusively say it's someone with a left hand, I mean,
19  that's something we would want to look into as well.
20      Q    Well, if the medical examiner -- if somebody
21  during that autopsy came to the opinion that Mr. Wiggins
22  was stabbed by somebody using their left hand, would you
23  agree that that would cast doubt on Mr. Sizemore's
24  implicating of William Anderson as the person who
25  committed the stab wounds?

Page 123

1      MS. ARNETT:  Object to form.
2      A    My recollection of my conversation with the
3  medical examiner, they were not able to determine what
4  hand the knife was used in when Mr. Wiggins was stabbed.
5      Q    I understand that.  I asked you a different
6  question.  My question -- and you didn't document any
7  information that you learned from the autopsy, right?
8      A    That's correct, yeah.
9      Q    I mean, in your Exhibit number 1, you do
10  document in here that you went to the medical examiner's
11  office.  And I'm looking at page 7, so if you want to go
12  there, you can.  "The autopsy results determine Wiggins
13  was struck with a blunt object on the right side of the
14  head causing a laceration of the skull.  He was struck
15  with a blunt object on the left side of the nose causing
16  a fracture of the skull, a hemorrhage, sustained 12 stab
17  wounds to the chest and six stab wounds to the neck."
18  You don't write anything in here about a conversation
19  with Dr. Rolf about what hand was used to commit the
20  stabbing.  Do I have that right?
21      A    That is correct.
22      Q    Okay.  You certainly don't have any
23  independent memory, sitting here today, of your
24  conversation with Dr. Rolf eight years ago, correct?
25      A    I'm certain Dr. Rolf said that they would not

Page 124

1  be able to determine what hand it was in.  And that was
2  a pretty significant piece of information.
3      Q    You're certain of that?
4      A    Yes.
5      Q    Can't remember a single piece of information
6  that Deputy Eubanks or Sheriff Pickard provided to you
7  before questioning Sizemore, but you're absolutely
8  certain of what Dr. Rolf told you.  Is that right, sir?
9      MS. ARNETT:  Object to form.
10      Q    You can answer.
11      A    Again, I did provide some recollection of the
12  information provided to me by Deputy Eubanks and Sheriff
13  Pickard, but I can't recall everything that they said to
14  me.
15      Q    Sure.
16      A    But I also do recall this detail.
17      Q    Why is that detail so important?
18      A    Just to see what information we could find out
19  from the wounds that he obtained.  I mean, it's just
20  information that we would like to -- just like to know
21  that might help us further our investigation.
22      Q    Would it be important to determine whether the
23  knife was used by somebody's right hand or left hand
24  when killing Bobby Wiggins in order to corroborate the
25  allegations from Mr. Sizemore?

Page 125

1      MS. ARNETT:  Object to form.
2      A    Again, I mean, they were not able to determine
3  that information.
4      Q    I'm not asking you that.  I'm asking:  Would -
5  - is the -- would it be important to determine what hand
6  was used to commit the stabbing in order to corroborate
7  Mr. Sizemore's statement?
8      A    The information would have been helpful.
9      Q    Yes.  And certainly you would have had a
10  conversation with the medical examiner about whether
11  that determination could be done while you were at the
12  autopsy, right?
13      A    It would have been while I was there, yes.
14      Q    Yeah.  And you haven't documented the
15  substance of that conversation in any report during the
16  underlying criminal investigation, correct?
17      A    That's correct, sir.
18      Q    Is it fair to say that if the medical examiner
19  told you that the stab wounds were committed by somebody
20  using their left hand, would you agree that that would
21  have been an important piece of information to document?
22      A    If that's what they told me, yes, sir.
23      Q    And if the medical examiner told you that the
24  stab wounds were committed by somebody's left hand, will
25  you agree that that would be consistent with James Otis

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

126..129

---

Page 126

1  Sizemore doing the attack and not William Anderson?
2       MS. ARNETT:  Object to form.
3       Q    You can answer.
4       A    Yeah, James Otis Sizemore's left-handed.
5       Q    And would you agree that as an experienced law
6  enforcement professional, it would be highly remarkable
7  for somebody like Mr. Anderson to commit a crime, like a
8  stabbing, with their non-dominant hand?  Do you believe
9  that that simply lacks credibility?
10      MR. KELLEY:  Objection as to form.
11      MS. ARNETT:  Objection to form.
12      A    It's information so -- that we would have to
13 look into, yes.
14      Q    Well, Mr. Sizemore told you this on December
15 3, 2011.  Were you questioning the truthfulness of that?
16 And by this -- let me frame it for you.  What I'm
17 referring to is when Mr. Sizemore tells you that he is
18 left-handed, that Bill is right-handed, but that Bill
19 stabbed Bobby Wiggins to his death with his left and
20 non-dominant hand, did that cause you concerns about the
21 reliability of Mr. Sizemore's statement?
22      MS. ARNETT:  Object to form.
23      A    It was -- I mean, it was just information that
24 we had to take with -- with the other information we had
25 had.  I mean, at the time, just something that we had --

---

Page 127

1  we had to take into consideration.
2       Q    Sure.  But when you're taking this into
3  consideration, is it something that -- is it a piece of
4  information that you're concerned about in terms of its
5  reliability?
6       MS. ARNETT:  Object to form.
7       A    Well, that's why when I attend the autopsy,
8  you know, I'll try to find out if there's a way to
9  determine what hand, because then maybe it would
10 benefit, but --
11      Q    Exactly.  You went to the autopsy and asked
12 questions, because you had concerns about whether Mr.
13 Sizemore was telling you the truth; is that fair?
14      MS. ARNETT:  Object to form.
15      A    Just concerned or co -- just to corroborate or
16 just -- just to see what information they could provide
17 that we could use to compare with the information we
18 received.
19      Q    And you wanted to ask questions about which
20 hand was used to stab Bobby Wiggins to his death,
21 because that's one objective way of proving whether Mr.
22 Sizemore was being truthful or not when he implicated
23 William Anderson; is that right?
24      A    I'm sorry.  You'll have to repeat that.
25      MR. SLOSAR:  Can you play that one back?  I

---

Page 128

1  can't ask it better than that way, so I'm not going
2  to.
3       (REPORTER PLAYS BACK REQUESTED
4  TESTIMONY)
5       MS. ARNETT:  Object to form.
6       A    It potentially could be useful in that, yes.
7  BY MR. SLOSAR:
8       Q    Now, is it fair to say that if Mr. Sizemore --
9  is it fair to say that one reason that Mr. Sizemore was
10 alleging that Mr. Anderson used his left hand to commit
11 the stabbing is because Sizemore himself knew that Bobby
12 Wiggins was killed by somebody stabbing him with their
13 left hand?
14      MS. ARNETT:  Object to form.  Speculation.
15      A    Yeah.  I don't know what his reasoning behind
16 it would be.
17      Q    Well, when you're questioning Mr. Sizemore,
18 isn't that something that's running through your mind or
19 the reasons for why Sizemore is saying that somebody
20 stabbed someone to death with their non-dominant hand?
21      A    I don't recall that running through my mind at
22 the time.
23      Q    You were just taking information and not
24 considering it?
25      A    Probably considering some information, but

---

Page 129

1  just -- I don't remember that being something that I...
2       Q    Well, let me see if I can refresh your memory.
3  Let's go to -- I'm going to stay on page 28 and 29.  I'm
4  going to play a clip.  It says 28:58 through 30:54.
5       (AUDIO RECORDING PLAYED)
6       Q    Did you hear that, sir?
7       A    Yes, sir.
8       Q    Were you present for that part of the
9  questioning?
10      A    Probably.
11      Q    Yeah.  Do you disagree with anything that
12 Detective York just said?
13      A    You mean, do I disagree?
14      Q    Do you disagree with anything that he just
15 said, that somebody's not going to hurt someone with
16 their non-dominant hand?
17      A    It's -- it's uncommon.  Yeah.  I'll --
18      Q    Okay.  It's not a credible allegation.  Do you
19 agree with that?
20      A    It's very unlikely.
21      Q    Sir, one of the other claims that Sizemore
22 made is that -- and this is on page 12, so it's a little
23 bit earlier.  But one of the other claims is that Mr.
24 Anderson -- I'm sorry.  It's not page 12.  It's actually
25 farther back.  It's page 4.  That Mr. Anderson used the

---

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

130..133

---

Page 130

1  pocketknife that was recovered from him to commit this
2  murder. Do you recall him telling you that?
3     A   Used his pocketknife?
4     Q   Yeah.
5     A   It's what Mr. Sizemore said, yes.
6     Q   Yeah. And we went through the results of that
7  earlier, but Mister -- the knife recovered from Mr.
8  Anderson was tested and was not linked to the murder of
9  Bobby Wiggins; is that right?
10    A   There was no blood on it, correct.
11        MS. ARNETT:  Object to form.
12    Q   Is it fair to say that throughout the
13 questioning of Mr. Sizemore, and we can go page by page,
14 that his story continued to change?
15    A   Yes.
16    Q   Is it fair to say that Mr. Sizemore's story
17 conflicted with the evidence that you later developed in
18 this investigation?
19        MS. ARNETT:  Object to form.
20    A   What evidence? Like what --
21    Q   Well, forensics-wise, not a single piece of
22 forensic evidence ever corroborated Mr. Sizemore's
23 December 3, 2011 account that implicated William
24 Anderson, correct?
25    A   Correct. No D -- DNA. The blood did not

---

Page 131

1  match any DNA of anybody, other than the victim.
2     Q   There was never any blood or DNA associated
3  with the victim on the red Rhino, correct?
4     A   Right. Negative for blood.
5     Q   There was never any blood recovered on the
6  knife that was obtained from Mr. Anderson, correct?
7     A   No blood. That's correct.
8     Q   Yeah. Any of the clothes recovered from Mr.
9  Anderson, none of that ever linked him to the murder,
10 right?
11    A   I mean, other than them belonging to the
12 victim, but there was no --
13    Q   Like clothes --
14    A   -- blood or --
15    Q   When Mr. Anderson was arrested, there was
16 nothing that was ever on him that connected him to the
17 murder?
18    A   Oh, his clothing.
19    Q   Yeah.
20    A   I'm sorry. I misunderstood you.
21    Q   Okay.
22    A   No, it did not.
23    Q   Certainly, Mr. Sizemore, his account that the
24 victim was stabbed by Mr. Anderson in the back was
25 inconsistent with what you saw at the autopsy, correct?

---

Page 132

1        MS. ARNETT:  Object to form.
2     A   Yeah. I don't recall him ever saying he was
3  stabbed in the back. I just recall him saying that came
4  up behind him, but I don't recall him ever saying that
5  he stabbed him in the back. I don't recall that.
6     Q   The number of times that Sizemore informed you
7  that the victim was stabbed, that was inconsistent with
8  what you learned at the autopsy, correct?
9     A   It was different, yes.
10    Q   And because Sizemore's statement was
11 inconsistent with what you saw at the autopsy in some
12 respects, it could not have formed probable cause on its
13 own to initiate charges against William Anderson; do you
14 agree?
15        MS. ARNETT:  Object to form.
16    A   I don't know.
17    Q   Sitting here today, you don't know whether Mr.
18 Sizemore's statement, given its inconsistencies with
19 what you saw at the autopsy, whether that could have
20 formed probable cause or not?
21        MS. ARNETT:  Object to form.
22    A   I don't know.
23    Q   Let me ask you this. Obviously, you weren't
24 present when Mr. Wiggins was killed or else you would
25 have intervened and saved him. I have no doubt. Sitting

---

Page 133

1  here today, do you have any reason to believe that
2  William Anderson was involved in the murder of Bobby
3  Wiggins?
4     A   I do.
5     Q   What basis do you have for your belief that
6  William Anderson was involved in the murder of Bobby
7  Wiggins?
8     A   I mean, how do I describe, you know, things
9  that I've just done through the course of the
10 investigation and -- and leading up to and...
11    Q   Outside of James Otis Sizemore's statement,
12 can you name a single piece of evidence that you
13 obtained in your investigation into Bobby Wiggins' death
14 that implicates William Anderson in the murder?
15    A   Forensically, no.
16    Q   How about witnesses? Can you name a single
17 witness, outside of James Otis Sizemore, who implicates
18 William Anderson in the murder of Bobby Wiggins?
19    A   You got Jeremiah Evans, who come forward with
20 the information that he provided, and I know Kim York
21 had came forward and provided information.
22    Q   I mean, sir, is it your testimony that Kim
23 York has ever implicated William Anderson in the murder
24 of Bobby Wiggins? Is that your --
25    A   Well, it's -- again, it's been a long time

---

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

134..137

Page 134

1  since I've done, but she provided a new statement.
2      Q    Sir, isn't it true that Helen Fay Scott gave
3  you a receipt of a gas purchase in Corbin, Kentucky from
4  the date that Mr. Wiggins disappeared?
5      A    Yes.  She -- she brought that up to my
6  attention while I was at her house.
7      Q    And she gave you the receipt, right?
8      A    I believe so, yes, sir.
9      Q    And that was a gas receipt that was from the
10 date that Mr. Wiggins was believed to have been
11 murdered, correct?
12     A    I don't recall exactly, but it was around that
13 time, yes, sir.
14     Q    Corbin, Kentucky was also the same town that
15 Mr. Gray and Mr. Sizemore ultimately went to a Lowe's
16 store, correct?
17     A    That is, yes.
18     Q    And what did you do with the receipt that Ms.
19 Scott gave you?
20     A    I don't recall.  I know that I contacted -- I
21 don't remember what I done with the receipt.
22     Q    It certainly wasn't maintained as part of the
23 investigative file, right?
24     A    Yeah.  It's not in there, no, sir.
25     Q    And this was a receipt from a Walmart

Page 135

1  purchase, correct?
2      A    It was.  It was gas.  It was a gas card.
3      Q    Did you ever make any attempts to obtain the
4  video footage from the gas station?
5      A    I believe I did ask Walmart, but the gas
6  station is far away from the store, and they didn't have
7  cameras at that location at the time.  But I did speak
8  to the individual that used that gas card.
9      Q    Who is that?
10     A    Don't know her name.  I don't remember.
11     Q    Is that Elaine Amburgy (phonetic)?
12     A    Possibly.
13     Q    What did you learn from that individual?
14     A    She stated that sometimes she stay -- takes
15 Mr. Wiggins to doctors' appointments out of state and
16 that he allows her that card to use to -- for the gas
17 purchases for those trips and stuff.
18     Q    Did you document that in any way?
19     A    No, sir.
20     Q    Did Ms. Fay Scott inform you that the
21 signature on the receipt was not her brother's?
22     A    I don't recall if she did or not, sir.
23     Q    Did you ever inform Ms. Fay Scott that she
24 could check on tracking down the information easier than
25 you could?

Page 136

1      A    Possibly.
2      Q    Did Ms. Fay Scott ever request to you that you
3  should obtain the victim's phone records?
4      A    Probably.  We probably talked about his phone
5  records.
6      Q    Did you ever obtain Bobby Wiggins' phone
7  records?
8      A    I did not obtain his phone records.
9      Q    Why not?
10     A    I don't know.
11     Q    Would that be an important thing to do in a
12 homicide investigation, to obtain phone records from the
13 victim around the time of his disappearance?
14     MS. ARNETT:  Object to form.
15     A    It'd be important, yes.
16     Q    But you didn't do that in this investigation,
17 right, sir?
18     A    That's correct.
19     Q    And while we're talking about phone records,
20 did you ever make any attempt to obtain phone records
21 for James Otis Sizemore?
22     A    No, sir.  Not that I recall.
23     Q    Did you make any attempt to obtain phone
24 records for Jeff Gray?
25     A    No, sir.

Page 137

1      Q    Did you make any attempts to find out whether
2  Jeff Gray and James Otis Sizemore were with each other
3  around the time of the murder, outside of questioning
4  each of them?
5      A    Not that I recall, no, sir.
6      Q    Did Ms. Fay Scott -- and by the way, for the
7  record, Ms. Fay Scott, that's the victim's sister,
8  correct?
9      A    Yes, sir.  That's correct.
10     Q    Did Ms. Fay Scott ever report to you that she
11 found a quart sized plastic bag on her steps the day
12 that Mr. Wiggins disappeared?
13     A    I don't remember that.
14     Q    Did she inform you that this bag had strips of
15 paper in it with various phone numbers for individuals
16 linked to her brother?
17     A    I don't recall any of that, no, sir.
18     Q    Sir, isn't it true that Ms. Fay Scott turned
19 the bag and its contents over to you?
20     A    Don't recall that, no, sir.
21     Q    Do you know where that bag is today?
22     A    I'm not aware of that bag.  That's the first
23 I've heard of that.
24     Q    Sir, I don't have copies of this, but let me
25 show you this to see if this is your handwriting.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

138..141

Page 138

1     A    Yes, sir.  It appears to be.
2     Q    That's your handwriting?  Let me identify it
3  just for the record.  I'll introduce this as Exhibit 18,
4  and this is Bates stamped 9371 -- Anderson 9371.
5              (EXHIBIT 18 MARKED FOR IDENTIFICATION)
6         MS. ARNETT:  Can I see it?
7         MR. SLOSAR:  Uh-huh.
8     Q    All right.  At the bottom of this, do you see
9  where it says, "Jess Jones" (phonetic)?
10    A    Yes.
11    Q    And it has some information about Kim
12  apparently telling somebody that Bobby needs to be
13  robbed.  Do you see that?
14    A    I do, yes.
15    Q    Did you ever talk to Jess Jones?
16    A    I did.
17    Q    What information did you learn from that?
18    A    I don't recall exactly what -- what he said.
19  But maybe something consistent to that -- that.  Yeah.  I
20  don't know.  I don't know.
21    Q    Something consistent with Kim York saying that
22  somebody needs to rob Bobby Wiggins; is that right?
23    A    I believe so, yeah.
24    Q    Now --
25    A    I want to think he said that she had made

Page 139

1  comments like that about a bunch of people or something,
2  but I don't -- I don't recall.
3     Q    Now, to your knowledge, there was never a
4  connection between Kim York and William Anderson, right?
5     A    I want to think they knew of each other.  I
6  don't know -- outside of that, I don't know of any
7  connection.
8     Q    Okay.  Certainly there was a connection
9  between Kim York and James Otis Sizemore, correct?
10    A    Yes, sir.
11    Q    Now, after leaving James Otis Sizemore's
12  December 3rd questioning, is that when you went to the
13  autopsy?
14    A    It was that -- yes, that morning.
15    Q    Who went with you to the autopsy?
16    A    I believe I went by myself, sir.
17    Q    Outside of Wiggins being stabbed, there was
18  nothing that you learned at the autopsy that confirmed -
19  - let me withdraw that.  Do you recall how long the
20  autopsy was, how many hours?
21    A    No, sir.
22    Q    We -- I know we went over this earlier.  But
23  you actually learned information in the autopsy that
24  contradicted some of Sizemore's claims; is that correct?
25    A    I'm sorry.  You'll have to repeat that.

Page 140

1     Q    In the autopsy, you learned information that
2  contradicted some of the claims made by Sizemore; is
3  that right?
4         MS. ARNETT:  Object to form.
5     A    I'm not sure what you're referring to.  I
6  don't...
7     Q    For instance, we went over earlier when
8  Sizemore said that the victim was stabbed less than ten
9  times, that was inaccurate based on the autopsy?
10    A    That's correct, yes.
11    Q    And Sizemore said that the victim -- that Mr.
12  Anderson came from behind to stab Mr. Wiggins.  That,
13  too, would be incorrect based on what you saw at the
14  autopsy, correct?
15    A    I don't think I can say that.  Again, I don't
16  see where it says that he stabbed him in the back.  It
17  says he came up behind him but --
18    Q    It says -- page 28 says, Mr. Eubanks was
19  asking where was Bill Bill at the first strike?  Behind
20  him, besides him, in front of him?  JS:  first strike
21  behind him."  According to Mr. Sizemore, Mr. Anderson is
22  standing behind the victim when he's stabbing him for
23  the first strike.  Did I read that right?
24    A    That Mr. Anderson was standing behind Mr.
25  Wiggins --

Page 141

1     Q    Uh-huh.
2     A    -- when the first strike occurred?
3     Q    Yeah.
4     A    Yeah.  That's what it says.
5     Q    Yeah.  And certainly you didn't see anything
6  at the autopsy, any wounds, that would indicate that the
7  victim was struck from behind with a knife, correct?
8     A    You mean "struck from behind"?
9     Q    Well, there's no way -- I mean, if somebody is
10  behind someone, I mean, you can't stab them in the
11  front.  I mean do you know of a way to --
12        MR. KELLEY:  Sure you can.
13        MR. SLOSAR:  -- well, are you -- okay.  I
14     mean, look, this is supposed to be like court.  You
15     testify --
16        MR. KELLEY:  I object, but go ahead.
17  BY MR. SLOSAR:
18    Q    Well, it's --
19    A    And exactly right after that, it says, "And
20  where was that strike at?"  He says, like, "Right here,
21  right there."  It says, "On his left titty or his right
22  one."  And Mr. Sizemore says, "It should be on his left
23  titty, because Bill Bill came up behind him."
24    Q    I mean, how as a law enforcement officer, how
25  would somebody stab any victim from behind with knife

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

142..145

Page 142

1   wounds that are going in the up direction?  Can you
2   explain that?
3        A    No, sir.
4        Q    Okay.  Because given the entrance wounds and
5   the autopsy report, there's no indication that somebody
6   is being stabbed from behind.  Would you agree?
7        A    Again, my rec -- recollection at the autopsy
8   is they were not able to determine where anyone was when
9   the stabbing occurred.
10       Q    Would you agree that you learned in the
11  autopsy that the stab wounds were made from a knife that
12  was blunted on one side and the second side being sharp?
13  I can refer you to Exhibit 16.  We're on page seven if
14  you need to refresh your memory.
15       A    I remember it was listed in the report -- the
16  report.  I don't remember if that exact detail was
17  discussed to -- during the autopsy.  But I did -- it was
18  listed in the medical examiner's report, which were
19  being provided to me at a later date.
20       Q    You certainly would have received some
21  preliminary findings on the day of the autopsy, correct?
22       A    Yes.
23       Q    Now, if the knife that caused his wounds was
24  blunted on one side and another side being sharp, that
25  would be another inconsistency with the pocket knife

Page 143

1   recovered from William Anderson that was double-sided,
2   correct?
3             MS. ARNETT:  Object to form.
4        A    Well, I -- I don't recall the knife blades
5   were double-sided.  The knife had blades that extended
6   from both sides of the knife.  It was a dual-bladed
7   knife.  You could open the blade one side or the other.
8   I don't know specifically the blades were sharpened on
9   both edges of each blade.  I'd have to...
10       Q    Sir, is it fair to say that you didn't learn
11  any information in the autopsy that confirmed the
12  involvement of William Anderson in the murder of Bobby
13  Wiggins?
14            MS. ARNETT:  Object to form.
15       A    Just the injuries that were present were
16  consistent with what we had been told.
17       Q    Except in the ways that you've already
18  testified to, right?
19       A    I'm sorry.  You have to explain yourself.
20       Q    Except in the ways that you've already
21  testified to?
22       A    What's that mean?
23       Q    Well, certainly the autopsy wasn't consistent
24  with some of the information that Mr. Sizemore provided
25  to you.  The number of stab wounds, the location of the

Page 144

1   stab wounds --
2        A    No.
3        Q    -- right?
4        A    Those --
5        Q    The stuff that we've gone over --
6        A    -- were --
7        Q    Yeah.
8             MS. ARNETT:  Object to form.
9        And certainly the autopsy confirmed to you
10  that Mr. Sizemore was involved in the murder of Bobby
11  Wiggins, right?
12            MS. ARNETT:  Object to form.
13       A    Yes.
14       Q    But you didn't learn any information at the
15  autopsy that corroborated one way or the other as to
16  whether there was a second person involved in the
17  murder, correct?
18            MS. ARNETT:  Object to form.
19       A    Again, the -- there was -- we're not able to
20  determine how many individuals was or were not involved
21  in this.
22       Q    The autopsy did not corroborate Mr. Sizemore's
23  account that there was a second person, correct?
24            MS. ARNETT:  Object to form.
25       A    Well, I don't think you can say it did or

Page 145

1   didn't.
2        Q    Okay.  And after leaving the autopsy, what did
3   you do next in your investigation as it relates to
4   William Anderson?
5        A    It says I departed the autopsy at 15:50 hours,
6   and I contacted Detective Mefford.
7        Q    And when you contacted Detective Mefford, have
8   you spoken to anybody else in the investigation between
9   after leaving the autopsy and contacting Mefford?
10       A    I don't recall if I did.  I don't think so.
11       Q    And when you contacted Detective Mefford, what
12  did you request?
13       A    Advised him the injuries on Mr. Wiggins
14  correlated to the statement by Mr. Sizemore, and
15  Detective Mefford completed a criminal complaint for the
16  arrest warrant on William Anderson for murder.
17       Q    Did you inform Mr. Mefford that some of the
18  information you learned at the autopsy was inconsistent
19  with the information provided by Mr. Sizemore in this
20  phone call?
21       A    I don't recall.
22       Q    Certainly didn't document that in your report,
23  correct?
24       A    It's not documented in my report, no, sir.
25       Q    Now, why didn't you take any steps to initiate

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019          146..149

Page 146

1  murder charges against James Otis Sizemore at that
2  point?
3      A    I think Mr. Sizemore was already detained on
4  other charges, and he was already incarcerated.
5      Q    Do you have any other reason?
6      A    No, sir.  I mean, that's it.  Just he --
7      Q    Why wouldn't you --
8      A    -- he was already in jail.
9      Q    Why wouldn't you want to charge him with the
10  murder that he confessed to?
11     A    Well, I mean, I did.
12     Q    Two days later?
13     A    Uh-huh.
14     Q    Why did you wait?  Why did you wait?
15     A    Again, because he was -- we knew where he was.
16  He was already incarcerated, and it wasn't a risk of him
17  leaving or fly -- you know, flight risk or --
18              (OFF THE RECORD CONVERSATION)
19     Q    So other than Mr. Sizemore being in custody,
20  you don't have any other explanation for why you didn't
21  initiate charges against him at the same time that you
22  did against Mr. Anderson?
23     A    That's correct.
24     Q    What did you do next after communicating with
25  Mr. Mefford and requesting that Mr. Anderson be charged

Page 147

1  with murder?
2      A    I returned back to Knox County from Frankfort.
3      Q    And what'd you do then?
4      A    I went to the Barbourville Police Department
5  where Mr. Anderson was transported to and obtained a
6  interview from him.
7      Q    Why wouldn't you question Bill Anderson before
8  charging him?
9      A    I don't know.
10     Q    Would that be an important thing -- or would
11  you agree that it would have been helpful for your
12  investigation to the -- to make an attempt to
13  corroborate the information provided by Mr. Sizemore by
14  talking to witnesses?
15              MS. ARNETT:  Object to form.
16     A    Again, going on the information I had, he was
17  -- the arrest warrant was obtained, and he was
18  questioned upon being arrested.
19     Q    I know the arrest warrant was obtained.  My
20  question to you is a little bit different.  Would it
21  have been an important thing to do after leaving the
22  autopsy before charging somebody with murder to speak to
23  witnesses in the investigation?
24              MS. ARNETT:  Object to form.
25     A    Possibly.  It could go either way.

Page 148

1      Q    And I'll show you the arrest warrant, Exhibit
2  number 19.  It's confidential, but I don't think it
3  should be labeled a confidential exhibit.  If there's
4  something -- some type of personal information we need
5  to redact on here.  I think we can talk about it, but
6  there's nothing on here that's --
7              (EXHIBIT 19 MARKED FOR IDENTIFICATION)
8              MS. ARNETT:  It's just the personal
9      information.
10              MR. SLOSAR:  Oh, yeah.  Like my client's
11     Social, okay.
12              MS. ARNETT:  Yes.
13              MR. SLOSAR:  Yeah.  We can redact -- we can
14     just maybe redact that personal information for the
15     exhibits.
16  BY MR. SLOSAR:
17     Q    Sir, is this the arrest warrant that was
18  ultimately issued against Mr. Anderson?
19     A    Yes, sir.
20     Q    And the date -- according to the date of this
21  arrest, that was at December 3 at 8:30 p.m.?
22     A    Yes, sir.
23     Q    You authorized the initiation of charges,
24  according to your report, at what time?
25     A    I contacted Detective Mefford at 3:50 p.m.

Page 149

1      Q    So charges would have been initiated around
2  3:50 p.m. on December 3, 2011 against William Anderson;
3  is that right?
4      A    Approximately, yes, sir.
5      Q    Now, I'm going to show you what I'll mark as
6  Exhibit 20.  Did you do a Miranda warning with Mr.
7  Anderson when you met with him on December 3rd to
8  question him about the murder?
9              (EXHIBIT 20 MARKED FOR IDENTIFICATION)
10     A    Yes, sir.
11     Q    And do you recognize the document that's
12  before you?
13     A    Yes, sir.
14     Q    What is this document?
15     A    It's a Kentucky State Police Statement of
16  Rights and a Waiver of Rights.
17     Q    According to this document, when did you begin
18  questioning Mr. Anderson on December 3?
19     A    It says at 6:58 p.m.
20     Q    Did you record that interrogation?
21     A    Yes, sir.
22     Q    And where did that questioning occur at?
23     A    Where did it occur?
24     Q    Yeah.
25     A    It occurred at the Barbourville Police

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

150..153

---

Page 150

1  Department in one of their rooms.
2      Q    Who did you question Mr. Anderson with?
3      A    I know Detective York assisted at one point,
4  and Detective Mefford assisted at one point.
5      Q    Detective Mark Mefford?
6      A    Yes, sir.
7      Q    Who requested Mr. Mefford's assistance in
8  this?
9      A    Probably me.
10     Q    Did Derek Eubanks participate in the
11  questioning of Mr. Anderson?
12     A    I don't recall if he did or not.
13     Q    Were you the lead in that interrogation?
14     A    You mean by "lead," did I do the most speaking
15  or --
16     Q    Yeah.
17     A    I don't recall if I spoke more than Detective
18  Mefford or Detective York, but...
19     Q    Is it fair to say that when you questioned Mr.
20  Anderson that you wanted to get information about the
21  homicide of Bobby Wiggins?
22     A    Yes.
23     Q    Is it fair to say that you wanted to get a
24  statement from Mr. Anderson regarding the Wiggins
25  homicide?

---

Page 151

1          MS. ARNETT:  Object to form.
2      A    Yes.
3      Q    Is it fair to say that any statements that you
4  made to Mr. Anderson would have been made for the
5  purpose of getting information or the statement
6  regarding the Wiggins homicide?
7      A    Yes.
8      Q    Is it fair to say that when you believed that
9  Mr. Anderson was lying that you would confront him?
10     A    (No verbal response.)
11     Q    Let me ask you a better way.  Let me withdraw
12  that.  Do you recall confronting Mr. Anderson when you
13  believed he was not telling the truth?
14     A    Possibly.
15     Q    Yeah.  You don't have any independent memory
16  though, right?
17     A    Not specifically, no.
18     Q    Is it fair to say that every statement that
19  was made to Mr. Anderson was for the purpose of getting
20  him to give a statement that implicated himself and
21  James Otis Sizemore in the murder of Bobby Wiggins?
22          MS. ARNETT:  Object to form.
23     A    I was questioning him in order to get
24  information into the regards of the death of Mr.
25  Wiggins.

---

Page 152

1      Q    But by this time Mr. Anderson was already
2  charged, correct?
3      A    Yes, sir.  He was.
4      Q    And the goal was to get a statement that
5  implicated him and James Otis in the murder, correct?
6          MS. ARNETT:  Object to form.
7      A    Just the information as to what happened in
8  regards to the death of Mr. Wiggins.
9      Q    Did you inform Mr. Anderson that he was
10  charged with murder at the very beginning of the
11  interrogation?
12     A    I don't recall.
13     Q    By the time you questioned Mr. Anderson on
14  December 3, 2011, after the initiation of charges, did
15  you -- have you listened to the recorded statement that
16  he gave to Derek Eubanks and Sheriff Pickard on December
17  1st?
18     A    I don't think so.
19     Q    Had you listened to the Fox -- Dave Fox or
20  Jeremy Ferrell recordings from December 1st?
21     A    I don't believe so.
22     Q    Would you agree that Mr. Anderson was
23  cooperative in his interactions with you on December 3,
24  2011?
25     A    Yes.

---

Page 153

1      Q    Would you agree that he provided you with his
2  whereabouts on the day in question?
3          MS. ARNETT:  Object to form.
4      A    I believe he said he was at the Messers.
5      Q    Did he encourage you to speak with witnesses
6  like Dave Fox and Jeremy Ferrell and the Messers to
7  corroborate his alibi for the day in question?
8      A    He -- he may have said that he was with them.
9  I don't remember specifically.
10     Q    Let me see if this refreshes your memory.
11          (AUDIO RECORDING PLAYED)
12     Q    Now, I'm going to -- we'll introduce this as
13  an exhibit.  This is the Billy Anderson recording from
14  December 3, 2011.  Do you recognize that, sir?
15     A    Yes.
16     Q    Okay.  You listened, and we'll mark this as
17  Exhibit 21.  And to your knowledge, you were present for
18  the entire time Mr. Anderson was questioned that day,
19  correct?
20          (EXHIBIT 21 MARKED FOR IDENTIFICATION)
21     A    The majority of it.
22     Q    Well, do you have any independent memory of
23  leaving the interrogation room?
24     A    Not specifically, but I may have walked out
25  momentarily, but I don't remember.

---

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

154..157

**Page 154**

1    Q    Do you have any notes that would refresh your
2    memory?
3    A    No, sir.
4    Q    And when Mr. Anderson told you that alibi
5    witnesses would corroborate a story, you hadn't
6    personally questioned them prior to that point, correct?
7    A    I had not.
8    MS. ARNETT:  Object to form.
9    Q    I'm going to play another clip, getting at
10    22:10.  I'm going to ask you some questions right after.
11    (AUDIO RECORDING PLAYED)
12    Q    Sir, were you present for that part of the
13    questioning of Mr. Anderson?
14    A    Yes, sir.  I believe so.
15    Q    And did you give any credit to anything that
16    the Messers -- well, let me withdraw that.  Did you
17    question any of the Messers before initiating charges
18    against William Anderson?
19    A    No, sir.
20    Q    Did you question the Messers after the
21    initiation of charges?
22    A    I'd spoke to the Messers, specifically
23    Leonard, I believe, Brenda, and Elij -- Elijah Messer.
24    I'd spoke to them afterwards.
25    Q    By "after," you mean after the initiation of

**Page 155**

1    charges?
2    A    Yes, sir.  It was after he had already been
3    charged.
4    Q    I believe you created a report about that; is
5    that right?  Do you recall?  I think it's Exhibit number
6    2?
7    A    Yes, sir.
8    Q    Okay.  And the Messers with -- the information
9    the Messers gave you was consistent with what Billy
10    Anderson had told you on December 3, 2011, correct?
11    A    The information in regards to him staying on
12    the property and -- and that -- is what you're referring
13    to, sir?
14    Q    Yes.
15    A    Yes.
16    Q    And certainly the information they provided to
17    you was consistent with part of Mr. Anderson's alibi,
18    right?
19    A    As in they -- I don't know exactly what you're
20    referring to as far as just him staying at the property
21    and...
22    Q    Mr. Messer told you that on November 23, 2011,
23    he and his wife Brenda went to town, that Dave Fox and
24    William Anderson stayed at his house with Elijah.  And
25    when they returned, Fox and Anderson were still at the

**Page 156**

1    house.  Did he tell you that information on January 10,
2    2012, sir?
3    A    That -- yes.  It's in my report.
4    Q    Did Elijah Messer also tell you that Mr.
5    Anderson was at the house watching him on November 23,
6    2011, and that he did not remember Mr. Anderson leaving
7    throughout the day?
8    A    He did.  That's correct.
9    Q    So the Messers corroborated the information
10    that Mr. Anderson gave you on December 3, 2011; is that
11    fair?
12    A    Some of it, yes.
13    Q    Uh-huh.  You also spoke to Jeremy Ferrell on
14    January 10, 2012; is that right?
15    A    Yes, sir.
16    Q    And in that conversation on January 10, 2012,
17    did Mr. Ferrell inform you that James Otis Sizemore came
18    to his home in a black Toyota car on November 23, 2011?
19    A    Yes.
20    Q    Did Mr. Ferrell advise you that he went to the
21    Indian store with James Otis Sizemore on that date?
22    A    That's correct.
23    Q    Did Mr. Ferrell inform you that, as they were
24    arriving at the store, he saw David Fox and William
25    Anderson driving in Leonard Messer's van?

**Page 157**

1    A    That's correct.
2    Q    And did Mr. Ferrell inform you that he and
3    Sizemore saw Mr. Anderson and Mr. Fox when they were at
4    the Indian store purchasing items?
5    A    Yes, sir.
6    Q    So is it fair to say that Mr. Ferrell's
7    January 10, 2012 account also corroborated the statement
8    that Mr. Anderson gave to you on December 3, 2011?
9    MS. ARNETT:  Object to form.
10    A    Yes.
11    Q    Between December 3, 2011 and January 10, 2012,
12    did you make any attempts to speak to Dave Fox or Jeremy
13    Ferrell?
14    A    No, sir.  I don't believe so.
15    Q    Between December 3, 2011 and January 10, 2012,
16    did you make any attempts to speak to the Messer family?
17    A    No, but the majority of the time between then
18    and when I did speak to them, I was not working.
19    Q    Why not?
20    A    Because the state police works off of a comp
21    system, and I was contacted and advised that I need to
22    take time off of work because my comp time was too high.
23    Q    Even though you were in the middle of a
24    homicide investigation?
25    A    Yes, sir.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

Page 158

1    Q    Did anybody take over your duties when you
2  were forced to take comp time in December 2011 and
3  January 2012?
4    A    No, sir.
5    Q    So the investigation just sat?
6    A    Yes, sir.
7    Q    And you knew by then that Mr. Anderson was
8  also sitting in jail, charged with murder during that
9  time period, correct?
10       MS. ARNETT:  Object to form.
11   A    Yes, sir.
12   Q    And after you learned this information in
13 January of 2012 from Jeremy Ferrell, from the Messers,
14 did you take any steps to stop the initiation of charges
15 against William Anderson?
16       MS. ARNETT:  Object to form.
17   A    No, sir.
18   Q    Now, at the time that you participated in the
19 questioning of William Anderson, the theory of the case
20 was that the knife that was recovered from him during
21 the arrest was the knife used to commit the murder,
22 correct?
23       MS. ARNETT:  Object to form.
24   A    Yes, sir.
25   Q    And that theory was based upon the statement

Page 159

1  provided by Mr. Sizemore; is that right?
2    A    That's correct.
3    Q    Okay.  In fact, during Mr. Anderson's
4  interrogation, Mr. York, I believe, mentioned to Mr.
5  Anderson that he was surprised that he kept the knife on
6  him.  I'll play you this clip, and I'll ask you some
7  questions.  It says, "29:59."
8        (AUDIO RECORDING PLAYED)
9    Q    First of all, do you remember in the
10 questioning of Mr. Anderson whether he was shown
11 photographs of the victim?
12   A    I believe he was, yes, sir.
13   Q    Whose idea was that?
14   A    I don't remember.
15   Q    Was it your idea?
16   A    I don't remember.
17   Q    Is that a tactic that you use when you
18 question people, you show them photographs of a crime
19 scene or deceased victim?
20   A    It's a technique that could be used.
21   Q    Mr. Anderson proclaimed his innocence
22 throughout that questioning, right, sir?
23   A    That's correct.
24   Q    And when Mr. Anderson would proclaim his
25 innocence, at times, the interrogation would become more

Page 160

1  aggressive.  Would you agree with that?
2    A    More loud speaking and cussing.  Is that what
3  you mean by "aggressive"?
4    Q    Uh-huh.
5    A    Yes, sir.
6    Q    I'll play one of those parts.  It's at 38 --
7  I'm sorry.  In fact -- let me withdraw that question.  In
8  fact, at some point, Detective York actually threatened
9  to have Mr. Anderson killed, correct?
10   A    I don't recall that.
11   Q    Let me play 36:34 through 37:12 for you and
12 see if that refreshes your memory.
13       (AUDIO RECORDING PLAYED)
14   Q    Were you there for that part of the
15 questioning, sir?
16   A    I believe I was.
17   Q    Did you do anything to stop Detective York
18 when he made that comment to Mr. Anderson?
19   A    I did not stop him, no.
20   Q    You didn't take any steps to intervene at that
21 point, right?
22   A    I did not.
23   Q    And you were the lead investigator in charge
24 of the investigation at the time that Mr. York told Mr.
25 Anderson that he will "fucking fry him," correct?

Page 161

1    A    I was the lead detective, yes, sir.
2    Q    Okay.  Have you ever told a witness or a
3  suspect that you were going to "fucking fry them?"
4    A    No, sir.
5    Q    Would you agree that that could be construed
6  as a threat?
7        MS. ARNETT:  Object to form.
8    A    I take it as a statement such as when
9  referring to -- if I've done something they would put me
10 under the jail.  It's -- it's not an active physical
11 harm.  It's more the seriousness of the offense.  I
12 mean, it's just -- that's how I took that.  I don't take
13 that he was going to harm him, or he was going to fry
14 him.  He was just relaying the seriousness of the
15 charges at hand.
16   Q    Was it ever explained to Mr. Anderson that
17 Detective York didn't mean that he was actually going to
18 make sure that he was killed?
19   A    Not that I'm aware of, no, sir.
20   Q    And, in fact, Mr. Anderson's -- you were
21 present from Mr. Anderson's murder trial, right?
22   A    I was, yes, sir.
23   Q    Yeah.  You testified there, right?
24   A    I did.
25   Q    Yeah.  You were aware that that was a death

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

Page 162

1  penalty case, correct?

2       A    I'm sorry?

3       Q    You were aware that this was a death penalty

4  case, right?

5       A    I know that the charges could have been.  My -

6  - my understanding is that the prosecutor has to file

7  certain things in order for it to be a death penalty

8  case.  I don't know if that was ever put on the table by

9  the prosecutor to be an option or not, but -- but I know

10  the charge of murder in the event of robbery, I mean, it

11  could meet that criteria.

12      Q    Detective York didn't just tell Mr. Anderson

13  that he was going to "fucking fry him," but he also told

14  Mr. Anderson repeatedly, throughout the questioning,

15  that he was going to hang him.  Do you recall that?

16      A    Yes, sir.

17      Q    Did you consider that to be a threat?

18      A    Not a personal threat, no, sir.

19      Q    You didn't take any steps to stop Mr. York

20  when he told Mr. Anderson that he was going to have him

21  hung, right?

22      A    No, sir.  I did not stop it.

23      Q    And, again, throughout this questioning

24  session with Mr. Anderson, this is when the goal was to

25  obtain a statement from him, correct?

Page 163

1            MS. ARNETT:  Object to form.

2       A    Yes, sir.

3       Q    At the end of this questioning, did Mr.

4  Anderson ever confess to having any involvement in the

5  murder?

6       A    No, sir.

7       Q    He remains cooperative, right?

8       A    Yes, sir.

9       Q    Mr. Anderson provided you with information

10  regarding his alibi witnesses, correct?

11      A    Yes, sir.

12      Q    And after the questioning of Bill Anderson,

13  isn't it true that you had a conversation with other

14  members of the Kentucky State Police about next steps to

15  take in the investigation?

16      A    I'm not sure.  You'd have to -- if you could,

17  be a little more specific?

18      Q    Sure.  After questioning Mr. Anderson, did you

19  have a conversation with Detective York about the need

20  to question Dave Fox?

21      A    I don't recall if I did.

22      Q    Did you make any request to Detective York to

23  question Dave Fox?

24      A    Again, I don't recall if I did.

25      Q    Let me ask you in a different way.  You became

Page 164

1  the lead investigator on Redbird Mountain December 2,

2  2011, correct?

3       A    Yes, sir.

4       Q    Would it have been appropriate for Kentucky

5  State Police Officers to be questioning witnesses in

6  this case without you having knowledge of it?

7       A    Possibly.  Again, I mean, I'd asked Detective

8  Mefford to assist in the criminal complaint.  I know

9  they -- several also executed a search warrant that I

10  had asked them to do.  And if -- I mean, during the

11  course of them doing that, if they interviewed somebody

12  -- I don't want to say it's inappropriate.  I mean, it -

13  - they might -- I might not be -- it might not be my

14  intent to say go do this.  And if I don't tell them not

15  to interview somebody then not interview them.  But I --

16  I think they -- you know, they're just going to assist

17  me in my investigation where they can.

18      Q    Sir, isn't it true that you would've been on

19  notice either before or shortly after Dave Fox's

20  December 3, 2011 questioning by members of your own law

21  enforcement agency in this case?

22      A    I was not aware of that investigate --

23  interrogation or questioning until it was brought up by

24  Sergeant Pickrell at trial.

25      Q    Why not?

Page 165

1       A    I don't know.

2       Q    Is it concerning to you that Detective York

3  and Sergeant Pickrell questioned Dave Fox for nearly

4  three hours about the Wiggins homicide investigation

5  without ever informing you?

6            MS. ARNETT:  Object to form.

7       A    That the recording wasn't provided to me or a

8  report wasn't provided to me, I mean, yeah, that is

9  concerning.  But it doesn't concern me that they've done

10  the interrogation.

11      Q    Well, what happened during that interrogation

12  is definitely concerning to you, right?

13      A    It's just a technique that I don't use.

14      Q    You wouldn't ever use a technique like what

15  Detective York did with Dave Fox in that interrogation

16  room, correct?

17            MS. ARNETT:  Objection to the form.

18      A    Yeah.  I've not used that technique, no.

19      Q    That's because law enforcement officers

20  shouldn't resort to those types of techniques when

21  conducting a legitimate law enforcement investigation.

22  Would you agree with that?

23            MS. ARNETT:  Object to form.

24      A    Again, there's -- there's numerous techniques.

25  And I use what -- what I feel works for me and is best

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

Kentuckiana
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

166..169

Page 166

1  for me.  And that's not one that I use.

2       Q    Have you ever hit an article of clothing off

3  of a witness's head while questioning them?

4       A    No, sir.

5       Q    Has anybody at the Kentucky State Police ever

6  led you to believe that that type of technique is

7  acceptable?

8       A    No, sir.

9       Q    Did you ever ask Sergeant Pickrell why she

10 became involved -- well, sitting here today, do you know

11 that Sergeant Pickrell was actually the one that went to

12 go get Dave Fox?

13      A    I do know that, yes.

14      Q    Okay.  Did you ever ask her why any of that

15 came about?

16      A    I don't -- I don't recall if we ever spoke

17 directly on that, no, sir.

18      Q    Did you ever asked Sergeant Pickrell why she

19 and Detective York hid from you the fact that they had

20 questioned Dave Fox?

21           MS. ARNETT:  Object to form.

22      A    Again, once it was brought up that that

23 interview existed, I -- I don't think there was ever an

24 intention to hide it from me.  I just don't think that

25 once the interview was done, the copy wasn't provided to

Page 167

1  me or placed in the case file.  But I don't think it was

2  an intentional thing.

3       Q    And the fact that a copy of the recording

4  wasn't placed in the case file, there should have also

5  been -- let me withdraw the question.  My understanding

6  of the practice of the Kentucky State Police is that

7  even if an audio recording was conducted, there is still

8  a requirement to create a police report summarizing the

9  fact that a recorded interview took place; is that

10 right, sir?

11      A    It's -- it's certainly best practice to

12 document any involvement another officer would have in -

13 - in a situation like that.

14      Q    And in 2011, it certainly would have been the

15 practice that members of the Kentucky State Police to

16 document when a recorded statement was obtained during

17 the course of a homicide investigation; is that right?

18      A    Yeah.  Again, I mean, I've -- going back then

19 I'm not sh -- I can't specifically say what policy

20 stated at that time, as far as what a detective or

21 trooper or whatever should follow to what they should or

22 should not create a supplemental report for, but...

23      Q    Well, certainly Sergeant Pickrell, as a

24 supervisor at the Kentucky State Police, would've had an

25 understanding of the policies and procedures in place,

Page 168

1  right?

2           MS. ARNETT:  Object to form.  Speculation.

3       A    Yes, sir.

4       Q    Yeah.  And in this case, Detective York,

5  Sergeant Pickrell, Derek Eubanks, none of them

6  documented the fact that they questioned Dave Fox on

7  December 3, 2011 about the Wiggins homicide; is that

8  right?

9       A    That is correct.

10      Q    And somehow that recording never made it into

11 the file either, right?

12      A    That's correct.

13      Q    Did you ever ask Sergeant Pickrell why she

14 didn't reveal to you that she had questioned Dave Fox?

15      A    I don't specifically recall us talking about

16 that, no, sir.

17      Q    Did you ever have a conversation with

18 Detective York about this Dave Fox interview that went

19 missing?

20      A    If it was ever discussed between me and

21 Detective York, it would've been once it was brought up

22 in court and they played it there.  But before that, I

23 didn't know the -- the -- a recording had existed.

24      Q    Did you ever have a conversation with him,

25 either before or after trial, about why he interviewed

Page 169

1  Dave Fox?

2       A    No, sir.

3       Q    You've since listened to that entire

4  recording, correct?

5       A    Yes, sir.

6       Q    And what did you think when you heard it?

7       A    It's not my technique.

8       Q    Would you agree that in that recording

9  Sergeant Pickrell and Detective York attempt to get Dave

10 Fox to change his story?

11           MS. ARNETT:  Object to form.  Speculation.

12      A    I guess I feel they may have felt he just

13 wasn't being truthful, and they were just trying that

14 technique to get him to be truthful.

15      Q    Sir, in order for James Otis Sizemore to be

16 telling the truth when he implicates William Anderson

17 for murder, isn't it true that Leonard Messer, Elijah

18 Messer, Dave Fox, Jeremy Ferrell, Kim York, and William

19 Anderson all have to be lying about Mr. Anderson's

20 whereabouts on November 23, 2011?

21           MS. ARNETT:  Object to form.

22      A    Given my recollection, especially after

23 speaking with the Messer's, they -- I mean, I don't

24 recall them ever being able to consistently say he was

25 there, and he never left.  They can say he was there

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

170..173

Page 170

1  various times throughout the day, but there's not a
2  certain he was here for the whole -- for that whole day.
3  I mean, if -- and that -- that's my recollection.  I
4  don't -- I don't remember them ever saying that he was
5  always here, and they always had eyes on him.
6      Q   You can literally dwindle it down to Dave Fox
7  and Jeremy Ferrell.  Would you agree that there's no way
8  that Dave Fox and Jeremy Ferrell can be telling the
9  truth at the same time as James Otis Sizemore?
10         MS. ARNETT:   Object to form.
11     Q   That these stories are mutually exclusive?
12     A   Again, my recollection, I think Mr. Ferrell
13  was an after the fact.  It was later when he had
14  observed them.
15     Q   When Mr. Ferrell told you that Sizemore came
16  over his house in Bobby Wiggins' car, and Bobby Wiggins
17  was not in the car.  And that he saw -- and that they
18  ran into Bill and Dave Fox at the Indian store.  That
19  generally what he told you?
20     A   That's correct.
21     Q   Yeah.  And then after leaving the Indian
22  store, they went and got high, right?
23     A   Yes, sir.  I believe that's correct.
24     Q   Yeah.  So the inference is that Wiggins is
25  dead since he -- the drugs that were stolen would have

Page 171

1  likely have been used for them to get high?  That's the
2  inferences of reasonable law enforcement officer that
3  you would get from that information, correct?
4         MS. ARNETT:   Objection.
5      A   Possibly, yes, sir.
6      Q   And Dave Fox separately says, in this three
7  hour interrogation with these techniques, he repeatedly
8  says to law enforcement that he was with William
9  Anderson during that day.  And that the first time that
10  they ran into James Otis Sizemore was at the Indian
11  store, correct?
12         MS. ARNETT:   Object to the form.
13         MR. KELLEY:   Objection to the form.
14         MR. SLOSAR:   He can answer it.
15         MS. ARNETT:   But misstates the --
16         MR. SLOSAR:   He can answer it.
17         MS. ARNETT:   -- statement.  What was the
18     question?
19     A   I don't recall specifically what Mr. Fox said
20  during that interview to say if he was with him the
21  whole day.
22  BY MR. SLOSAR:
23     Q   Let's see if this refreshes your memory.
24         (AUDIO RECORDING PLAYED)
25     Q   Sorry.

Page 172

1         (AUDIO RECORDING PLAYED)
2      Q   So mark Dave Fox's questioning session as
3  Exhibit number 22.  So Dave Fox reiterates in this
4  recording that he did not see Bobby Wiggins in the black
5  car over the house at all that day, right?  It's not in
6  your report, because there's not a single report ever
7  created about this?
8         (EXHIBIT 22 MARKED FOR IDENTIFICATION)
9         MS. ARNETT:   If he wants to look at something
10     on the table while he thinks about it, I don't
11     think that's --
12         MR. SLOSAR:   Well, I think he can keep
13     looking, but there's nothing in there.
14     A   I can't say that I know that that's what Dave
15  Fox said during that interview.  I -- I don't.  I don't
16  recall that specifically.  I'm not saying he didn't say
17  it, but I don't personally remember that.  That's all
18  I'm -- all I'm saying.
19  BY MR. SLOSAR:
20     Q   Let me ask you this:  When Detective York was
21  making promises of consideration to James Otis Sizemore
22  on December 3, 2011, did you ever do anything to stop
23  him?
24     A   I'm sorry.  You'll have to say it again, sir.
25         MS. ARNETT:   Object to form.

Page 173

1      Q   When Detective York made promises to James
2  Otis Sizemore in the December 3, 2011 questioning, did
3  you make any attempts to stop him?
4         MS. ARNETT:   Object to form.
5      A   If you could play the -- the promises, I'd
6  appreciate it.
7      Q   So if you look at page 2 of the statement.  And
8  this is the exhibit that I gave you earlier, sir.  Could
9  actually --
10         (AUDIO RECORDING PLAYED)
11     Q   Did you hear that?
12     A   Yes.
13     Q   So Detective York is talking about, the only
14  way you're going to get any leniency from us, you know,
15  is tell us the truth, right?
16     A   He did say that, yes, sir.
17     Q   Yeah.  And I'll represent to you if you go to
18  page 72 of this exhibit that Detective York starts
19  talking about helping him on some other court cases that
20  he has pending in the system.  That's at page 72.  My
21  question to you is:  When Detective York is making
22  promises about leniency on the murder case or these
23  other cases, you didn't make any attempts to stop him,
24  correct?
25         MS. ARNETT:   Object to form.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

174..177

Page 174

1    Q    You can answer.
2    A    If you could just let me review this for one
3  second --
4    Q    Sure.
5    A    -- just to see what to -- is that there -- are
6  you referring to -- on page 72?
7    Q    Yes.
8    A    The -- where they're asking what other charges
9  are facing?
10   Q    Yes.
11   A    On the motorcycle?
12   Q    It says, "I'll see what I can do to help you
13 out on this other stuff." "Uh-huh.  What other stuff?"
14 Oh, you know what?  You're right.  Let me play this,
15 because I might be wrong.  I'm going to play Sizemore's
16 Exhibit at 117:43.
17            (AUDIO RECORDING PLAYED)
18   Q    Is that your voice?
19   A    No, sir.
20   Q    Whose voice is that?
21   A    Detective York.
22   Q    Okay.
23            (AUDIO RECORDING PLAYED)
24   Q    All right.  Was that Detective York -- voice?
25   A    Yes.

Page 175

1    Q    Okay.  Now, you created a police report
2  regarding parts of your conversation with Mr. Sizemore
3  on December 3, 2011; is that right?  I'm looking at
4  Exhibit 1 page 6 and --
5    A    Yes, sir.
6    Q    Did you put anywhere in this police report
7  that Detective York made promises of consideration to
8  James Otis Sizemore prior to completing the statement?
9            MS. ARNETT:  Object to form.
10   A    I didn't put nothing in my report.
11   Q    Did you write anything -- now, you would agree
12 that, you know, Mr. Sizemore's statement was -- even the
13 transcript is approximately 72 pages.  So you certainly
14 did not document all the information obtained from
15 Sizemore in your two-page excerpt; is that fair?
16   A    That is fair.
17   Q    Okay.  Is it fair to say that you did not
18 document in your police report the inconsistencies in
19 Mr. Sizemore's statement with the physical evidence in
20 this case?
21            MS. ARNETT:  Object to form.
22   A    Again, I just provided a summary of the
23 information presented to us from Mr. Sizemore.
24   Q    Fair enough.  Did that summary include
25 inconsistencies between Sizemore's statement and the

Page 176

1  physical evidence?
2            MS. ARNETT:  Object to form.
3    Q    You can answer.
4    A    I just want to make sure I understand what --
5  what physical evidence, what discrepancies are you
6  referring to?
7    Q    Sure.  How about when Sizemore says that Mr.
8  Anderson came from behind to stab the victim?  That's
9  not in here, right?
10   A    That was not listed in the summary, I don't
11 think.
12   Q    How about when Mr. Sizemore's accounts of the
13 events changed and he needed to be confronted by
14 Detective York.  Does any of that confrontation and
15 changes -- is that included in your two-page summary?
16            MS. ARNETT:  Object to form.
17   Q    You can answer.
18   A    No, sir.
19   Q    And you knew when you were creating this
20 report that it was going to be used for the criminal
21 investigation, right?
22   A    It's going to be part of the investigation.
23   Q    Uh-huh.  And you knew that when you created
24 this report that grand jurors are oftentimes provided
25 with reports --

Page 177

1            MS. ARNETT:  Object to form.
2    Q    -- during the indictment process, correct?
3    A    Yeah, I would imagine they would be provided
4  with information from the investigation.
5    Q    But you agree that grand jurors can't be
6  provided with information that isn't documented?
7    A    Yes, sir.
8    Q    Okay.  Now, do you recall testifying at the
9  grand jury on December -- oh, I'm sorry.  Do you recall
10 testifying at a preliminary hearing on December 21,
11 2011?
12   A    Yes, I did.
13   Q    And did you understand at the time you were
14 testifying before the grand jury that that proceeding
15 was relating to the formal initiation of charges against
16 William Anderson?
17   A    I'm sorry.  You're referring to the
18 preliminary hearing, and then you --
19   Q    Uh-huh.
20   A    -- referred to the grand jury --
21   Q    Oh, I'm sorry.
22   A    You confuse me.
23   Q    I apologize.  I'm thinking I'm confusing
24 myself --
25   A    That's okay.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

178..181

Page 178

1    Q    I'm sorry, Detective Johnson.

2    A    Uh-huh.  It's probably me.

3    Q    At the time you testified at the preliminary

4  hearing, did you -- was it your understanding that your

5  testimony that day, which was December 21, 2011, was

6  relating to the initiation of charges against Bobby

7  Wiggins -- against William Anderson for the murder of

8  Bobby Wiggins, sir?

9    A    I testified at the preliminary hearing on the

10  21st --

11   Q    Yeah.

12   A    -- for the charges that I brought up on Mr.

13  Anderson.

14   Q    Okay.  And I just gave you what's been marked

15  as Exhibit number 21.  This is a transcript that we have

16  had put together of the preliminary hearing in this

17  case.  I want to go through some pages of this real

18  briefly with you, sir.  I'm almost done here today.  Now,

19  if you go to page 11 and I refer you to specific line

20  numbers.  And if you look at the first line, it says,

21  "You know, again, and hit him in the face with a rock."

22  And then it says, "He stated at that point Mr. Wiggins

23  was just sort of stepping backwards he said.  And Mr.

24  Anderson came from around to him."  Do you see that?

25   A    I do, yes.

Page 179

1    Q    Okay.  And the "he" that you're talking about,

2  that is stating this information to you, this would be

3  the information that you obtained from James Otis

4  Sizemore on December 3, 2011, correct?

5    A    Possibly could be information he provided to

6  me on the 5th when I interviewed him as well.

7    Q    Oh, so this could have been on the 5th as part

8  of that statement that wasn't maintained as part of the

9  investigative file; is that right?

10   A    Thought it was.  If it's not in there, I'm --

11  I wasn't aware of that.

12   Q    Well, we certainly don't have it.  It's never

13  been produced in this case.  Do you -- you know when you

14  prepared for these depositions about a year ago, do you

15  recall whether you listened to the December 5th

16  statement?

17   A    I don't.  I can't recall.  I don't know if I

18  listened to that specific one or not.

19   Q    Let me ask you about this:  According to your

20  testimony, Mr. Sizemore stated that Mr. Anderson was

21  behind him.  And he'd come from behind him, and that he

22  had a knife in his right hand and had a blade proceeding

23  from both sides of his hand.  And he stated that he seen

24  him strike Mr. Wiggins in the chest.  Do you see that

25  sir?

Page 180

1    A    I do.

2    Q    Okay.  Now, certainly your testimony at the

3  preliminary hearing about Mr. Sizemore telling you that

4  Bill Anderson had a knife in his right hand when he

5  struck Wiggins in the chest, that is inconsistent with

6  the December 3, 2011 statement that Mr. Sizemore gave to

7  you, correct?

8        MS. ARNETT:  Object to form.

9    A    Yes, I'd said that he had it in his right hand

10  according to this transcript, yes.

11   Q    Yeah.  And Mr. Sizemore told you on December

12  3, 2011 that Mr. Anderson stabbed Mr. Wiggins with his

13  left hand, right?

14   A    In the statement, yes, that's what it said.

15   Q    So your testimony at the preliminary hearing

16  differed from what Mr. Sizemore told you on December

17  3rd, correct?

18   A    From that December 3rd, yes.

19   Q    But you would have been aware at the time you

20  testified at the preliminary hearing that Mr. Anderson

21  was right-handed by that time, correct?

22   A    Probably, yes, sir.

23   Q    Well, surely you knew because Mr. Sizemore

24  told you on December 3, 2011 --

25   A    Uh-huh.

Page 181

1    Q    -- that Mr. Anderson was right-handed, right?

2    A    Yes.

3    Q    Yeah.  Let's go to the next page, page number

4  12.  Looking at line 8 -- or looking at line 6, did you

5  inform the court at the preliminary hearing that Mr.

6  Sizemore stated he told him, "Listen, keep that knife in

7  your pocket.  I don't want no part of it.  Do what we

8  got to do."  And Mr. Anderson advised him to go ahead

9  and sprinkle some brush, trees, leaves, whatever, over

10  the body, then he would come back later and take care of

11  it.  Is that what you testified to, sir?

12   A    Yes.

13   Q    Now, this information is certainly

14  inconsistent with the evidence that you later developed

15  from Lowe's, right?

16       MS. ARNETT:  Object to form.

17   A    No, sir.  Not -- not -- not really.  Again, I

18  don't know if it was on the December 5th statement, but

19  Mr. Sizemore, at one point, when I had interviewed him,

20  said that Mr. Anderson -- after they had covered the

21  body, Mr. Anderson said that -- for Mr. Sizemore to go

22  and retrieve those items and bring them back to him, and

23  then he would cover up the rest of the body, as was

24  testified.  That's what was provided to me by Mr.

25  Sizemore.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

182..185

Page 182

1    Q    My question is a little bit different.
2    A    I'm sorry.
3    Q    I appreciate -- I don't recall this from the
4  December 3rd statement, either, which is what I think
5  you were maybe getting at just now.  That this -- you
6  could've learned this on the 5th from Sizemore.  But my
7  question to you is a little bit different, which is that
8  the -- Mr. Sizemore's allegation that Bill Anderson said
9  he was going to come back and deal with the body is very
10  different than the surveillance footage that you
11  ultimately recovered from Lowe's in February of 2012.
12  Would you agree with that?
13        MS. ARNETT:  Object to form.
14    A    Again, going off of the information provided
15  to me by Mr. Sizemore, he stated that he retrieved those
16  items and then transferred them over the -- the stuff to
17  Mr. Anderson.  That's what he had disclosed to me.
18    Q    You're saying that Sizemore told you that he
19  got that stuff from Lowe's and transferred it to Mr.
20  Anderson?
21    A    Some of the lime, yes.
22    Q    When did he tell you that?
23    A    December 5th, I guess.
24    Q    So when you met with Mr. Sizemore on December
25  5, 2011, he did tell you that he went to Lowe's to

Page 183

1  purchase the shovel and the crushed lime and the
2  flashlight?
3    A    He didn't.  No, he didn't.  I didn't know
4  about Lowe's until Sheriff Pickard called me.  Somehow
5  that is misspeaking on that.  But at -- at some point,
6  and I don't know if it was during preparation for trial
7  or something, but Mr. Sizemore had told us that it --
8    Q    Well, it had to have been prior to January of
9  2012 -- or February of 2012, because that's when you --
10  that's how you knew to get the Lowe's video, right?
11    A    Well, because I was contacted by Sheriff
12  Pickard and said that they had purchased -- that he had
13  heard that they'd purchased stuff down there.  So that's
14  why I went to look for it, yes.
15    Q    And Sizemore doesn't have any -- there's --
16  Sizemore refused to talk to you after you saw the Lowe's
17  footage without his lawyer, right?
18    A    Yeah.  When I went to talk to him at the Clay
19  County, he declined.
20    Q    And you testified earlier here today that you
21  can only remember two occasions where you interviewed
22  Mr. Sizemore.  That would've been the 3rd and the 5th of
23  December 2011, correct?
24        MS. ARNETT:  Object to form.
25    A    I'm trying to recall.  I know that he was

Page 184

1  interviewed on those two days, but -- I don't know,
2  but...
3    Q    Is it possible that Mr. Sizemore did inform
4  you on December 5, 2011 that he went to the Lowe's in
5  Corbin to purchase tools used to bury the body?
6    A    No, sir.
7    Q    That's not a possibility anymore?
8    A    I am not aware of Mr. Sizemore ever telling me
9  that they went to Lowe's on those -- on December 3rd or
10  the December 5th.
11    Q    But Mr. Sizemore did tell you prior to trial
12  that he went to Lowe's to purchase the items used to
13  bury Mr. Wiggins' body, correct?
14    A    I'm trying to recall.  I don't -- I didn't
15  know about the Lowe's video.  I didn't know about the
16  Lowe's purchase until I was contacted by Sheriff
17  Pickard.
18    Q    I understand.  You don't know when exactly
19  that was, but it had to have been prior to February of -
20  - or it had to have been prior to January of 2012,
21  because that's when you got the video?
22    A    That's correct.  Fair.
23    Q    Okay.  Prior to trial, though, prior to Mr.
24  Anderson's trial --
25    A    Okay.

Page 185

1    Q    -- you had a conversation with James Otis
2  Sizemore where he revealed to you that he went to the
3  Lowe's in Corbin, Kentucky to purchase tools used to
4  bury the body of Bobby Wiggins; is that right?
5        MS. ARNETT:  Object to form.
6    A    Yes, sir.  He said he -- he went to get those
7  items to then later transfer it to Mr. Anderson is what
8  -- what was told to me.
9    Q    And isn't it true that Mr. Sizemore revealed
10  to you that he was scared of Jeff Gray?
11    A    Possibly.  Yeah.  Maybe I remember that.
12    Q    And isn't it true that Mr. Sizemore revealed
13  to you that Jeff Gray had knowledge of what those tools
14  were going to be used to do?
15    A    Trying to remember what Mr. Gray said during
16  his statement.  When I asked him about that, if he knew
17  what they were for or not, but I don't -- I don't
18  remember.
19    Q    I'll tell you, sir.  One of the reasons why
20  I'm asking you -- let me give you Jeff Gray.  Did I give
21  you Jeff Gray's statement already?
22    A    No, sir.
23        MR. KELLEY:  Can we take a break?
24        MR. SLOSAR:  Sure.
25        VIDEOGRAPHER:  The time is 3:19.  We are off



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

186..189

**Page 186**

1   the record.
2               (OFF THE RECORD)
3           VIDEOGRAPHER:  We're on the record at 3:28.
4   BY MR. SLOSAR:
5       Q   Sir, before we left, I think I gave you
6   Exhibit number 23, and then I asked for you to turn to
7   Exhibit number 11, which is the statement that you took
8   from Jeff Gray.  Do you recall taking a statement from
9   Jeff Gray in this case, sir?
10      A   Yes, sir.
11      Q   Was that statement recorded?
12      A   Yes, sir.
13      Q   I believe you not only took a recorded
14  statement from Jeff Gray, but you also created a police
15  report; is that right?
16      A   I believe so.
17      Q   I'll show you this.  I'm going to introduce it
18  as Exhibit 24.  Is that a report that you created, sir?
19              (EXHIBIT 24 MARKED FOR IDENTIFICATION)
20      A   Yes, sir.  It's my report.
21      Q   When did you interview Jeff Gray?  Do you see
22  the date?
23      A   February 2, 2012.
24      Q   So this would have been about two weeks after
25  you got the surveillance footage?

**Page 187**

1       A   Yes, sir.
2       Q   And is it fair to say that in 2012 when you
3   were questioning somebody who you believed could've been
4   involved in a crime, that you had the practice of
5   providing that person with their Miranda rights?
6       A   Only if they were in custody as well, which he
7   was not.
8       Q   Well, on February 2, 2012, did you question
9   Mr. Gray at the probation and parole offices in
10  Pineville, Kentucky?
11      A   Yes.
12      Q   And at the onset of that questioning, did you
13  provide him with his Miranda warning?
14      A   I don't believe I did.
15      Q   Look at page 2.
16      A   Oh, yes, sir.  I did provide him with this.
17      Q   Is it fair to say that you provided Mr. Gray
18  with his Miranda warning due to information you had
19  received to that point in the investigation?
20      A   I guess potentially, but my common practice is
21  anytime I speak to anyone, typically regarding a
22  investigation, then I Mirandize them even if they're not
23  in custody.  That's a practice that I still do.
24      Q   Okay.  Looking at page 9, during this
25  interview with Mr. Gray, isn't it true that you learned

**Page 188**

1   that Jeff Gray and his wife Wendy more or less raised
2   James Otis Sizemore?
3           MS. ARNETT:  Object to form.
4       Q   164 to 170.
5       A   Yes, sir.  It was discussed.
6       Q   And, in fact, you learned in this interview
7   that Jeff Gray's wife Wendy was even putting money on
8   Mr. Sizemore's books while he was in custody on this
9   case, correct?
10      A   Yes.  That's what he said, yes.
11      Q   Okay.  Now, in this interview with Mr. Gray,
12  he told you a lot of different stories; is that fair?
13      A   Yeah.  His story changed.
14      Q   And, in fact, one of the stories that he tried
15  saying, and I'm looking at page 11, is that William
16  Anderson and James Otis Sizemore came over his house on
17  the day of the murder in the evening hours.  I'm looking
18  at page 11.  Do you see that?
19      A   I'm on page 11.
20      Q   Here it says, "I got -- oh, I'm sorry.  He
21  came -- he gone to my house that day.  Me and him and
22  Bill did."
23      A   Okay.  Yeah.
24      Q   And Jeremy Ferrell on the next page.
25      A   Okay.

**Page 189**

1       Q   He's trying to tell you a story that was
2   inconsistent with any of the other statements you had
3   received so far in the investigation, right?
4       A   Yes, sir.
5       Q   Okay.  And the story that Mr. Gray was trying
6   to tell you implicated Sizemore, Anderson, and Jeremy
7   Ferrell as being at Jeff Gray's house on the date of the
8   murder; is that right?
9       A   Yes.
10      Q   And even to this day, you've never been made
11  aware of any other witness in this case who has ever
12  claimed that Mr. Sizemore, Mr. Anderson, and Mr. Ferrell
13  went to Jeff Gray's house on November 23, 2011; is that
14  right?
15      A   That's correct.
16      Q   Not even Mr. Sizemore, in all of his
17  statements, Mexicans in Eastern Kentucky through William
18  Anderson, everything in between, Mr. Sizemore has never
19  even told law enforcement that they went to the Gray
20  residence on the evening of the murder, correct?
21          MS. ARNETT:  Object to form.
22      A   That's correct.
23      Q   And is it fair to say that when you believed
24  that Jeff Gray was lying to you, you began confronting
25  him about the surveillance footage that you had

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

Page 190

1  retrieved in the investigation?
2      MS. ARNETT: Object to form.
3      A   Yes, sir.
4      Q   Is it fair to say that when Mr. Gray was
5  providing the story to you, that you didn't find it to
6  be credible based on the information that you had
7  gathered in your investigation?
8      MS. ARNETT: Object to form.
9      Q   You can answer.
10     A   That's correct.
11     Q   And as Mr. Gray -- Mr. Gray ultimately -- if
12  you go to page 12 and to page 13, there's a conversation
13  between you and Jeff Gray about whether the items he
14  used -- or the items he purchased, whether those were
15  items used during the murder.  And at some point, I
16  think, you told Mr. Gray that you're analyzing the line
17  from the autopsy.  Do you see that?
18     A   I do, yes, sir.
19     Q   And, in fact, Detective Johnson, isn't it true
20  that you did, in fact, send out a substance to be
21  analyzed to the Kentucky State Police laboratory?
22     A   I did send -- send it to the lab, yes.
23     Q   Yeah.  And I'll now show you what we'll mark
24  as Exhibit 25.  And in June of 2012, you ultimately
25  received some test results back that indicated that the

Page 191

1  white substance contained in the plastic container was
2  limestone; is that right?
3      (EXHIBIT 25 MARKED FOR IDENTIFICATION)
4      A   Yes, sir.  It is.
5      Q   Okay.  And that certainly would be consistent
6  with the surveillance footage that you saw from the
7  Lowe's; is that right?
8      MS. ARNETT: Object to form.
9      Q   You can answer, sir.
10     A   Yes, limes -- lime was bought from Lowe's,
11  yes.
12     Q   Uh-huh.  Now, you told -- I'm looking at page
13  13, Detective.  You told Jeff Gray in this interview
14  that you believed that you would be able to match the
15  substance to the lime he purchased at the Lowe's.  Do
16  you see that on here?
17     A   Yes, sir.
18     Q   And in response, Jeff Gray informed you, "If
19  they used that lime, he got it right there at my house.
20  I'm not going to say he did, I'm not going to say he
21  didn't.  I don't know"; is that right?
22     A   That's what he said, yes.
23     Q   So in this interview with Jeff Gray, he's not
24  even denying that Sizemore may have used this stuff that
25  he purchased at Lowe's to bury the body, right?

Page 192

1      MS. ARNETT: Object to form.
2      A   Uh-huh.  Yes.
3      Q   But would you agree, as experienced law
4  enforcement officer, something that's important to do is
5  to analyze the statements that witnesses give you in a
6  criminal investigation?
7      MS. ARNETT: Object to form.
8      Q   Do you agree with that?
9      A   Yes.
10     Q   And something that I want to ask you about is
11  lines 252 to 253.  Do you see where Jeff Gray tells you,
12  "But -- but -- but I'm telling you, I didn't kill nobody
13  and have nothing to do with no murder."  Do you see
14  that?
15     A   I do.
16     Q   Jeff Gray didn't deny having anything to do
17  with burying the body in that sentence, right?
18     MS. ARNETT: Object to form.
19     A   That's true.
20     Q   And you continued questioning Mr. Gray for
21  quite a while during this interview; is that fair?
22     A   Uh-huh.  We did.  It was a little while, yes.
23     Q   Okay.  And Mr. Gray told you -- I'm looking at
24  page 19.  He told you that he went to Lowe's because his
25  water went out and he needed to fix something with a

Page 193

1  pipe.  Is that generally what he describes on page 19 to
2  20?
3      A   Yes, sir.
4      Q   And you don't say anything in this recording
5  about seeing Mr. Gray digging up a hole or anything
6  indicating that this story was true.  You don't reveal
7  any information during this part of the questioning with
8  Mr. Gray, correct?
9      A   About --
10     Q   I guess --
11     A   -- what I'd seen?
12     Q   Yeah.  So earlier today you testified that you
13  may have seen some stuff --
14     A   Uh-huh.
15     Q   -- in Mr. Gray's yard when you did the initial
16  canvas.  You certainly didn't reveal any of that to Mr.
17  Gray when you were questioning him, at least during this
18  part of the interview, right?
19     A   No, sir.
20     Q   And Mr. Gray told you that the shovel and
21  these items are still at his house, right?  Looking at
22  page 20?
23     A   Yes, sir.
24     Q   And we went over it earlier.  You didn't take
25  any steps to recover those items for testing, correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

194..197

Page 194

1    A    Correct.
2    Q    Even though Mr. Gray admitted to you in this
3  statement that Sizemore could have actually used them to
4  bury the body?
5         MS. ARNETT:  Object to form.
6    Q    Right?
7    A    He said that.  I guess from his statement
8  earlier --
9    Q    He didn't know.
10   A    He -- yeah.  No, he didn't know.  It could
11 have.  If -- if it did, it could've come from the stuff
12 that he had purchased.
13   Q    Now what I want to ask you about, sir, is page
14 26, and before we left, I asked you to -- I told you I
15 was going to ask you about this page.  On page 26, you
16 say -- beginning on line 526, "So if I talked to James
17 Otis and while I was talking to him, he told me, and he
18 confessed to you everything that had happened.  You
19 offered to take him to Lowe's to buy these items.  So
20 something could -- so that the items could be used to
21 bury the body of Bobby Wiggins.  Would you be honest and
22 tell me that?"  Did you ask him that question?
23   A    Yes, sir.
24   Q    In response, Jeff Gray says, "Yes"; is that
25 right?

Page 195

1    A    Yeah.
2    Q    Yeah.  And then you asked Mr. Gray, "So do you
3  think he would be a liar if I got that statement from
4  him?"  And Jeff Gray responds, "Yeah, I do."  Do you see
5  that?
6    A    Yes, sir.
7    Q    Yeah.  By February 2, 2012 you had already
8  received information from James Otis Sizemore
9  implicating Jeff Gray as purchasing the items that were
10 used to bury the body of Bobby Wiggins, correct?
11   A    I had not heard from -- repeat that, from what
12 date?
13   Q    So I'm saying by February of 2012, in one of
14 your prior conversations with James Otis Sizemore, he
15 had revealed to you that Jeff Gray purchased the tools
16 that were used to bury the body?
17        MS. ARNETT:  Object to form.
18   A    I didn't know about the purchase at Lowe's un
19 -- until it was provided to me by Sheriff Pickard.
20   Q    I understand that.  My question to you is:
21 After Sheriff Pickard told you this, you would have gone
22 to speak to Mr. Sizemore, who was in custody, correct?
23   A    I don't recall.  I don't remember going back
24 and talking to him after that.
25   Q    If Sheriff Pickard has given a statement in

Page 196

1  this case saying that James Otis Sizemore revealed in an
2  interview that Jeff Gray purchased those tools to bury
3  the body, would you have any reason to dispute that?
4    A    I'm just not aware --
5         MR. KELLEY:  Objection.
6         MS. ARNETT:  Object to form.
7    A    I'm just not aware of it.
8    Q    No recollection?
9    A    No, sir.
10   Q    The story that Mr. Gray provided to you, you
11 didn't find that to be credible, right?
12   A    Yeah.  I -- I thought he was lying on -- on
13 certain things.
14   Q    And you thought he was lying so bad that that
15 was one of the reasons why you immediately tried to go
16 talk to James Otis Sizemore again, right?  And I think
17 your report -- this is that -- it's a two-page report
18 with -- that talks about -- yeah, it's Exhibit 2.  Do
19 you have it?
20   A    Yes, sir.
21   Q    Actually, let me withdraw that.  I'm wrong.
22 I'm looking at this.  It looks like you went to go talk
23 to Sizemore again on January 16, 2012, before -- two
24 weeks before you even talked to Jeff Gray.  On January
25 16, 2012, Mr. Sizemore refused to talk to you, right?

Page 197

1    A    Yes, sir.
2    Q    Yeah.  And it says, "I will attempt to contact
3  his attorney to set up a meeting."  Do you see that?
4    A    I did put that, yes.
5    Q    Okay.  Did you did you contact Mr. Sizemore's
6  attorney to set up a meeting?
7    A    I don't remember.
8    Q    Now, at some point prior to trial, you
9  certainly did have a conversation with James Otis
10 Sizemore about Jeff Gray, correct?
11   A    It's possible, yes.
12   Q    And I believe you testified some -- about some
13 of the information earlier that you believe you learned
14 from that conversation; is that right?  Before we went
15 on a break?
16   A    Yes, sir.
17   Q    Now, one of the things -- I want to focus on
18 your preliminary hearing transcript again.  The
19 preliminary hearing transcript, this Exhibit 21.  It's
20 right over on the -- it's all the way on the left.  Yeah.
21 That one.
22   A    It says Exhibit 23.
23   Q    That's 23.  You know what?  I think that -- I
24 think maybe I just wrote my number wrong in my --
25        MR. KELLEY:  21 is the recording.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

198..201

Page 198

1    MR. SLOSAR:  You have what?
2    MS. ARNETT:  Uh-huh.
3    MR. KELLEY:  21 is the audio of Anderson's
4    interview.
5    MS. ARNETT:  The preliminary.
6  BY MR. SLOSAR:
7    Q    Okay.  So then it's definitely that one.  Okay.
8  Yeah, 23.  I just can't read my own handwriting here.
9  Okay.  So if you turn to page 13, sir.  Now, according
10 to page 13 of your preliminary hearing, while they're at
11 the store, they bought a pack of cigarettes and a pop,
12 then went back to Ferrell's, at which point in time all
13 three of them went into the residence, commenced to
14 taking some of the pills that had been removed from the
15 victim.  So according to this part of your testimony,
16 Mr. Wiggins would have already been killed by the time
17 they went to the store; is that right?
18            (EXHIBIT 23 MARKED FOR IDENTIFICATION)
19    A    Yes, sir.
20    Q    And, again, you're telling -- you're
21 testifying at the preliminary hearing to what Mr.
22 Sizemore told you, correct?
23    A    Yes, sir.
24    Q    Now, at the preliminary hearing, you testified
25 at page 13, line 20 and 23, that the statement given by

Page 199

1  Mr. Sizemore was consistent with the injuries that you
2  observed on the victim from the autopsy; is that
3  correct?
4    A    Yes, sir.
5    Q    You didn't testify at the preliminary hearing
6  as to any of the inconsistencies that you observed at
7  the autopsy based on Mr. Sizemore's statement, correct?
8    A    That's -- I believe that's correct.
9    Q    And I know earlier you testified that the --
10 well, that the police theory of the investigation was
11 that the knife recovered from Mr. Anderson's pocket was
12 the knife that Mr. Sizemore described as being used in
13 the murder of Bobby Wiggins; is that right?
14    A    What was that?
15    Q    Page 14, lines 8 through 12.  I believe
16 earlier you testified that it was the police theory of
17 the investigation that the knife recovered from Mr.
18 Anderson was the one used to kill Bobby Wiggins, based
19 on Mr. Sizemore's description; is that right?
20    A    Yeah.  Mr. Sizemore described that it was his
21 knife that was used.
22    Q    Yeah.  Mr. Sizemore described that it was --
23    A    Mr. Anderson's knife.
24    Q    -- Mr. Anderson's knife that was recovered by
25 police during his arrest, right?

Page 200

1    A    I'm sorry.  You'll have to --
2    Q    The knife that Mr. Sizemore described on
3  December 3, that was the knife that was ultimately
4  recovered in Mr. Anderson's pocket at the time of his
5  arrest by Sergeant Pickrell, correct?
6    A    Yes, sir.
7    Q    And it was the police theory of the case that
8  that knife that was recovered from Mr. Anderson was the
9  one that was used to kill Bobby Wiggins, correct?
10    A    Yes.
11    Q    And that knife, even at the time of the
12 preliminary hearing, was sent to the lab for
13 examination; is that right?
14    A    That knife was sent to the lab, yes.
15    Q    And even -- I know earlier you testified that
16 you hadn't reviewed any of these other statements prior
17 to initiating charges outside of James Otis Sizemore,
18 but I want to refer you to page 17.  Actually, it's
19 really page 16, line 24, and it continues onto 17.  But
20 by the time of the preliminary hearing, isn't it true
21 that you had not even reviewed the audio recording nor
22 transcript from Jeremy Ferrell's interview with the Knox
23 County Sheriff's Department on December 1, 2011?
24    A    Yes.  That's what I've testified to.
25    Q    So by the time of the preliminary hearing, you

Page 201

1  still hadn't reviewed -- outside of James Otis
2  Sizemore's statement that you participated in taking,
3  you hadn't reviewed any of the other witness statements
4  up to that point, correct?
5    A    Yeah.  That's probably correct.
6    Q    The only two statements that you would have
7  had personal knowledge of and been aware of by the time
8  you testified at the preliminary hearing, would have
9  been those two statements that you participated in
10 taking, one from James Otis Sizemore and one from
11 William Anderson; is that right?
12    A    Yes.
13    Q    And there would have been a third statement,
14 which is just a second statement from James Otis
15 Sizemore that you would've taken from December 5, 2011,
16 that you would have a personal knowledge of but it is
17 not memorialized in any way today; is that right?
18    A    Yes.
19    Q    You did not speak to any of the Messer's prior
20 to the preliminary hearing, correct?  It's also --
21    A    No, sir.
22    Q    All right.  You also testified at the grand
23 jury proceeding.  Do you recall testifying at a grand
24 jury, sir?
25    A    I did.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

202..205

**Page 202**

1    Q    Okay.  And at that grand jury proceeding, you
2  understood at the time that your testimony could lead to
3  a formal indictment charging William Anderson with the
4  murder at Bobby Wiggins; is that right?
5    A    Mr. Anderson and Mr. Sizemore, yes.
6    Q    Yeah.  Did you provide any investigative files
7  to the Commonwealth -- I'm sorry.  Let me withdraw that
8  question.  Did you provide any investigative reports to
9  the Commonwealth Attorney, so that the grand jury could
10  review those documents prior to forming a decision on
11  whether to charge Mr. Anderson?
12    A    Yes.
13    Q    Which -- would you have provided Ms. Blondell
14  with Exhibit number 1, which is your 11-page report?
15    A    Yes, sir.
16    Q    And do you recall whether you would have
17  provided Ms. Blondell with any other reports?
18    A    I would have provided her with any of her --
19  my reports that would've been completed up until that
20  point.
21    Q    Now my understanding -- you know that -- do
22  you remember that packet that I gave you earlier today
23  from the Bell County Coroner?
24    A    Yes, sir.
25    Q    Okay.  Now, when you received that packet from

**Page 203**

1  the Bell County Coroner, do you recall creating a one-
2  page report just documenting when you had received it?
3  I'll hand you what is marked as Exhibit number 26.
4         (EXHIBIT 26 MARKED FOR IDENTIFICATION)
5    A    Yes.
6    Q    Okay.  And according to this report, did you
7  receive the packet from the Bell County Coroner on or
8  around March 20, 2012?
9    A    That is correct.
10    Q    Is it fair to say that that would have been
11  several months after your grand jury testimony in this
12  case?
13    A    Roughly, yes.
14    Q    Fair to say that you could not have provided
15  Ms. Blondell with documents that you had not yet
16  received from the Bell County Coroner?
17    A    I believe that the coroner had provided them a
18  copy as well, and -- I don't know what date he
19  provided them.  This is just the date that I went and
20  received my copy from him.
21    Q    Okay.
22    A    Because I --
23    Q    So you would have -- you would have given your
24  Exhibit number -- you would have given any report that
25  was complete prior to your testimony at the grand jury;

**Page 204**

1  is that right?
2    A    Yes, sir.
3    Q    Okay.  Now, did you give the grand jury --
4  outside of reports, did you give that grand jury any
5  other documents?
6    A    I'm sorry.
7    Q    Or did you give the grand jury -- or did you
8  give the Commonwealth Attorney any other material,
9  outside of the reports, to provide to the grand jury?
10    A    I don't remember exactly which documents was
11  provided to them, but -- but yeah, I would have provided
12  statements or, you know, what photographs whatever we
13  had up to that point.  But I don't remember which ones I
14  provided to them --
15    Q    Did you have a list of document -- did you
16  have a list that kept track of materials that you
17  provided to the grand jury?
18    A    No, sir.
19    Q    Was it Ms. Blondell that you were working
20  closely with?
21    A    Well, it was -- Ms. Blondell was the
22  prosecutor and --
23    Q    Now, I want to refer you to parts of your
24  grand jury testimony.  Do you have your grand jury
25  testimony handy?  It should be Exhibit number 14.

**Page 205**

1    A    Did you say 14, sir?
2    Q    Yes, sir.  It should look like this on the
3  front.
4    A    Yes.  Right after 13.
5    Q    There it is.  All right.  It's been a long
6  day.  Now, I'm going to refer you just to some portions,
7  just like you did with the preliminary hearing, sir.  If
8  you could go to page 4.  Now, on page 4, did you testify
9  to the grand jury, "In the course of Chief Deputy Derek
10  Eubanks investigation, he had obtained some information
11  that James Sizemore, William Anderson, and a Jeremy
12  Ferrell were the last seen in the victim's car.  Mr.
13  Eubanks then proceeded to try to locate these subjects.
14  When he went to Mr. Ferrell's house, Mr. Ferrell stated
15  yes, he was in the car, but he knows nothing about the
16  victim and stated that Mr. Anderson and Mr. Sizemore had
17  come to the residence in the victim's car and actually
18  burnt some items from the glovebox."  Did you testify to
19  that effect, sir?
20    A    Yes.
21    Q    When you testified to that effect, you
22  understood that your testimony was going to be used to
23  consider whether charges were appropriate against
24  William Anderson; is that right?
25    A    Yes, sir.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

206..209

Page 206

1    Q    Now, by the time of the preliminary hearing,
2  you had never actually even reviewed Mr. Ferrell's
3  statement, correct?
4    A    That's correct, yes.
5    Q    Yeah.  By the time of the grand jury
6  testimony, had you reviewed that statement?
7    A    I can't advise.  I don't know.
8    Q    I'm sorry?
9    A    I don't -- I don't know.  I can't recall.
10   Q    And probably not, since -- well, I'll withdraw
11  that.  I'm going to show you a transcript of Mr.
12  Ferrell's statements to Derek Eubanks.  My question to
13  you is, sir -- and this is Exhibit 27.  Isn't it true
14  that Mr. Ferrell did not inform Mr. Eubanks that William
15  Anderson and Mr. Sizemore came to his residence together
16  in the victim's car?  And I will refer you to page --
17  the bottom of page 3 beginning at line 47 and at page 4,
18  line 65.  Did you get to read that?
19   A    I -- I did, yes.
20   Q    Yeah.  Isn't it true that Mr. Ferrell informed
21  Deputy Eubanks that James Otis Sizemore came to his
22  house by himself in the black Toyota Camry on November
23  23, 2011 before they left to go to the Indian store?
24        MS. ARNETT:  Object to form.
25   A    Yes.

Page 207

1    Q    He doesn't say anything about Mr. Anderson
2  being with Mr. Sizemore at that time, correct?
3        MS. ARNETT:  Object to the form.
4    A    That's correct.
5    Q    And isn't it true that Mr. Ferrell informed
6  Deputy Eubanks that they actually did not run into Mr.
7  Anderson at all until they were at the Indian store on
8  the day in question?
9        MS. ARNETT:  Object to form.
10   A    Yes.
11   Q    So Mr. Ferrell did not reveal to Mr. Eubanks
12  that William Anderson and James Otis Sizemore came to
13  his residence together in the victim's car, correct?
14        MS. ARNETT:  Object to form.  Misstates the...
15   A    Yes.
16   Q    And, in fact, what Mr. Ferrell revealed to
17  Deputy Eubanks was that Mr. Anderson, Mr. Sizemore, and
18  Mr. Ferrell only came to the residence together after
19  meeting at the Indian store, correct?
20   A    Yes.
21   Q    And when they returned to the residence
22  together, Mr. Ferrell revealed to Deputy Eubanks that
23  Mr. Sizemore burnt items from the glovebox, correct?
24   A    Yes, sir.
25   Q    Mr. Ferrell did not reveal to Mr. Eubanks that

Page 208

1  Mr. Anderson had any participation in burning items from
2  the glovebox, correct?
3        MS. ARNETT:  Object to form.
4    A    I believe that's correct.
5    Q    But you told the grand jury that Mr. Anderson
6  and Mr. Sizemore had come to the residence in the
7  victim's car and actually burned some items from the
8  glove box, correct?
9        MS. ARNETT:  Object to form.
10   A    Yes.
11   Q    Yeah.  You didn't tell the grand jury that
12  when Mr. Sizemore first appeared in Mr. Ferrell's house
13  that day, that William Anderson was not in the victim's
14  car, correct?
15        MS. ARNETT:  Object to form.
16   A    Yeah.  I believe that's correct.
17   Q    You didn't tell the grand jury that Mr.
18  Anderson only came to Mr. Ferrell's house in the black
19  Camry after meeting Mr. Ferrell and Mr. Sizemore at the
20  Indian store, correct?
21        MS. ARNETT:  Object to form.
22   A    I believe that's correct.
23   Q    You didn't tell the grand jury that Mr.
24  Anderson didn't have any participation in burning items
25  from the glovebox, correct?

Page 209

1        MS. ARNETT:  Object to form.
2    A    That's correct.
3    Q    Sir, you testified to the grand jury that Mr.
4  Anderson -- Let me withdraw that.  You testified to the
5  grand jury, I'm looking at page 4 at the bottom, line
6  37, that when Mr. Eubanks arrived at the residence where
7  Mr. Anderson was, that he came out of the residence
8  carrying a plastic bag that contained a black Columbia
9  jacket and a black Nike hat and stated, "I guess you're
10  here to get these."  Did you testify to that effect?
11   A    Yes, sir.
12   Q    And when you say, "I guess you're here to get
13  these," you're attributing that comment to Mr. Anderson,
14  correct?
15   A    Yes, sir.
16   Q    Who told you that Mr. Anderson told Deputy
17  Eubanks "I guess you're here to get these," when he
18  provided the articles of clothing that Mr. Sizemore had
19  given him?
20   A    I believe it'd be Deputy Eubanks would've told
21  me that.
22   Q    Certainly wouldn't have made that up, would
23  you?
24   A    No, sir.
25   Q    Why didn't you tell the grand jury that Mr.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


Kentuckiana
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

210..213

Page 210

1  Anderson received those item -- articles of clothing
2  from James Otis Sizemore?
3      A    I don't know.
4      Q    You made a decision not to, right?
5      A    I just presented the -- the information the
6  best that -- that I could, you know, the best that I
7  knew at the time.
8      Q    Were you questioned --
9      A    I didn't purposely not tell them that.  I just
10 told them what -- what I knew or what I recalled from
11 the investigation up to that point.
12     Q    Well, you participated in the December 3rd
13 questioning of William Anderson, right?
14     A    (No verbal response.)
15     Q    The recording of December 3rd?
16     A    I participated, yes.
17     Q    Yeah.  And in that interview, Mr. Anderson
18 repeatedly revealed that James Otis Sizemore did have
19 the clothing at issue, correct?
20     A    Yes, sir.  I believe that's correct.
21     Q    And you didn't provide any of that to the
22 grand jury, correct?
23     A    No, sir.  I don't believe so.
24     Q    Looking at page 5, you provide some testimony
25 about one of the stories that Mr. Sizemore gave to you.

Page 211

1  I'm looking at Lines 41 through 48.  "They located
2  Sizemore and he told them he knows a little bit about
3  Mr. Wiggins but doesn't know a lot.  He told them that
4  himself, Mr. Anderson took Mr. Wiggins up to a logging
5  road up in the mountains of Beverly, probably Bell
6  County, Kentucky, and that they were up there to conduct
7  a drug deal."  You stated that when they were there,
8  that Mr. Anderson and Mr. Wiggins proceeded down over
9  the hillside.  He stated he heard a struggle but didn't
10 see anything.  At that point, you said, Mr. Anderson
11 came up and had blood on his hands.  Did you testify to
12 that effect?
13     A    Yes, sir.
14     Q    Now, you didn't provide the grand jury with
15 any of the stories that Mr. Sizemore provided to Sheriff
16 Pickard or Deputy Eubanks on December 2, 2011, correct?
17          MS. ARNETT:  Object to form.
18     Q    You can answer.
19     A    If you can repeat that?  I'm sorry.
20     Q    So you didn't provide the grand jury with any
21 of the other stories that James Otis Sizemore provided
22 to law enforcement prior to December 3, 2011, correct?
23     A    Yes.
24     Q    You didn't tell the grand jury that Mr.
25 Sizemore was originally implicating Mexicans in Eastern

Page 212

1  Kentucky, right?
2      A    Yes, sir.
3      Q    You didn't tell the grand jury that Mr.
4  Sizemore was initially denying any knowledge or
5  involvement in the murder, correct?
6      A    Yes, sir.
7      Q    You didn't tell the grand jury how Mr.
8  Anderson's name was first brought up by law enforcement
9  during the course of questioning by James Otis Sizemore
10 --
11          MS. ARNETT:  Object to form.
12     Q    -- correct?
13          MR. KELLEY:  Objection to form.
14     Q    You can answer.
15     A    That's correct.
16     Q    I want to show you something on page 7.  I'm
17 looking at line 86 through line 92.  According to this,
18 you testified to the grand jury that he was leaving out
19 of Flat Lick, stopped at a convenience store known as
20 the Indian Store, and while they were there, Mr.
21 Anderson and another gentleman by the name of Dave Fox
22 drove by and pulled into the store.  Mr. Fox then
23 obtained a pill from Mr. Wiggins, then Mr. Fox left the
24 location.  Mr. Anderson then got into the vehicle with
25 the victim, Bobby Wiggins, and James Sizemore and then

Page 213

1  proceeded back up to Buckeye Branch, the residence where
2  Mr. Anderson lives.  Did you testify that effect, sir,
3  to the grand jury?
4      A    Yes, sir.
5      Q    And did you testify that while they were at
6  the residence, Mr. Wiggins was sitting on the couch in
7  the living room, Mr. Anderson walked to a back bedroom,
8  at which point Mr. Sizemore followed him.  When they
9  were in the back bedroom, Mr. Sizemore made the comment
10 to Mr. Anderson that Ms. York had previously told him
11 that Mr. Wiggins typically carried a lot of money on him
12 and a lot of pills and that he would be an easy target
13 to rob.  Did you testify to that effect, sir?
14     A    Yes, sir.
15     Q    I'll refer you to Exhibit number 1, sir, and I
16 ask that you to turn to page 6.
17     A    Okay.
18     Q    Page 6, do you see -- it's about 12 lines
19 down.  Do you see where it starts with, "Mr. Sizemore
20 stated he went to the residence of Leonard, Junior, and
21 Brenda Messer?"
22     A    I do, yes.
23     Q    Read the rest of that, where William Bill Bill
24 Anderson stays "to see if he wanted to buy Mr. Wiggins'
25 pills.  Mr. Sizemore stated that Mr. Anderson wasn't

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

214..217

Page 214

1  there.  That him and Dave Fox had went to the store. Mr.
2  Sizemore then stated that he drove back down Buckeye
3  Branch to the junction of KY 718 and pulled across the
4  road in a gravel lot.  He stated him and Mr. Wiggins
5  done a pill while waiting for Mr. Anderson to come
6  home."  Do you see that, sir?
7      A    Yes, sir.
8      Q    "Mr. Sizemore stated that the Messer's van
9  turned up Buckeye Branch, so he pulled out and followed
10  them.  He stated he flashed his headlights, and the van
11  pulled over.  Mr. Sizemore advised Mr. Anderson got out
12  of the van and walked back to him.  He stated he talked
13  to Mr. Anderson for a few minutes and that Mr. Wiggins
14  remained in the car.  Mr. Sizemore was talking to Mr.
15  Anderson about the pills, and Mr. Fox asked Mr. Sizemore
16  if he could get one."  Do you see all that, sir?
17      A    Yes, sir.
18      Q    When you testified to the grand jury, you
19  didn't inform them that Mr. Sizemore gave a different
20  statement advising that he was following the Messer's
21  van and pulled over, and that's when they had a
22  conversation, correct?
23          MS. ARNETT:  Object to form.
24      A    Yes, sir.
25      Q    Instead, you told the grand jury that Mr.

Page 215

1  Sizemore merely advised that he met with Mr. Fox and Mr.
2  Anderson at the Indian Store with Mr. Wiggins and then
3  immediately proceeded to Buckeye Branch, right?
4      A    That's what I testified to, yes, sir.
5      Q    But you left out the inconsistencies that
6  existed in Mr. Sizemore's statement when you testified
7  before the grand jury, correct?
8      A    From his statement from the 3rd, yes, sir.
9      Q    In fact, when you testified to the grand jury
10  -- I'm looking at page 10, line 50 -- 150, you then
11  testify that they left Buckeye Branch, "They went to
12  Jeremy Ferrell's residence, who also lived in Flat Lick,
13  picked him up, at which point they went back down to the
14  Indian Store and purchased some items, some cigarettes
15  and some pop."  This would have been after the murder.
16  Do you testify to that effect, sir?
17      A    Yes.
18      Q    Now, you didn't inform the grand jury that
19  Jeremy Ferrell gave a statement saying that none of that
20  ever happened, right?
21          MS. ARNETT:  Object to form.
22      A    That's correct.
23      Q    You didn't inform the grand jury that Dave Fox
24  gave a statement saying that that didn't happen, right?
25          MS. ARNETT:  Object to the form.

Page 216

1      A    That's correct.
2      Q    Page 11, you testified at lines 176 to 178,
3  "They then left there, went back to Kim York's --
4  Kimberly York's residence in Barbourville, at which
5  point Mr. Anderson got back in the van in the driver's
6  seat and proceeded away from the residence."  Do you see
7  that, sir?
8      A    Yes, sir.
9      Q    When you testified to that effect, did you
10  ever inform the grand jury that Kimberly York, in her
11  statement to the police, did not provide any information
12  that would corroborate that allegation?
13          MS. ARNETT:  Object to form.
14      A    Yeah.  That's correct.
15      Q    Didn't tell them anything about Kim York's
16  knowledge and how that was inconsistent with Mr.
17  Sizemore's allegations, correct?
18          MS. ARNETT:  Object to form.
19      A    Yeah, I didn't provide them her testimony.
20      Q    I've got -- well, you did inform the grand
21  jury, I'm looking at page 12, that Mr. Wiggins was
22  stabbed 18 times, 12 times in the chest, six times in
23  the throat, and that was information you learned in the
24  autopsy, correct?
25      A    Yes, sir.

Page 217

1      Q    But you didn't provide the grand jury with any
2  of the information from the autopsy that was
3  inconsistent with James Otis Sizemore's statements,
4  correct?
5          MS. ARNETT:  Object to form.
6      A    I believe that's correct.
7      Q    Yeah.  Instead, you told the grand jury that
8  the information you learned in the autopsy correlated
9  with the statement obtained from Mr. Sizemore, correct?
10      A    I did, yes.
11      Q    You also told the grand jury that when Mr.
12  Anderson was arrested, they located a black double-
13  bladed knife in his front right pocket and took the
14  knife into evidence; is that right?
15      A    Yes, sir.
16      Q    And you testified to the grand jury that the
17  knife has since been sent to the Kentucky State Police
18  crime lab and analyzed for any DNA belonging to the
19  victim; is that right?
20      A    Yes, sir.
21      Q    And after testifying to the grand jury, you
22  got results back from all of the forensic testing in
23  this case, correct?
24      A    Yes, sir.
25      Q    And none of that forensic testing ever linked

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

Page 218

1  William Anderson to the murder of Bobby Wiggins; is that
2  right?
3      MS. ARNETT:  Object to form.
4      Q   You can answer.
5      A   Yes.
6      Q   Did you ever go back to the grand jury to re-
7  present this case to see if they would indict him, or
8  they would decline to indict him, based on the
9  investigation that you conducted?
10     MS. ARNETT:  Object to form.
11     A   No, sir.
12     Q   Did you ever take any steps to stop the
13 initiation of murder charges against William Anderson at
14 any time prior to his 2016 trial?
15     A   No, sir.
16     MS. ARNETT:  Object to form.
17     Q   Sir, is it fair to say that you did not inform
18 the grand jury that Mr. Sizemore provided more than a
19 dozen different stories before implicating William
20 Anderson in the murder of Bobby Wiggins?
21     MS. ARNETT:  Object to form.
22     A   That's correct.
23     Q   Is it fair to say that you did not inform the
24 grand jury that William Anderson's name was first
25 mentioned by law enforcement personnel?

Page 219

1      MS. ARNETT:  Object to form.
2      A   Yeah, I believe that's correct.
3      Q   Is it fair to say that you did not inform the
4  grand jury that Mr. Sizemore's statements conflicted
5  with physical evidence?
6      MS. ARNETT:  Object to form.
7      A   Could you repeat that?
8      Q   Is it fair to say that you did not inform the
9  grand jury that Mr. Sizemore's statements conflicted
10 with physical evidence?
11     A   Yeah, I didn't provide that.  I didn't say
12 that.
13     Q   Is it fair to say that you did not inform the
14 grand jury that Mr. Sizemore was told what to say at
15 various points during his questioning with law
16 enforcement?
17     MS. ARNETT:  Object to form.
18     A   Yeah, I didn't advise it.
19     Q   Is it fair to say that you did not inform the
20 grand jury that James Otis Sizemore was threatened --
21     MS. ARNETT:  Objection.
22     Q   -- by Detective York during questioning on
23 December 3, 2011?
24     A   I didn't perceive it as a threat.  But no, I
25 did not report what was said.

Page 220

1      Q   Is it fair to say that you did not inform the
2  grand jury that Mr. Sizemore was made promises of
3  consideration by Detective York during the December 3,
4  2003, questioning?
5      MS. ARNETT:  Object to form.
6      A   Was not provided.
7      Q   Is it fair to say that you did not inform the
8  grand jury of statements provided by law enforcement,
9  prior to that date, by Dave Fox?
10     A   Yeah.  I don't believe so.
11     Q   Is it fair to say that you did not inform the
12 grand jury of statements provided to law enforcement,
13 prior to the date of the grand jury, by Jeremy Ferrell?
14     A   Yeah, that's correct.
15     Q   Is it fair to say that you did not provide the
16 grand jury with any of the information learned from
17 statements provided by the Messer family?
18     A   That's correct.
19     Q   Is it fair to say that you did not provide the
20 grand jurors with any of the information learned from
21 statements provided by Kim York?
22     A   Yeah.  I believe that's correct.
23     Q   Is it fair to say that you did not provide the
24 grand jury with any information learned from the
25 victim's own sister, Helen Fay Scott?

Page 221

1      A   Yeah.  I believe that's probably correct.
2      Q   Sir, is it fair to say that at the time you
3  testified at the grand jury, that you knew that you were
4  there to provide testimony that could lead to an
5  indictment against William Anderson for the murder of
6  Bobby Wiggins?
7      MS. ARNETT:  Object to form.
8      A   Yes.  For William Anderson and James Otis
9  Sizemore, yes, sir.
10     Q   Is it fair to say that the information that
11 you provided to the grand jury was done with the intent
12 of securing an indictment against William Anderson for
13 the murder of Bobby Wiggins?
14     MS. ARNETT:  Object to form.
15     A   Just provided the information that -- that I
16 had obtained in the investigation up to that point --
17     Q   Well --
18     A   -- through various statements and whatnot,
19 but...
20     Q   You've already testified that you didn't
21 provide the grand jury with an overwhelming amount of
22 information that was learned in the investigation.  So
23 let me ask it a better way, maybe.  Is it fair to say
24 that when you testified to the grand jury, you provided
25 them with the information that you thought would assist

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

222..225

Page 222

1  in obtaining an indictment against William Anderson for
2  the murder of Bobby Wiggins?
3      A     Just provided them a summary of the
4  investigation the best I could recall at that time.
5      Q     Is it your testimony here today that the
6  witnesses that you did not provide any information about
7  --
8      A     Sorry?
9      Q     I withdraw that.  You were the person that
10 chose what information to provide to the grand jury,
11 correct?
12     A     I was the one who provided the grand jury
13 testimony, yes, sir.
14     Q     And you provided that information
15 intentionally, correct?
16     A     Yes.
17     Q     And you knew that when you testified at the
18 grand jury, that those jurors would be left to decide
19 whether to initiate charges against William Anderson for
20 the murder of Bobby Wiggins, correct?
21     A     Yes.
22     Q     Sir, sitting here today, do you have any
23 personal opinions or beliefs as to whether William
24 Anderson was actually involved in the murder of Bobby
25 Wiggins?

Page 223

1      MS. ARNETT:  Object to form.
2      A     Yes, sir.  I do.
3      Q     You do?  Sitting here today, do you have any
4  personal opinions or beliefs as to whether Jeff Gray was
5  involved in assisting James Otis Sizemore in burying the
6  body of Bobby Wiggins?
7      MS. ARNETT:  Object to form.
8      A     It's possible.
9      Q     Is it fair to say that the recorded jail
10 conversations that you listened to prior to trial cast
11 doubt on the credibility of the statement given by James
12 Otis Sizemore?
13     MR. KELLEY:  Object.
14     MS. ARNETT:  Object to form.  Asked and
15 answered.
16 BY MR. SLOSAR:
17     Q     You can answer.
18     A     Could you repeat that one more time for me,
19 just to make sure I understand what you're asking?
20     Q     Is it fair to say that those jail recordings
21 that you listened to from James Otis Sizemore talking to
22 relatives about the homicide of Bobby Wiggins, that
23 those recordings cast doubt on the credibility of his
24 allegations against William Anderson?
25     A     I -- I -- I really -- I can't answer that.  I

Page 224

1  just -- I listened to some, but I don't recall listening
2  to any that was --
3      Q     Sir.  Let me --
4      A     -- talking about --
5      Q     Let me ask you this.  Did you ever pull James
6  Otis Sizemore out of his cell at any point in time while
7  he was in custody to talk to him about the homicide of
8  Bobby Wiggins?
9      A     On December 5th, I talked to him.
10     Q     Did you ever tell James Otis Sizemore that --
11 did you ever tell James Otis Sizemore anything to the
12 effect that if he didn't help law enforcement take down
13 William Anderson that he would get the needle or the
14 death penalty?
15     MS. ARNETT:  Object to form.
16     A     I don't recall ever saying that.
17     Q     Have you ever made any threats to Mr.
18 Sizemore?
19     MS. ARNETT:  Object to form.
20     A     Not that I can recall.
21     Q     Have you ever talked to him about the death
22 penalty?
23     A     Not that I recall.
24     Q     Have you ever been present when any other law
25 enforcement officer has talked to Mr. Sizemore about the

Page 225

1  death penalty?
2      A     No.  I don't recall if it was ever mentioned
3  or not.  I don't recall.
4      MR. SLOSAR:  I think we've talked about this
5  agreement before, but we'll -- we'd like to reserve
6  punitive damages --
7      MS. ARNETT:  What?
8      MR. SLOSAR:  -- just -- we'd like to reserve
9  questions related to punitive damages for prior to
10 trial.
11     THE WITNESS:  Okay.
12     MR. SLOSAR:  So punitive damages are just
13 personal assets that you have that we can ask you
14 questions about, and I think we typically reserve
15 that for prior to trial.  With that, I don't have
16 any further questions today.  Thank you, Detective.
17     THE WITNESS:  Yes, sir.
18     MS. ARNETT:  No questions.
19     MR. KELLEY:  Can I take ten short minutes, I
20 hope?
21     MR. SLOSAR:  Sure.
22     MR. KELLEY:  I'm not sure what number we're
23 at, but if we could just -- I'd like to go ahead
24 and make it sequential with the rest.
25     COURT REPORTER:  Your next one will be 28.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

226..229

Page 226

1          MR. KELLEY:  Okay.
2          MR. KELLEY:  You want me to give you a copy of
3     this?  It's the 110 pages.  It comprises the entire
4     --
5          MR. SLOSAR:  I have one through --
6          MR. KELLEY:  Oh, do you?
7          MR. SLOSAR:  Are you going to be asking him a
8     lot about it, or why --
9          MR. KELLEY:  No.
10         MR. SLOSAR:  All right.
11         MR. KELLEY:  I am going to be asking him about
12    the last page, I think, particularly.
13              CROSS EXAMINATION
14    BY MR. KELLEY:
15    Q    Mr. Johnson, again my name is John Kelley.  I
16    represent Sheriff Pickard, Derek Eubanks, and Knox
17    County.  What I've presented to you is Exhibit number
18    28.  I'd ask you to assume that this is what was
19    provided during the exchange in this federal lawsuit.
20    That is, the KSP provided us a copy of what I believe
21    was your entire written report, at least, comprised of
22    110 pages.  If you take just a minute to look at that
23    and see if you can -- if it looks familiar to you.  How
24    I've just -- looked at it is.  You've also sup -- during
25    the course of this -- during the course of this

Page 227

1     deposition identified supplemental reports, that some
2     are and some aren't in there.  But in other words, do
3     you now believe that all the reports you wrote that were
4     part of your written record are now in evidence?  In
5     other words, do you remember any particular reports that
6     you've not seen today?
7     A    No, sir.
8     Q    Okay.  I am interested in finding out your
9     contacts with my clients.  When you first came -- when
10    you were first notified of your involvement or the need
11    for you to become involved in this case, I assume you
12    were at post?
13    A    Was I assigned to post?
14    Q    When you first got the call saying, we need
15    you to come up here to Red Bird.
16    A    No, I was not at post.
17    Q    Okay.  At home, I guess, if you remember --
18    A    Well, I remember that that day I was probably
19    at home.
20    Q    Okay.  Do you remember who contacted you?
21    A    No, sir.
22    Q    All right.  At some point, you mentioned
23    before that you met up with Sheriff Pickard; is that
24    right?
25    A    Yes, sir.

Page 228

1     Q    All right.  There's a place called
2     Pigeonroost.  Is that where you met him?
3     A    It's at the head of 718, yes, sir.
4     Q    Okay.  From that point, he could take you up
5     to the actual site in his four-wheeler; is that correct?
6     A    That's correct.
7     Q    All right.  And of course, you wrote down the
8     times that you got there, et cetera, in your report.  I
9     understand that.  Do you remember if anybody else was
10    with Sheriff Pickard when he picked you up?
11    A    I don't remember if there was.
12    Q    In particular, do you know if Detect -- Deputy
13    Eubanks was with him at that time?
14    A    I don't recall if he was.
15    Q    All right.  As you're going up the mountain
16    was Sheriff Pickard -- obviously, I would think you were
17    talking to each other.  Was he trying to fill you in as
18    far as what they had found or not, or do you remember
19    anything about the conversation?
20    A    I don't -- I don't remember what we talked
21    about on the way up.
22    Q    All right.  When you got up to the top, you
23    did have an opportunity to see or at least talk -- to
24    see and talk with Deputy Eubanks as well; is that
25    correct?

Page 229

1     A    Probably.
2     Q    Okay.  I do know that aft -- you come down
3     from the mountain and ultimately go to the Knox County
4     Sheriff's Office.  And I think before you told us that -
5     - we know that Deputy Eubanks was with you when James
6     Sizemore was interviewed on that occasion; is that
7     correct?
8     A    Yes.
9     Q    All right.  Do you have a recollection as to
10    whether Sheriff Pickard was with you at that time?
11    A    I don't recall him being --
12    Q    Okay.
13    A    -- at the interview.
14    Q    Okay.  Do you remember having any contact with
15    Sheriff -- excuse me, with Deputy Eubanks after the
16    interview -- or the interview with James Sizemore that
17    night?
18    A    Anymore contact with him?
19    Q    Yeah.
20    A    I did receive some items from him.
21    Q    Okay.  If you look at the back of the report,
22    page 110, I think it is.  In particular, I want to ask
23    you, first of all -- there's a -- it's page 100 -- KSP
24    110 at the top, and it's identified as, "Evidence
25    Recovered Property."  Is that a log of the evidence you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

230..233

Page 230

1  received during the course of your investigation?
2      A    Yes, sir.
3      Q    Okay.  I want to skip down to where it talks
4  about the black Columbia jacket and black Nike hat.  Is
5  that in your -- do you see that entry?
6      A    Yes, sir.
7      Q    Is that something you received from Deputy
8  Eubanks?
9      A    I did receive that item from Deputy Eubanks.
10 However, it was not -- this form was created because the
11 defense had requested these items be sent to a third-
12 party --
13     Q    Okay.
14     A    -- place for questioning.
15     Q    All right.
16     A    So it will be --
17     Q    I know it's mentioned elsewhere as to what you
18 received.
19     A    Probably about six or seven pages prior to
20 that is the other KSP 41s that list the jacket and the
21 hat.  And that's labeled KSP 103 at the top.
22     Q    Okay.  So you -- obviously you indicate that
23 you received that from the Knox County Sheriff's
24 Department, it looks like, on December 4, 2011?
25     A    December 3 --

Page 231

1      Q    Okay.
2      A    -- of 2011 at approximately 12:21 a.m.
3      Q    All right.
4      A    And I completed this evidence form on December
5  4.
6      Q    All right.  I'm looking for -- did you also
7  receive what was listed on the last page, the burnt
8  owner's manual?
9      A    Yes, sir.
10     Q    Did you receive that from Deputy Eubanks?
11     A    Yes, sir.
12     Q    All right.  Now, at the top of the list, and
13 admittedly this was something going out for further
14 examination, there's a black and silver Motorola flip
15 phone.  Do you know how you came into the possession of
16 that?
17     A    Yes, sir.
18     Q    Okay.  Can you tell us?
19     A    While myself and Detective Mefford was doing
20 our neighborhood canvas, Deputy Eubanks, and I believe
21 Sheriff Pickard was with him, had flagged -- pulled over
22 beside myself and Detective Mefford or flagged us over
23 and stated that they had recovered that item.  And they
24 provided it to me at that time.
25     Q    All right.  Can you tell me when that was in

Page 232

1  relationship to the interview with Mr. Sizemore?
2      A    Would have been after I received these items
3  at -- on December 4, 2011 at about 4:00 p.m.
4      Q    Okay.  And did you have contact with -- did
5  you receive any other materials from the Knox County
6  Sheriff's Department?
7      A    No, sir.  I don't recall.
8      Q    Okay.  Did you have any further contact with
9  Deputy Eubanks after that incident or do you remember?
10     A    No, sir.  I don't recall him assisting me on
11 anything else on this investigation after -- after that.
12     Q    All right.  It has come up -- come to light
13 later on in the investigation that Deputy Eubanks was at
14 an interview of Dave Fox, along with Detective York and
15 Sergeant Pickrell; is that correct?
16     A    Yes, sir.
17     Q    All right.  And I believe that was what,
18 December 3rd or 4th; is that correct?
19     A    In December 3rd, I believe.
20     Q    All right.  Do you know of any further role
21 that Deputy Eubanks played in the investigation beyond
22 those instances I've described to you?
23     A    Not that I can recall.
24     Q    All right.  I want to go back, I forgot to ask
25 you about -- did you receive audio recordings of the

Page 233

1  interviews that Deputy Eubanks and Sheriff Pickard
2  conducted during the -- their investigation into the mur
3  -- missing person investigation, I should say?
4      A    Yes, sir.
5      Q    Okay.  Did you receive one of -- a audio
6  recording of an interview with Kim York?
7      A    I believe so.
8      Q    All right.  Likewise, did you receive one of
9  Dave Fox?
10     A    I believe so, yes, sir.
11     Q    Jeremy Ferrell?
12     A    Yes, sir.
13     Q    Okay.  William Anderson?
14     A    I can't recall.
15     Q    Okay.  And likewise, did you receive one of
16 James Sizemore?
17     A    Yes, sir.
18     Q    All right.  You mentioned before that Sheriff
19 Pickard contacted you, and it looks like -- I want to
20 say December 12th, but I could be wrong.  Where you got
21 a phone call from him concerning -- information
22 concerning the surveillance tape at the Lowe's store?
23         MR. SLOSAR:  There's not a -- there's not a
24 date.  It's just prior to the 12th.
25     Q    I think January 12th, you go to see Jennifer

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

234..237

Page 234

1  at Lowe's is what this indicates.  So it was sometime
2  close in time to that or know when?
3          MR. SLOSAR:  Objection to form.  Foundation,
4      asked and answered.
5      A    As I testified earlier, if it wasn't that day,
6  it -- it was the day before.  I mean, once I received
7  that information, I went to -- to try to obtain those
8  items.
9      Q    Okay.  Do you remember any further involvement
10 Sheriff -- of Sheriff Pickard in your investigation?
11     A    No, sir.
12     Q    Okay.  And you mentioned before, I think you
13 said you were not familiar with -- you knew of them,
14 Sheriff Pickard and Deputy Eubanks, but you had not
15 worked with them before?
16     A    Yeah, that's correct.
17     Q    All right.  I take it you felt more
18 comfortable working directly with other KSP
19 investigators within your own investigation?
20         MR. SLOSAR:  Objection to form.
21     A    I guess, probably.  But it's -- I mean, if I --
22 - I guess, if there was an instance that I felt that
23 they could assist me with something, I -- I would have
24 asked them to do so.
25     Q    I understand.  And what I'm trying to find out

Page 235

1  is whether there were any of those instances where you
2  contacted Sheriff Pickard for help?
3      A    Not that I can recall, no, sir.
4      Q    Okay.  Did you think there was anything
5  missing from the investigation they performed?  In other
6  words, do you think they gave you everything that had?
7          MR. SLOSAR:  Objection to form.  Calls for
8      speculation.  You can answer.
9      A    I mean, those items are all that I was -- that
10 I'm aware of.
11     Q    Okay.  Did you come across mention of any
12 other evidence that they may have acquired during the
13 course of their investigation?
14     A    Not that I'm aware of.
15     Q    Okay.  Did you ever consult with them prior to
16 the preliminary hearing that was discussed earlier?
17         MR. SLOSAR:  Objection to form and foundation.
18     A    I don't recall.
19     Q    Okay.  Likewise, did you talk with them before
20 going before the grand jury in February of 2004?
21     A    I -- I don't recall.
22         MR. SLOSAR:  Objection to form.
23     Q    Okay.  All right.  Had you -- did you know
24 anything about Jeff Gray before you became involved in
25 this investigation?

Page 236

1      A    No, sir.
2      Q    Likewise, all Grays, Wendy Gray?  Did you know
3  the Messers at all?
4          MR. SLOSAR:  Objection to form.
5      A    No, sir.
6      Q    Okay.  I take it, during your time at Harlan
7  Post, you were assigned either to -- what were you
8  assigned to?  Obviously, the Bell County.  Did you have
9  any other assigned areas besides those while at Harlan
10 Post?
11     A    Just Harlan County before I went to Bell.
12     Q    And, again, you'd not worked at Knox County
13 before?
14     A    If I did, it was only one day working the road
15 because they didn't have enough troopers out or
16 something, but it -- it was extremely rare.
17     Q    Okay.
18     A    If it happened, maybe one time, maybe twice
19 but...
20     Q    Okay.
21     A    I didn't work down there.
22         MR. KELLEY:  That's all I have.  Thank you.
23         MR. SLOSAR:  I have a few limited.  Do -- you
24     guys don't have any follow-up, right?
25         MS. ARNETT:  No.

Page 237

1                   REDIRECT EXAMINATION
2  BY MR. SLOSAR:
3      Q    Okay.  Just real quick, Mr. Johnson.  Earlier
4  you testified about this Jeremiah Evans fellow, who came
5  about right before trial.  Do you recall that?
6      A    Yes, sir.
7      Q    Okay.  You didn't come up with Jeremiah Evans,
8  correct?
9      A    That's correct.
10     Q    Okay.  My understanding is that Trooper Lawson
11 came up with Mr. Evans; is that right?
12     A    I believe so, yes, sir.
13     Q    Prior to trial, had you ever been provided
14 with the homicide investigation file that Trooper Lawson
15 was the lead detective on that involved Jeremiah Evans?
16     A    No, sir.
17     Q    Were you aware that Trooper Lawson was the
18 lead investigator in a homicide case for which Mr. Evans
19 pled guilty and cooperated against his co-defendants,
20 prior to Mr. Anderson's trial?
21     A    No, sir.
22     Q    Were you aware of any promises of
23 consideration that were made by Trooper Lawson to
24 Jeremiah Evans?
25     A    No, sir.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BRYAN JOHNSON, taken on December 03, 2019

238..241

Page 238

1    Q    Were you aware that at the time -- you
2 interviewed Jeremiah Evans with Ms. Blondell; is that
3 right?
4    A    Yes, sir.
5    Q    Were you aware at the time of that interview
6 that Mr. Evans was on parole?
7    A    No, sir.  I'm not aware.
8    Q    Did Mr. Evans ever ask Ms. Blondell or
9 yourself for any consideration in exchange for
10 cooperating?
11   A    No, sir.  Not that I recall.
12   Q    Did he ever inform you or Ms. Blondell, in
13 your presence, that Trooper Lawson had made any promises
14 of consideration to him?
15   A    No, sir.
16   Q    Okay.  Now, is it fair to say that Mr. Evans'
17 story generally alleged that William Anderson confessed
18 to him, while they were in jail, that a Mexican hit
19 Bobby Wiggins with a rock.  Do you recall that?
20   A    I believe so, yes.
21   Q    Yeah.  That certainly wasn't consistent with
22 anything that you had developed in your investigation.
23 Would you agree with that?
24        MS. ARNETT:  Object to form.
25   A    Yeah, I don't think so.

Page 239

1    Q    James Otis Sizemore certainly isn't -- wasn't
2 Mexican to your knowledge, right, or of any Hispanic
3 origin?
4    A    No.  But I -- I don't believe he is.
5    Q    Okay.
6    A    But I think during the investigation, people
7 have referred to him as being called that, but I don't
8 know.
9    Q    All right.  Certainly, Mr. Sizemore admitted
10 to hitting Mr. Wiggins in the head with a rock, correct?
11   A    Yes, sir.
12   Q    Yeah.  And is it fair to say that Mr. Evans
13 statement by itself would not have been enough to form
14 probable cause against William Anderson for the murder
15 of Bobby Wiggins?
16        MS. ARNETT:  Object to form.
17   A    I don't know.
18   Q    Given the inconsistencies between the limited
19 knowledge that Mr. Evans alleged to have had and the
20 evidence that you had developed in the underlying
21 investigation, would you agree that it would not have
22 been enough to form probable cause to charge William
23 Anderson with murder?
24        MS. ARNETT:  Object to form.
25   A    I don't -- I don't know.

Page 240

1        MR. SLOSAR:  I don't have any further
2 questions.  Thank you, sir.
3        VIDEOGRAPHER:  Okay.  The time is 4:57.  This
4 concludes the deposition.
5 (EXHIBIT 5 MARKED FOR IDENTIFICATION)
6 (EXHIBIT 7 MARKED FOR IDENTIFICATION)
7 (EXHIBIT 10 MARKED FOR IDENTIFICATION)
8 (EXHIBIT 27 MARKED FOR IDENTIFICATION)
9 (EXHIBIT 28 MARKED FOR IDENTIFICATION)
10 (DEPOSITION CONCLUDED AT 4:57 P.M.)

Page 241

1              CERTIFICATE OF REPORTER
2              STATE OF INDIANA

4    I do hereby certify that the witness in the foregoing
5    transcript was taken on the date, and at the time and
6    place set out on the Title page hereof, by me after
7    first being duly sworn to testify the truth, the whole
8    truth, and nothing but the truth; and that the said
9    matter was recorded by me and then reduced to
10   typewritten form under my direction, and constitutes a
11   true record of the transcript as taken, all to the best
12   of my skill and ability. I certify that I am not a
13   relative or employee of either counsel and that I am in
14   no way interested financially, directly or indirectly,
15   in this action.



22   LACEE TOWNSEND,
23   COURT REPORTER/NOTARY
24   MY COMMISSION EXPIRES:  06/19/2024
25   SUBMITTED ON:  12/16/2019

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com