UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
AT LONDON

| | |
|---|---|
| WILLIAM ANDERSON, | CIVIL ACTION |
| | NO. 6:17-133-KKC |
| Plaintiff, | |
| | |
| v. | OPINION AND ORDER |
| | |
| KNOX COUNTY, | |
| JOHN PICKARD, *in his individual capacity*, | |
| DEREK EUBANKS, *in his individual capacity*, | |
| JASON YORK, *in his individual capacity*, | |
| BRIAN JOHNSON, *in his individual capacity*, | |
| MARK MEFFORD, *in his individual capacity*, | |
| JACKIE JOSEPH, *in his individual capacity*, and | |
| TYSON LAWSON, *in his individual capacity*, | |
| | |
| Defendants. | |

\*\*\* \*\*\* \*\*\*

Plaintiff William Anderson was indicted by a Bell County grand jury for the murder of a man named Bob Wiggins. Anderson spent nearly five years in state custody awaiting trial on that charge. After the trial, a jury acquitted Anderson. He then filed this civil action alleging that various county and state law enforcement officers framed him by forcing three individuals to falsely implicate him in the murder.

The testimony of two of those individuals – Dave Fox and Jeremy Evans – could not have caused Anderson to be wrongfully detained because their testimony was presented only at his

trial, which resulted in his acquittal and release from custody. The other individual is James Sizemore, who told the officers that he hit Wiggins with a rock and that Anderson stabbed Wiggins, all in an effort to steal the drugs Wiggins had on him. The officers relied on Sizemore's testimony at a preliminary hearing and at the grand jury proceedings, which resulted in Anderson's detention and indictment.

To survive summary judgment, Anderson must produce evidence that the officers forced or coerced Sizemore to falsely state that Anderson stabbed Wiggins. The transcripts and recordings of Sizemore's interrogation are in the record. No reasonable juror could find the officers forced or coerced Sizemore to say anything.

For these and the following reasons, the Court must grant the defendants' motions.

## I.  Background

During the relevant time period, Anderson was staying with Leonard ("Junior") Messer and Messer's wife Brenda on property owned by the Messers in Knox County. (DE 193-12, Fox Dep. at 10; DE 193-11, Fox Test. at Anderson Trial at 67.) Anderson is sometimes called Bill or Bill-Bill. (DE 193-23, Anderson Statement at 3.)

There are two different houses on the Messer property. The Messers live in a house that is on a hill. (DE 193-11, Trial Tr. at 67.) The Messers' son, Elijah, owns a home that is across from the Messers' house. (DE 193-12, Fox Dep. at 33) Elijah is unable to care for himself because he was injured in the leg when someone shot him. He is unable to walk and is in a wheelchair. (DE 193-12, Fox Dep. at 11.) Thus, he was also staying at the Messers' house during the relevant time period. (DE 193-12, Fox Dep. at 33; DE 193-11, Trial Tr. at 79.)

A man named Dave Fox also lived on the property. (DE 193-12, Fox Dep. at 10.) The Messers took Fox in because he was "basically homeless" at the time and living out of a vehicle.

2

(DE 193-12, Fox Dep. at 11.) The Messers were letting Fox stay there until Fox could "get on [his] feet a little bit." (DE 193-45, Fox Statement 2 at 9.) Messer allowed Fox to stay on the property and provided Fox food in exchange for Fox helping out with things around the house like errands, chopping wood, and caring for Elijah. (DE 193-12, Fox Dep. at 11-13.) Fox had been friends with Elijah for a long time. (DE 193-45, Fox Statement 2 at 14.)

Fox primarily stayed in the Messers' home. (DE 193-11, Trial Tr. at 68; DE 193-45, Fox Statement 2 at 178.) During the relevant time, Fox was addicted to pain pills. (DE 193-12, Fox Dep. at 12.)

Anderson was also addicted to pain pills during the relevant time period. (DE 193-2, Anderson Dep. at 76.) Like Fox, he would help with household chores and with assisting Elijah. (DE 193-12, Fox Dep. at 20.) During the relevant time period, Anderson was living at Elijah's house. (DE 193-23, Anderson Statement at 2; DE 193-12, Fox Dep. at 126.) Thus, Elijah's house is sometimes referred to as "Anderson's house" in this litigation. Anderson also stayed at the Messers' house from time to time. (DE 193-12, Fox Dep. at 169.)

There were four vehicles on the Messers' property, including a red Rhino side-by-side four-wheeler ATV and a blue minivan that are discussed in this action, both of which Anderson had access to and was permitted to drive. (DE 193-6, Trial Tr. at 82.)

**A. Bob Wiggins' Disappearance**

The investigation that led to Anderson's indictment for murder began on December 1, 2011 when Bob Wiggins' sister and a woman named Kimberly York[1] went to the Knox County Sheriff's office and filed a missing persons report regarding Wiggins. (DE 193-6, K.York Dep. at 72; DE 193-13, Missing Persons Report.) Kimberly testified in her deposition in this case that

---

[1] One of the defendants in this case is Jason York. Kimberly York and Jason York are not related. In order to avoid confusion, the Court will refer to Kimberly York as "Kimberly" in this opinion.

she was a nurse but got injured at work and began taking pain pills. She was abusing pills during the relevant time period. (DE 193-6, K. York Dep. at 11-12.) She was good friends with Wiggins and bought pills from him at times. (DE 193-6, K. York Dep. at 14.) She also traveled to other states with Wiggins to buy pills. (DE 193-6, K. York Dep. at 16.) Kimberly was also friends with a man named James Otis Sizemore. (DE 193-6, K. York Dep. at 19.) She did not buy pills directly from Sizemore but bought them from Sizemore's uncle Jeff Gray. (DE 193-6, K. York Dep. at 14.)

Kimberly testified that, on Wednesday, November 23, 2011 (the day before Thanksgiving) Sizemore came to her house, and they immediately started "devising the pill hunt, what we was going to do to get one." (DE 193-6, K. York Dep. at 20-21.) She called Wiggins and told him to come to her house so she could buy a pill. (DE 193-6, K. York Dep. at 23-24.) She testified that Wiggins arrived at her house between 3:00 and 4:00 p.m. (DE 193-6, K. York Dep. at 17-18.) Wiggins drove to her house in a black Toyota Camry. (DE 193-6, K. York Dep. at 18.) He was there about 30 minutes. (DE 193-6, K. York Dep. at 26.) He left with Sizemore. (DE 193-6, K. York Dep. at 26.) She understood that Wiggins was going to give Sizemore a ride to Flat Lick, a nearby town. (DE 193-6, K. York Dep. at 26.)

Kimberly testified that she learned that Wiggins was missing about a week later when her sister told her that no one had seen him. (DE 193-6, K. York Dep. at 27-28.)

### B.  Kimberly York's Statement

Defendant John Pickard was then the Knox County sheriff. (DE 193-15, Eubanks Dep. at 41.) Defendant Derek Eubanks was then chief deputy in the Knox County Sheriff's office. (DE 193-15, Eubanks Dep. at 20-21.) Deputy Eubanks and Sheriff Pickard interviewed Kimberly about the missing persons report. (DE 193-6, K. York Dep. at 39-40.) She told the officers the

4

last time she saw Wiggins was when he left her house with Sizemore at about noon on November 23, 2011. (DE 193-22, York Statement at 3, 5.) Wiggins was wearing a black North Face coat, blue jeans, and a black Nike cap. (DE 193-22, York Statement at 3.) Wiggins and Sizemore left in Wiggins' black Toyota Camry. (DE 193-22, York Statement at 4.)

She also told the officers about a conversation she had with Dave Fox on the Monday after Thanksgiving. Fox told her that he had seen Sizemore in Wiggins' car at a store that the locals call the "Indian Store." (DE 193-22, York Statement at 5.) The Court will refer to this store as the "Convenience Store" in this opinion.

Fox later called her on speakerphone. He was with Anderson. (DE 193-22, York Statement at 6.) Anderson and Fox told Kimberly that the two had seen Sizemore at the Convenience Store, and that Sizemore had a "big roll of money" and was flashing it around, offering to pay for Fox and Andersons' purchases.  (DE 193-22, York Statement at 7.) They told her Anderson left the store with Sizemore. (DE 193-22, York Statement at 8.) Anderson told her that he and Sizemore then stopped at someone's house and that Sizemore "burnt up the paperwork that was in the glove box" of Wiggins' car. (DE 193-22, York Statement at 8.) Anderson said that Sizemore then took him home. (DE 193-22, York Statement at 8)

Anderson and Fox later called Kimberly back to ask what Wiggins was wearing the last time she saw him. (DE 193-22, York Statement at 8.) When she told them, the men told her that Sizemore had given Anderson a black Nike hat and a North Face jacket that had been lying in the backseat of the Camry. (DE 193-22, York Statement at 9.)

### C.  Anderson's Statement

After interviewing Kimberly, at about 7:00 p.m. on December 1, 2011, Deputy Eubanks went to the Messer property to interview Anderson and Fox. (DE 193-15, Eubanks Dep. at 127-28.) In

his interview, Anderson said that, on the Wednesday before Thanksgiving, Junior and Brenda Messer were going into town and needed someone to watch Elijah, so he and Fox went from Anderson's house to the Messers' house, where Elijah was. (DE 193-23, Anderson Statement at 3.) He said he stayed with Elijah all day. (DE 193-23, Anderson Statement at 4.)

When Brenda and Junior returned, they asked Anderson if he would take some green beans and chow chow to someone at a grocery store. (DE 193-23, Anderson Statement at 4.) (During this litigation, it has become clear that the person was Junior's cousin, Dessie, who works at a grocery store that some in this litigation have called the "Messer's store." The store is located in Barbourville, Kentucky. There is a big chicken in front of the store, so locals also call it the "Big Chicken" or the "Chicken Store." (DE 193-12, Fox Dep. at 20.))

Anderson told the officers that he and Fox delivered the food. (DE 193-23, Anderson Statement at 4.) (Anderson testified at his murder trial that he and Fox drove the Messers' blue minivan to the Chicken Store. (DE 193-7, Trial Tr. at 84.)) On the way back to the Messers' property, he and Fox pulled into the Convenience Store to buy cigarettes and sodas. They saw Sizemore in a black Toyota Camry and walked into the store with him. Sizemore paid for the items that Anderson and Fox purchased. Sizemore offered to give Anderson a ride back to the Messer property. (DE 193-23, Anderson Statement at 5-6.) It was just starting to get dark outside, probably around 5:30 in the evening. (DE 193-23, Anderson Statement at 9, 13.)

Anderson asked Sizemore where he got the car, and Sizemore said his "old lady" had taken over payments on the car from somebody. (DE 193-23, Anderson Statement at 5.) Sizemore was with a man named Jeremy Ferrell. (DE 193-23, Anderson Statement at 6.) Anderson got in the backseat of the car, Sizemore was driving, and Jeremy Ferrell was in the passenger seat. Fox went back to the Messers' property in the Messers' van. (DE 193-23, Anderson Statement at 7.)

6

Anderson said the three men stopped at Ferrell's house, walked in, and talked to Ferrell's mom and a man named "Cloudy." (DE 193-23, Anderson Statement at 7.) (Anderson explained in his deposition in this case that he and Sizemore "shot up" some pills at Ferrell's house. (DE 193-2, Anderson Dep. at 161-62.)) Before they walked in, Sizemore got papers out of the glove box of the car and burned them in a burning barrel in Ferrell's yard. (DE 193-23, Anderson Statement at 7-8.) Anderson did not ask what the papers were. (DE 193-23, Anderson Statement at 8; DE 193-2, Anderson Dep. at 159.) Sizemore and Anderson left, and Sizemore told Anderson to drive. The men drove to Anderson's house. (DE 193-23, Anderson Statement at 8.) Sizemore walked in with him and told Anderson that he had a nice coat to give him. Sizemore walked out to the Camry and returned with a black coat and black hat. (DE 193-23, Anderson Statement at 9.) Anderson gave the officers the coat and hat. (DE 193-23, Anderson Statement at 9; DE 193-2, Anderson Dep. at 135-36.)

### D.  Dave Fox's First Statement

The interview with Anderson concluded at about 7:16 p.m. Deputy Eubanks then interviewed Fox. (DE 193-15, Eubanks Dep. at 137; DE 193-25, Fox Statement 1.) No other officer was present.  (DE 193-15, Eubanks Dep. at 138.) Fox told essentially the same story as Anderson about the men's activities on November 23, 2011.

He stated that Junior Messer asked him and Anderson to deliver some green beans and other food for Thanksgiving to the Chicken Store. (DE 193-25, Fox Statement 1 at 4-5.) After the men delivered the food, they stopped at the Convenience Store, where they ran into Sizemore and Ferrell in the black Toyota Camry with tinted windows. (DE 193-25, Fox Statement 1 at 5.) This occurred at about 5:00 p.m., a little before dark. (DE 193-25, Fox Statement 1 at 11.) Sizemore offered to pay for Fox's and Anderson's purchases from the store if they did not have enough

7

money. Sizemore was with Jeremy Ferrell. (DE 193-25, Fox Statement 1 at 5.)

Anderson left the store with Sizemore and Ferrell. Fox stated that, within 20 to 30 minutes, Sizemore and Anderson arrived at the Messers' property. (DE 193-25, Fox Statement 1 at 6.) Fox said that he recognized the car Sizemore was in as belonging to Wiggins. (DE 193-25, Fox Statement 1 at 7.) He asked Sizemore about the car, and Sizemore told Fox that his wife went back to work and got the car with some help from his mother-in-law. (DE 193-25, Fox Statement 1 at 7-8.) Fox said that Sizemore stated several times, both at the store and at the Messers' house when he dropped off Anderson, "y'all ain't seen me." (DE 193-25, Fox Statement 1 at 8.)

Fox told Deputy Eubanks that, on the Monday after Thanksgiving, he ran into Kimberly at the H&R Block office. Both he and Kimberly were there to apply for "anticipation loans." (DE 193-25, Fox Statement at 3.) Kimberly told Fox that Wiggins' sister had been texting her asking where Wiggins was. Kimberly told Fox that no one had seen Wiggins since he left her house on the day before Thanksgiving. (DE 193-25, Fox Statement at 9.) Later, Anderson instructed Fox to call Kimberly and ask if Wiggins was wearing a black coat and hat when she saw him last. When Kimberly confirmed that, Anderson "started trippin." (DE 193-25, Fox Statement 1 at 10.) Anderson then told Fox that Sizemore had given him a black jacket and black Nike cap when Sizemore dropped Anderson at the Messer's house on November 23rd. (DE 193-25, Fox Statement 1 at 10-11.)

### E.  Jeremy Ferrell's Statement

That same evening (December 1, 2011) at about 8:00 p.m., Sheriff Pickard and Deputy Eubanks interviewed Jeremy Ferrell at Ferrell's house. (DE 193-15, Eubanks Dep. at 55, 144-45; DE 193-27, Ferrell Statement.) Ferrell stated that Sizemore came to his house at about 3:30 p.m. on or about November 23rd in a black Toyota Camry and woke him up. Ferrell asked Sizemore

where he got the new car and Sizemore said it belonged to his wife. (DE 193-27, Ferrell Statement at 3-5.) Sizemore said he had been looking for Anderson, but Anderson was not home. (DE 193-27, Ferrell Statement at 8.)

Sizemore and Ferrell then went to the Convenience Store and ran into Anderson and Fox. (DE 193-27, Ferrell Statement at 3-4, 6.) Ferrell drove the Camry because Sizemore was "medicated." (DE 193-27, Ferrell Statement at 7.) Ferrell and Sizemore were at the Convenience Store for about 20 minutes. (DE 193-27, Ferrell Statement at 6.) This was some time before dark at about 3:00 or 4:00 p.m. (DE 193-27, Ferrell Statement at 3.) Sizemore then drove Ferrell and Anderson to Ferrell's house. (DE 193-27, Ferrell Statement at 4, 6.)

Ferrell at first said the three men stayed at his house between 90 minutes and two hours, and then Sizemore took Anderson home. (DE 193-27, Ferrell Statement at 4.) Later Ferrell stated the men stayed at his house just a few minutes before Sizemore took Anderson home. (DE 193-27, Ferrell Statement at 6.) Sizemore had some narcotics, and Sizemore and Anderson took "a couple of pills." (DE 193-27, Ferrell Statement at 5-6.) Sizemore burned every paper in the car. (DE 193-27, Ferrell Statement at 5.) Ferrell and Anderson discussed that Sizemore "could potentially be involved in something that another could . . . probably be in danger. And probably be already dead or something." (DE 193-27, Ferrell Statement at 5.) Ferrell said Sizemore was "on the run for several things," was "awful paranoid" and "every time a vehicle would drive by he was ready to bail out." (DE 193-27, Ferrell Statement at 7.)

### F. James Sizemore's First Interrogation

As might be expected, at this point, Sheriff Pickard and Deputy Eubanks began looking for Sizemore. The following day (December 2, 2011), the officers were informed that Sizemore had been arrested on an unrelated charge. (DE 193-15, Eubanks Dep. at 157.) Deputy Eubanks

questioned Sizemore. Sheriff Pickard was in and out of the interrogation. (DE 193-15, Eubanks Dep. at 159, 161.)

Sizemore initially told an inconsistent and confusing story about his activities on the day Wiggins disappeared. But he ultimately told the officers that Anderson had murdered Wiggins. Sizemore stated that he heard Wiggins being killed, but he did not do it. He stated, "the one that had the damn jacket and stuff is the one that done it." (DE 193-27, Sizemore Statement 1 at 60.)

Sizemore stated that, on the day of the murder, he and Wiggins left Kimberly's house, and Wiggins drove him to Anderson's house on the Messers' property. Sizemore told Wiggins that Anderson would buy a lot of pills. (DE 193-33, Sizemore Statement at 3.) Anderson was not home so they went to the Convenience Store to wait on him. They met up with Anderson there. Anderson got in the car with Sizemore and Wiggins and they proceeded to Anderson's house. (DE 193-33, Sizemore Statement 1 at 12-14.) Fox drove the Messers' van back to the Messers' house. (DE 193-33, Sizemore Statement 1 at 14.)

At Anderson's house, Anderson told Wiggins that someone named Mike Smith from Redbird, Kentucky was going to meet him at Red Bear Mountain to buy pills. (DE 193-33, Sizemore Statement 1 at 3-4 5,15.) The three men then went in the Messers' red Rhino ATV to Red Bear Mountain. (DE 193-33, Sizemore Statement 1 at 5, 15.) Wiggins left his Camry at Anderson's house. (DE 193-33, Sizemore Statement 1 at 18.) Wiggins was wearing a black Nike hat and a black coat. (DE 193-33, Sizemore Statement 1 at 9.)

On the mountain, Anderson told Sizemore to take off because the buyer did not know him. (DE 193-33, Sizemore Statement 1 at 6, 16.) Sizemore walked away, and then he heard "the awfulist battle roar there was" and he heard "somebody squall" so Sizemore took off running. (DE 193-33, Sizemore Statement 1 at 7.)

10

Then Sizemore heard the Rhino start up and so he ran back up the mountain because he did not want to be left on the mountain. (DE 193-33, Sizemore Statement 1 at 16-17.) When Sizemore returned to the site, Anderson was in the Rhino and Wiggins' jacket and hat were in the front passenger seat. (DE 193-33, Sizemore Statement 1 at 8, 17.) Sizemore stated that Anderson had blood on both his hands. (DE 193-33, Sizemore Statement 1 at 17.) Sizemore asked Anderson where Wiggins was, and Anderson told him that Wiggins left to go sell pills at a "big dealer's house." (DE 193-33, Sizemore Statement 1 at 18.) Anderson told Sizemore that Wiggins had left his keys and that Wiggins said to take his car (the Camry) to Flat Lick. (DE 193-33, Sizemore Statement 1 at 18.)

Sizemore and Anderson traveled in Wiggins' Rhino back to Anderson's house. (DE 193-33, Sizemore Statement 1 at 18.) Both men then got in Wiggins' Camry and went to Ferrell's house, where they smoked a joint and took two or three pills, and then Anderson "burned stuff" that was in the Camry. (DE 193-33, Sizemore Statement 1 at 18-21.) At some point, Anderson dropped Sizemore off at a hospital, where a friend met Sizemore to take him home. (DE 193-33, Sizemore Statement 1 at 23-24.) Sizemore said that was the last time he saw Anderson or Wiggins' car. (DE 193-33 at 24-25),

Sizemore agreed to take the officers to the location on a nearby mountain where the murder occurred. At about 11:00 a.m. on December 2, 2011, the officers contacted Detective Jason York of the Kentucky State Police because they believed the missing persons investigation had become a homicide investigation. (DE 193-15, Eubanks Dep. at 184-85; DE 193-17, York Dep. at 84; DE 193-31, Eubanks Dep. at 17.) The sheriff's office does not have the resources to investigate murders. (DE 193-31, Eubanks Dep. at 23.)

Sheriff Pickard, Deputy Eubanks, and Sizemore then all went to Redbird Mountain to locate

11

the body. They met Detective York at the base of the mountain, and then all four men drove up the mountain. (DE 193-17, York Dep. at 95; DE 193-31, Eubanks Dep. at 18.) At the top of the mountain, Sizemore pointed out a general area where the body was located. (DE 193-31, Eubanks Dep. at 20-21.) While the officers were searching that area, Sizemore ran down the mountain. The officers eventually located him at a family member's house. (DE 193-16, Pickard Trial Test. at 103.) The men returned to the top of the mountain, and Sizemore pointed out where the body was. (DE 193-31, Eubanks Dep. at 26-27.)

Deputy Eubanks testified that, after the body was found, the KSP took over the investigation. (DE 193-31, Eubanks Dep. at 27.) Deputy Eubanks remained involved in the case, however, taking part with KSP officials in second interviews of Sizemore and Fox. KSP Detective Bryan Johnson stated that he became the lead detective on the case after Wiggins' body was found. (DE 193-4, Johnson Dep. at 24.)

### G.  Sizemore's Second Interrogation

KSP Detectives York and Johnson and Deputy Eubanks then questioned Sizemore a second time. (DE 193-4, Johnson Dep. at 31-32.) Sizemore again recounted the events of November 23rd, but this time he admitted his own role in Wiggins' murder.

He stated that he and Anderson went up on the mountain with Wiggins to steal Wiggins' pills. (DE 193-36, Sizemore 2 at 7.) Sizemore told Wiggins that Sizemore knew someone who would buy the pills for $35 each. (DE 193-36, Sizemore 2 at 19.) Wiggins had about 30 or 40 pills in his pocket. (DE 193-36, Sizemore 2 at 22.)

After Sizemore and Wiggins left Kimberly's house, they went to find Anderson. Anderson was not home so the men waited at the store and both Sizemore and Wiggins "done a pill." They saw the Messers' van returning to the Messers' property. Sizemore told Wiggins to go to the

Messer property to see if Wiggins could sell "a couple of things." (DE 193-36, Sizemore Statement 2 at 44.) Fox went up the hill to the Messers' house. When Anderson got out of the van at the Messers' property, Sizemore told him that Kimberly said that Wiggins would be easy to rob. Sizemore, Anderson, and Wiggins went to Anderson's house. Anderson and Sizemore went into the back bedroom and Sizemore asked Anderson "how we gonna do this?" Anderson said to give him a minute to think. (DE 193-36, Sizemore 2 at 45.)

The two men returned to the living room where Wiggins was, and Anderson and Wiggins did a pill together. Wiggins said that was all Anderson would get until they sold some of his pills. Sizemore said Wiggins should go with them on the Rhino up the mountain. All three men left on the Rhino and went up the mountain. (DE 193-36, Sizemore 2 at 45.)

At the top of the mountain Sizemore told Wiggins that he and Anderson were going to rob him and take his pills. (DE 193-36, Sizemore 2 at 46.) He said Wiggins swung at him, Sizemore fell to his knees, grabbed a rock, and hit Wiggins in his forehead and then on the side of the head. (DE 193-36, Sizemore 2 at 24-25.) Wiggins fell to the ground, and then, according to Sizemore, Anderson came up behind Wiggins and stabbed him more than one time but probably fewer than ten times. (DE 193-36, Sizemore 2 at 25-27.)

Sizemore and Anderson then dragged Wiggins to an embankment and covered him up with leaves. (DE 193-36, Sizemore 2 at 37, 39.) Anderson told Sizemore he would come back later to "take care of things." (DE 193-36, Sizemore 2 at 39.) Anderson and Sizemore took the pills and money Wiggins had on him. (DE 193-36, Sizemore 2 at 62-63.) They split the pills and Anderson kept all the money, which was about $180. (DE 193-36, Sizemore 2 at 64.) Anderson took Wiggins' jacket and hat. (DE 193-36, Sizemore 2 at 47.) And then the men took the Rhino back down the mountain to Anderson's house. (DE 193-36, Sizemore 2 at 40.)

Anderson took Wiggins' jacket and hat into his house. Both men went into the house and did two or three pills. (DE 193-36, Sizemore 2 Tr. at 41.) Then they got in Wiggins' car. Anderson drove. (DE 193-36, Sizemore 2 Tr. at 48.) They went to Ferrell's house. Anderson cleaned himself up and told Sizemore to get the title from the car and burn it. (DE 193-36, Sizemore 2 at 48.)

Sizemore, Ferrell, and Anderson went to the store. (DE 193-36, Sizemore 2 at 48-49.) Anderson told Sizemore to tell Ferrell that Sizemore's wife bought the car. (DE 193-36, Sizemore 2 at 49.) The men took Ferrell back to his house and then went back to the Anderson's house. Anderson said he had some gas in the garage and was going to burn the car. Anderson got the keys to the Messers' van. Sizemore drove the van, following Anderson in Wiggins' Camry. (DE 193-36, Sizemore 2 at 49.)

They went down a back road. Anderson told Sizemore to go up the road and turn around and that Anderson would be walking up the road when Sizemore came back. (DE 193-36, Sizemore 2 at 49-50.) When Sizemore turned around and returned to where he dropped Anderson, Anderson was doing something under the hood of the Camry, and then, "woof…it went on fire right there." (DE 193-36, Sizemore 2 at 50.) Anderson got back in the van and dropped Sizemore at a hospital, where Sizemore called a friend to pick him up. (DE 193-36, Sizemore 2 Tr. at 50.)

Sizemore's interrogation ended at about 2:07 a.m. on December 3, 2011. (DE 193-36, Sizemore 2 at 77.) At about 8:00 a.m. on December 3, Detective Johnson attended the autopsy of Wiggins' body. (DE 193-4, Johnson Dep. at 47.) He observed that Wiggins had approximately 18 stab wounds in the front of his body. (DE 193-4, Johnson Dep. at 66, 118.) The autopsy revealed that Wiggins was struck with a blunt object on the right side of his head causing a laceration of the skull and on the left side of his nose causing a fracture of the skull. He sustained 12 stab

14

wounds to the chest and six stab wounds to the neck. (DE 193-4, Johnson Dep. at 123.)

## H.  Anderson's Arrest and Interrogation

That evening (December 3, 3011) at 6:58 p.m., KSP Detectives York and Mark Mefford and KSP Sgt. Jackie Joseph[2] arrested Anderson for Wiggins' murder. (DE 193-21, Joseph Dep. at 46.) At the time of his arrest, Anderson had a pocketknife on him, which the officers seized. (DE 193-7, Trial Tr. at 98-99.)

The officers transported him to the Barbourville Police Department, where Detectives Johnson and York questioned him. (DE 193-41, Anderson Statement 2 at 3.) Anderson stated that he took care of Elijah all day after the Messers left to grocery shop on Wednesday, November 23rd. (DE 193-41, Anderson Statement 2 at 8-9.) He said he and Fox were with Elijah all day. (DE 193-41, Anderson Statement at 65.)

Detective York explained that Sizemore said that Anderson stabbed Wiggins. (DE 193-41, Anderson Statement at 28.) Anderson stated that the only thing he did with Sizemore was ride from the Convenience Store to his house. He said he had never seen Wiggins. (DE 193-41, Anderson Statement at 29.) Detective York told Anderson that he knows "beyond the shadow of doubt you were there." (DE 193-41, Anderson Statement at 29.) Detective York stated, "they're going to fry you" and made other similar statements during the interrogation. (DE 193-41, Anderson Statement at 29.) He told Anderson that he was going to jail and would be charged with murder. (DE 193-41, Anderson Statement at 33.) Anderson insisted he was at the Messers' house all day on the day of the murder. (DE 193-41, Anderson Statement at 34.)

## I.  Fox's Second Statement

Later that evening, at about 10:10 p.m., Deputy Eubanks, KSP Detective York, and KSP Sgt.

---

[2] During the relevant time period, Sgt. Joseph's last name was Pickrell. (DE 193-44, Joseph Dep. at 120.)

Joseph conducted a second interview of Fox. (Sgt. Joseph supervised KSP detectives including Detectives York, Johnson and Mefford. (DE 193-44, Joseph Dep. at 16, 26.)) Fox testified in his deposition that Sgt. Joseph came to the Messers' home and asked him to come to the Sheriff's office for an interview. (DE 193-12, Fox. Dep. at 64.) Fox agreed and followed Sgt. Joseph in his own vehicle to a room in the courthouse. (DE 193-12, Fox. Dep. at 64-65.)

In the first portion of the interview, Sgt. Joseph was the only officer involved. Fox initially stated that he and Anderson had been at the Messers' property "about all day." (DE 193-45, Fox Statement 2 at 23.) He and Anderson both stayed on couches at the Messers' house on Tuesday night and woke up between 7:30 and 8:00 on Wednesday morning. (DE 193-45, Fox Statement 2 at 62-63.) Then Fox repeated essentially the same story about his activities on November 23rd as he had told in his first statement.

Fox stated that he could not "think of a time that [Anderson] was not present that day." (DE 193-45, Fox Statement 2 at 83.) He later clarified, "I mean, I wasn't with him all day long. No ma'am." (DE 193-45, Fox Statement 2 at 87.) He continued, "I mean, he might have slipped off and wasn't there, and there was a time frame that I was unaware of. . . . " (DE 193-45, Fox Statement 2 at 87.)

Fox stated he was also "not positive" that Anderson was on the couch asleep at the Messers' house the morning of the 23rd. (DE 193-45, Fox Statement at 159-60.)[3] Fox stated that he did not have eyes on Anderson the whole time that the Messers were at the store that morning. (DE 193-45, Fox Statement at 160-61.) Fox stated he was certain, however, that Anderson was with him from 3:00 p.m., when the two of them went to deliver food to Junior Messer's cousin at the Chicken Store, until 5:00 p.m., when Anderson left the Convenience Store with Sizemore. (DE

---

[3] This is consistent with Anderson's testimony at his murder trial. Anderson testified then that he stayed all night at his house on November 22, 2011 and then went to the Messers' house in the morning. (DE 193-7, Trial Test. at 78.)

193-45, Fox Statement 2 at 162.) Fox stated that, prior to 3:00 p.m., Anderson "was in and out of the house, but I can't say he was there all day long." (DE 193-45, Fox Statement 2 at 162.) Fox stated that he also knew Sizemore and Anderson were at Anderson's house in the black Camry at 6:00 or 7:00 p.m. (DE 193-45, Fox Statement 2 at 162-63.)

Anderson argues in his response brief in this action that Sgt. Joseph forced or coerced Fox into saying he could not account for Anderson's whereabouts the entire day of November 23rd.

### J.  Jeremy Evans' Statement at Trial

Jeremy Evans was incarcerated with Anderson at the Bell County jail while Anderson was awaiting trial. (DE 193-3, Evans Aff., ¶ 1.) He testified at Anderson's murder trial that Anderson told him that he was present when someone else killed an older man in Bell County. Evans testified that Anderson told him that a "Mexican" killed the man by hitting him with a rock and then stabbing the man. (DE 193-8, Trial Tr. at 150.) Evans said that Anderson told him that he and the "Mexican" took some pills they found on the victim; that the "Mexican" took all the money the victim had on him; and that Anderson took the victim's hat and coat. (DE 193-8, Trial Tr. at 152, 154.) Anderson told Evans that he and the "Mexican" buried the man and put lime on his body and then they burned the man's car. (DE 193-8, Trial Tr. at 152-53.)

Evans testified at Anderson's murder trial that he thought his testimony would help Anderson because it would prove that Anderson did not kill Wiggins but was only present when someone else did. Evans testified that he thought Anderson had admitted to being present at the time of the murder. (DE 193-8, Trial Tr. at 165.) Evans testified that he did not think Anderson killed the man, and he did not want Anderson to pay for something he did not do. (DE 193-8, Trial Tr. at 173.)

Anderson argues that KSP Detectives Lawson and Johnson and county prosecutor Karen

Blondell forced Jeremy Evans to falsely testify at Anderson's murder trial. (DE 193, Response at 49.) Anderson submits Evans' affidavit in which he now states that the detectives and prosecutor told him exactly what to say at trial and threatened him if he did not comply. (DE 193-3, Evans Aff. ¶ 6.) He states that Anderson always told him he was innocent. Evans states that he told the detectives and prosecutor that what they wanted him to say was not true. (DE 193-3, Evans Aff. ¶ 6.) He states he repeated the false information at Anderson's trial because he was afraid of what those individuals would do to him if he did not comply. (DE 193-3, Evans Aff. ¶ 12.)

### K. Anderson's Indictment and Acquittal

Anderson was incarcerated in the Bell County Detention Center on the date of his arrest (December 3, 2011) and remained there until his acquittal. (DE 193-2, Anderson Dep. at 150.) On February 17, 2012, a grand jury returned an indictment charging Anderson with murder. (DE 193-35, Wiggins Homicide Trial at CM-ECF p. 5.) Sizemore pleaded guilty to murder on August 27, 2013. (DE 193-11, Trial Tr. at 29-30.) Anderson stood trial. On May 25, 2016, the jury returned a verdict acquitting Anderson of the murder charge. (DE 193-5, Trial. Tr. at 89.) After Anderson's trial, Sizemore was sentenced to 30 years. (DE 193-35, Wiggins Homicide File at CM-ECF pp. 3, 22.)

### II. Analysis

Anderson then filed this action asserting various constitutional and state law claims against Knox County, Sheriff Pickard and Deputy Eubanks and against KSP law enforcement officials. By opinion dated October 3, 2018 (DE 57), the Court dismissed some of Anderson's claims.[4] The

---

[4] With the October 3, 2018 opinion, the Court dismissed the following claims: fabrication of evidence claim under the Fourteenth Amendment (Count II); substantive due process under Fourteenth Amendment (Count III); *Monell* claim against Knox County to the extent it was based on a county custom, policy or practice (Count VII) (the claim against the county was not dismissed to the extent it was based on a failure to train or supervise); a state law claim

18

pivotal remaining claims are Anderson's claims that the investigating officers violated his Fourth Amendment rights (Count I) and Kentucky common law (Count VIII) by maliciously prosecuting him and by "fabricating" evidence against him (Count II) by forcing or coercing Sizemore, Fox, and Evans to falsely implicate him in Wiggins' murder.

The remaining constitutional claims – supervisory liability (against defendants Joseph and Pickard) (Count IV), failure to intervene (Count V), civil conspiracy (Count VI), and failure to train or supervise (against Knox County) (Count VII) – depend upon the viability of the underlying malicious prosecution and fabrication of evidence claims. Likewise, the state-law claim against defendants Pickard and Joseph for negligent supervision (Count IX) depend upon the viability of Anderson's state-law claim for malicious prosecution.

The defendants move for summary judgment on all the remaining claims against them. "Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 507 (6th Cir. 2021). In conducting its analysis, the Court does not "judge credibility or weight conflicting evidence." *Id*. A genuine dispute of material fact exists if a reasonable jury could decide for the nonmovant. *Blanchet v. Charter Commc'ns, LLC*, 27 F.4th 1221 (6th Cir. 2022). On the other hand, "[i]f after reviewing the record as a whole a rational factfinder could not find for the nonmoving party, summary judgment is appropriate since there is no genuine issue for trial." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

---

for intentional infliction of emotional distress (Count X); and  a claim against the county for respondeat-superior liability (Count XI).

### A. Malicious Prosecution

A malicious prosecution claim under the Fourth Amendment "encompasses wrongful investigation, prosecution, conviction, and incarceration." *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010). The plaintiff must prove four elements. "First, the plaintiff must show that a criminal prosecution was initiated against the plaintiff and that the defendant 'made, influenced, or participated in the decision to prosecute.'" *Id.* (quoting *Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir. 2007)). "Second, because a § 1983 claim is premised on the violation of a constitutional right, the plaintiff must show that there was a lack of probable cause for the criminal prosecution." *Id.* "Third, the plaintiff must show that 'as a consequence of a legal proceeding,' the plaintiff suffered a 'deprivation of liberty,' as understood in our Fourth Amendment jurisprudence, apart from the initial seizure." *Id.* at 308–09 (quoting *Johnson v. Knorr*, 477 F.3d 75, 81 (3rd Cir. 2007)). "Fourth, the criminal proceeding must have been resolved in the plaintiff's favor." *Id.* at 309. Under the Fourth Amendment analysis, it is not necessary to prove malice or specific intent to violate the plaintiff's constitutional rights. *Id.*

As to the second element – probable cause – it exists "where facts and circumstances are sufficient to lead an ordinarily prudent person to believe the accused was guilty of the crime charged." *Webb v. United States*, 789 F.3d 647, 660 (6th Cir. 2015) (citation, quotations, internal brackets omitted). This is a very different standard than the reasonable-doubt standard that applied at Anderson's murder trial. "As the Supreme Court has recognized, the burden to establish the probable cause necessary to initiate a suit (and a pretrial detention) is much lower than the burden necessary to obtain a conviction." *Lester v. Roberts*, 986 F.3d 599, 610 (6th Cir. 2021). "[T]he Supreme Court has 'often' reminded courts that probable cause is not a 'high bar.'" *Id.* at 608 (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). "Probable cause 'does not

require the same type of specific evidence of each element of the offense as would be needed to support a conviction' beyond a reasonable doubt." *Id.* (quoting *Adams v. Williams*, 407 U.S. 143, 149 (1972)). "It 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *Id.* (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018)).

Anderson was indicted by a grand jury for Wiggins' murder. That means the grand jury found probable cause existed that Anderson was guilty of Wiggins' murder. A grand jury indictment creates a presumption of probable cause in malicious prosecution cases. *Jackson v. City of Cleveland*, 925 F.3d 793, 821 (6th Cir. 2019). Generally, this Court has no authority to second guess the grand jury's probable cause determination because there is a "presumption of regularity that attaches to grand jury proceedings." *United States v. Mechanik*, 475 U.S. 66, 75 (1986) (O'Connor, J. concurring in judgment).

There are times, however, when the Court cannot rely on the grand jury's probable cause determination. One which Anderson raises here is when the grand jury unwittingly made its decision based on evidence that was falsified or fabricated by law enforcement officers. In that case, the presumption of probable cause established by the indictment no longer exists.

In order to rebut the presumption of probable cause with evidence of such wrongful conduct by law enforcement officers, Anderson must produce evidence of the following:

> (1) a law-enforcement officer, in the course of setting a prosecution in motion, either knowingly or recklessly makes false statements (such as in affidavits or investigative reports) or falsifies or fabricates evidence;
>
> (2) the false statements and evidence, together with any concomitant misleading omissions, are material to the ultimate prosecution of the plaintiff; and

21

> > (3) the false statements, evidence, and omissions do not consist solely of grand-jury testimony or preparation for that testimony (where preparation has a meaning broad enough to encompass conspiring to commit perjury before the grand jury.)

*King v. Harwood*, 852 F.3d 568, 588 (6th Cir. 2017).

Anderson argues that Detective Johnson testified falsely at the preliminary hearing and before the grand jury. (DE 193, Response at 45-47, 58-59.) He cannot use Detective Johnson's testimony at these proceedings to rebut the presumption of probable cause established by the indictment. The Supreme Court has "upheld absolute immunity from § 1983 suits for a police officer's testimony, even acknowledging that this could result in defendants being falsely convicted by knowing false testimony given by police officers." *Miller v. Maddox*, 866 F.3d 386, 394 (6th Cir. 2017). Absolute immunity protects officers who testify at preliminary hearings and before the grand jury. "It is well-settled that witnesses are granted absolute immunity from suit for all testimony provided in judicial proceedings." *Spurlock v. Satterfield*, 167 F.3d 995, 1001 (6th Cir.1999) (citing *Briscoe v. LaHue*, 460 U.S. 325, 330–31 (1983)). This immunity applies "no matter how egregious or perjurious" the testimony. *Id*. Thus, the Court cannot consider the grand jury or preliminary hearing testimony in determining whether Anderson has rebutted the probable-cause presumption. *See King*, 852 F.2d at 586; *King v. Harwood*, No. 3:15-CV-762-CHB, 2020 WL 1578615, at *10 (W.D. Ky. Apr. 1, 2020).

Anderson does not, however, rely solely on Detective Johnson's testimony at the preliminary hearing and grand jury proceedings to rebut the probable-cause presumption. He argues that, prior to those proceedings, the officers fabricated evidence against him in order to "frame" him for Wiggins' murder.

He argues that the officers forced or coerced Sizemore to state that Anderson stabbed

22

Wiggins; forced or coerced Fox to state that he could not account for Anderson's whereabouts the entire day of November 23rd; and forced or coerced Evans to state that Anderson told him that he was present when another man killed Wiggins.

Of the three statements at issue, Detective Johnson presented only Sizemore's statement at the preliminary hearing and at the grand jury proceeding. (DE 193-58, Preliminary Hr'g Tr.; 193-59, Grand Jury Tr.) The statements of Fox and Evans were never mentioned at either proceeding. Thus, neither Fox's statement nor Evans' statement could have tainted the grand jury indictment and cannot rebut the presumption of probable cause established by the indictment.

As to Sizemore's statements during his interrogations on December 3rd, the full transcripts and recordings are in the record. The Court has reviewed them. No reasonable juror could find that the officers conducting the interrogations forced or coerced Sizemore into stating that Anderson stabbed Wiggins.

### 1)  Sizemore's First Interrogation

As to Sizemore, Anderson argues that Sheriff Pickard and Deputy Eubanks "fabricated" his statement. (DE 193, Response at 15.) He argues that, in Sizemore's first statement, Sheriff Pickard and Deputy Eubanks "resorted to encouraging [Sizemore] to falsely implicate" Anderson. (DE 193, Response at 16.) Anderson asserts that these officers asked Sizemore "to implicate Plaintiff as a second person involved." (DE 193, Response at 16-17.)

The evidence does not support these arguments. The Court has reviewed the entire interrogation. No reasonable juror could conclude that either Sheriff Pickard or Deputy Eubanks in any way forced Sizemore to falsely testify that Anderson was involved in Wiggins' murder.

Sizemore initially told the officers several inconsistent and confusing stories about his activities on the day Wiggins disappeared. The only reasonable interpretation of the interview is

that the officers proceeded to question Sizemore to get him to tell the truth, no matter whom that may implicate. Deputy Eubanks and Sheriff Pickard do this first by telling Sizemore that the officers already have a lot of information, and they know that Sizemore is not telling them everything he knows. (DE 193-32, Sizemore 1 at 12,16,17.) Deputy Eubanks explains that he does not believe Sizemore's story. (DE 193-32, Sizemore 1 at 35.) He explained that none of the stories that Sizemore told matched the evidence the officers already had. (DE 193-32, Sizemore 1 at 36.) Deputy Eubanks states that all of the evidence points to Sizemore and that there is sufficient evidence to present to a grand jury to indict Sizemore for Wiggins' murder. (DE 193-33, Sizemore 1 at 37, 40.) The officers explain that Sizemore can help himself by being honest. (DE 193-33, Sizemore 1 at 43.) They explain that, if he is honest, he could get a "deal" that would be in his favor. (DE 193-33, Sizemore 1 at 46.)

None of this is improper. Anderson argues that Deputy Eubanks was the first to implicate Anderson in the murder. (DE 193, Response at 15-16.) This is not correct. Sizemore implicated Anderson stating, "Maybe the person you got that jacket and coat off of is tellin' you a big tale. . . Maybe he's been lyin'."  (DE 193-32, Sizemore 1 at 49.) Later, Sizemore states, referring to Anderson, "Well that's the man you'll be wantin, right there." He continues, "I'd say when I show youin's, youin's will be wantin' to just go over there and get old Bill." (DE 193-32, Sizemore 1 at 55.)

Nothing that the officers said before Sizemore implicated Anderson in the murder could be reasonably interpreted as actions or statements that forced Sizemore to do so. Anderson argues that Deputy Eubanks "suggested" a motive for killing Wiggins. (DE 193, Response at 18.) For this argument, Anderson points to Deputy Eubanks' statement, "Let me guess. It was all over stealin' pills." (DE 193-32, Sizemore 1 at 61.) But Sizemore had already told the officers that

24

Wiggins sold pills (DE 193-32, Sizemore 1 at 8) and that Wiggins sold Kimberly, Ferrell and Anderson pills on the day he disappeared. (DE 193-32, Sizemore 1 at 9, 23, 24, 27.) Thus, it was a logical inference that pills had something to do with Wiggins' murder. The only reasonable interpretation of this portion of the transcript is that Deputy Eubanks was attempting to determine the motive for murdering Wiggins based upon the evidence the officers knew at that time. No juror could interpret this portion of the interview as Deputy Eubanks feeding Sizemore a motive.

Anderson states that Deputy Eubanks and Sheriff Pickard "praised Sizemore after he agreed to go along with the plan to implicate Plaintiff," stating, "That'll help you . . . that'll help." (DE 193, Response at 18.) Sheriff Pickard made this statement when Sizemore seemingly begins to give some detail about the murder by telling the officers, "I heared a thump and heared rustlin around, and that's about it." (DE 193-32, Sizemore 1 at 63.) The only reasonable interpretation of Sheriff Pickard's statement is that he is advising Sizemore that telling the officers what he knows about Wiggins' murder will help Sizemore. There is no possible way for a juror to find that Deputy Eubanks or Sheriff Pickard had any "plan" to implicate Anderson.

Anderson complains that the officers made promises to Sizemore "in exchange for a fabricated statement." (DE 193, Response at 19.) No reasonable juror could interpret the interview in that manner. The officers reasonably told Sizemore he could get a better deal for himself if he told the truth about Wiggins' disappearance, whatever that truth may be. There is nothing improper about that.

Anderson argues that the officers "led Sizemore through the story" and that "Sizemore merely agreed to the timeline provided by Eubanks." (DE 193, Response at 18.) This is simply an inaccurate characterization of Sizemore's interrogation. At the point in the interrogation that

Anderson cites in support of this assertion (DE 193, Response at 18), Sizemore had already implicated Anderson in the murder. Sizemore is inarticulate, however, and his story remained incoherent and confusing. The only reasonable interpretation of the transcript is that the officers at times repeat what they understood Sizemore to be saying for him to either confirm or dispute. No juror could interpret the transcript as Deputy Eubanks providing Sizemore a timeline.

Anderson argues that Deputy Eubanks instructed Sizemore to state that they went on the hill in "Bill Bill's little red wagon." (DE 193, Response at 18; DE 193-33, Sizemore 1 at 2.) Deputy Eubanks did not instruct Sizemore to say anything. He was merely trying to confirm what Sizemore had already told them. Sizemore stated that Wiggins' body was on Red Bear Mountain. (DE 193-32, Sizemore 1 at 65.) He said, "Put it this way. Junior Messer's got the vehicle.. . ." (DE 193-32, Sizemore 1 at 66.) When the officers inquired as to which vehicle, Sizemore stated it was the "little red [Rhino] that Bill Bill rides. The four wheel drive." (DE 193-32, Sizemore 1 at 66.) Thus, when Deputy Eubanks asked if Sizemore and Anderson took the red wagon on the hill, he was merely repeating what Sizemore had already said.

The Court has reviewed the entire first interrogation of Sizemore. It does not provide any evidence from which a jury could reasonably conclude that either Deputy Eubanks or Sheriff Pickard coerced Sizemore into providing false testimony implicating Anderson. The only reasonable interpretation is that the two officers interviewed Sizemore after concluding that he was, at least, present for Wiggins' murder. The only reasonable interpretation of their purpose in interviewing Sizemore is that the officers were attempting to determine from Sizemore precisely who killed Wiggins and how. Toward that end, the officers asked Sizemore for information about the murder, no matter whom it implicated.

Anderson alleges that the officers knew that Sizemore's story was false. (DE 193, Response

at 20.) There is no question that the officers believed Sizemore was not telling the truth in the initial part of his interview when he denied any knowledge of the murder. Sheriff Pickard testified at Anderson's trial that, if Sizemore, "done something criminally . . . he was bad to lie." (DE 193-16, Test. at 105-06.) Likewise, Deputy Eubanks testified in his deposition that Sizemore was not "super credible." (DE 193-15, Test. at 177.) Nevertheless, Sizemore's first statement was evidence regarding Wiggins' disappearance. Thus, the officers reasonably went to Red Bird Mountain with Sizemore to see if any portion of the story could be confirmed. There, they found Wiggins' body. Later, an autopsy revealed that Wiggins' wounds were consistent with Sizemore's story.

Anders argues that the officers knew that Anderson had an "ironclad alibi" before interrogating Sizemore and, thus, had to have believed his story was false.

**2) Second Sizemore Interrogation**

As discussed, the officers interrogated Sizemore a second time after he had led the officers to Wiggins' body in Bell County, and KSP Detectives York and Johnson had taken over the investigation. Deputy Eubanks, however, was present for Sizemore's second interrogation. (DE 193-4, Johnson Dep. at 31-32.) As with Sizemore's first statement, Anderson alleges that KSP Detectives York and Johnson and Deputy Eubanks "fabricated" Sizemore's second statement. (DE 193, Response at 22.)

Anderson alleges that "Defendant York encouraged Sizemore to implicate Plaintiff and was the first person to interject Plaintiff's name" and that Detective York and Deputy Eubanks "provided [Sizemore] with details to repeat." (DE 193, Response at 23.) In fact, Anderson alleges that Deputy Eubanks gave Sizemore a "play-by-play" to repeat. (DE 193, Response at 23.)

The Court has reviewed the entire second interrogation. Defendant York began by accusing

Sizemore of the murder. (DE 193-36, Sizemore 2 Tr. at 3.) Sizemore states that he "had help." (DE 193-36, Sizemore 2 Tr. at 4.) This is where Detective York asks Sizemore if he means Anderson. Anderson argues this is an example of York "encourag[ing] Sizemore to implicate Anderson." (DE 193, Response at 23.) Sizemore had already told the officers, however, that Anderson killed Wiggins. Thus, Detective York's question was rooted in the evidence already provided to the officers. It did not come out of nowhere. Further, far from encouraging Sizemore to implicate Anderson, Detective York responded that Anderson "didn't do it. I know he didn't do it. You know damn well." (DE 193-36, Sizemore 2 Tr. at 4.)

Detective York advises Sizemore to tell the truth about what happened. (DE 193-36, Sizemore 2 Tr. at 4-5.) Sizemore states that he and Anderson went up on the mountain with Wiggins to steal Wiggins' pills. (DE 193-36, Sizemore 2 Tr. at 7.) Sizemore stated that he and Wiggins got in a physical altercation. (DE 193-36, Sizemore 2 Tr. at 6-7.) York asked if Sizemore hit Wiggins in the head with a rock, and Sizemore states he did. (DE 193-36, Sizemore 2 Tr. at 6.) York asked Sizemore:

> How long did you fist fight for? Did you fist fight for two minutes before you hit him with a rock? Or -- or five minutes with the rock -- you hit him with a rock - cause you hit him in -- with the rock first. Then after you hit him in the head with a rock, Bill Bill came up with the knife, right?

(DE 193-36, Sizemore 2 Tr. at 8.)

Anderson argues this is an example of York providing Anderson with "the sequence of events." (DE 193, Response at 23-24.) No reasonable juror could interpret this question as York feeding Sizemore false information in order to implicate Anderson. Every element of this question was based on prior statements by Sizemore. Earlier in the interrogation, Sizemore stated that Wiggins was killed by the "pocket knife that [Anderson's] carryin' . . . The one that's in Bill

28

Bill's pocket is the one that done it . . . ." (DE 193-36, Sizemore 2 Tr. at 4.) Sizemore stated that he and Wiggins were fighting and that Wiggins "sorta hit his fuckin head real hard." (DE 193-36, Sizemore 2 Tr. at 6.) He said that he hit Wiggins with a rock and that "[Anderson's] the one that come up behind him and got him." (DE 193-36, Sizemore 2 Tr. at 6.) The only reasonable interpretation of Detective York's question is that he was attempting to confirm statements that Sizemore had already told the officers and also to find out how long the physical altercation that Sizemore had already described lasted. No juror could interpret this question as Detective York feeding Sizemore information or coercing or forcing him to testify in a particular way.

Anderson argues that Detective York "told" Sizemore what the motive for the killing was. (DE 193, Response at 24.) In support of this, he cites York asking Sizemore, "you all did not plan on killin' him, just stealin' his pills, right?" (DE 193-36, Sizemore 2 Tr. at 10.) Detective York already knew that Sizemore had "a problem with pills." (DE 193-36, Sizemore 2 Tr. at 5.) As discussed, in the first interrogation, Sizemore explained that the entire premise for taking Wiggins up the mountain was Anderson's false story that someone named Mike Smith from Redbird was going to meet them at Red Bear Mountain to buy pills. (DE 193-33 at 3, 5, 15.) Thus, York was not feeding Sizemore a motive to parrot. He asked a logical question based on statements Sizemore had already made.

Anderson argues that Detective York "praised" Sizemore when he alleged that he and Anderson burned Wiggins' car. (DE 193, Response at 24.) In support of that assertion, he cites Detective York's statement at sentence 236 on page 12 of the second interrogation, in which Detective York states, "Now what was so hard about that?" Prior to that, however, Sizemore had denied any involvement in burning Wiggins' car. (DE 193-36, Sizemore 2 Tr. at 11.) Detective York responded by telling Sizemore that the officers knew that Sizemore took Wiggins' car to

29

Ferrell's house and burned stuff in it. (DE 193-36, Sizemore 2 Tr. at 12.) York states, "Why in the fuck do I wanna believe that [Anderson] burned that car, when I already know that you did?" Sizemore then concedes that he also burned the car. Thus, in this exchange, Detective York, far from encouraging Sizemore to implicate Anderson, was upset that Sizemore would not admit his own involvement in burning the car instead of saying Anderson did it alone.

Anderson complains that the officers offered Sizemore leniency in exchange for a statement presumably implicating Anderson. (DE 193, Response at 25-26.) The officers repeatedly urged Sizemore to simply tell the truth, not to implicate Anderson. At times they did this by promising Sizemore leniency in exchange for the truth. For example, as Anderson points out, at the end of the statement, Detective Johnson again tells Sizemore that he "can't lie . . . If you lyin' about it, it looks like you tryin' to cover it up cause you planned it." (DE 193-36, Sizemore 2 Tr. at 71.) Detective Johnson explained, "[T]hat's why we told you, you gotta be honest. You gotta be straight up, 100 percent, if you want us to believe you that it was a mistake." (DE 193-36, Sizemore 2 Tr. at 71.) When Sizemore states he told the truth, Johnson states, "I appreciate that. And I'll see what I can do to help you out on" other charges that Sizemore was facing. (DE 193-36, Sizemore 2 Tr. at 72.) No reasonable juror could construe any of the officers' statements as offering Sizemore leniency for implicating Anderson. The only reasonable interpretation is that they offered Sizemore leniency if he told them the truth, whatever that may be.

The Court has reviewed the entire second interrogation of James Sizemore. No reasonable juror could interpret anything the officers said to either implicitly or explicitly ask or encourage Sizemore to falsely implicate Anderson in Wiggins' murder.

Anderson has not produced any evidence that the officers falsified or fabricated evidence that was presented at the preliminary hearing or grand jury proceedings. Accordingly, he has failed to

30

rebut the presumption that probable cause existed that he killed Wiggins as the grand jury determined.

### 3)   Information that Officers did not Present at Preliminary Hearing or Grand Jury

Anderson argues that, after Sizemore's statements, the officers learned of evidence that proved Sizemore was lying about Anderson's involvement in Wiggins' murder. Anderson complains that the officers "declined to introduce [this evidence] at the preliminary hearing and grand jury." (DE 193, Response at 38.)

This evidence cannot overcome the probable-cause presumption. The "purported 'omission' of exculpatory evidence (as opposed to affirmative 'false statements,' *King*, 852 F.3d at 587) may not suffice to defeat [the probable-cause] presumption." *Lester v. Roberts*, 986 F.3d 599, 608–09 (6th Cir. 2021). This is because, "[t]he Constitution does not require prosecutors to present *any* exculpatory evidence to the grand jury." *Id*. (citing *United States v. Williams*, 504 U.S. 36, 51 (1992). "Courts in this context thus have held that 'failing to disclose potentially exculpatory evidence differs from affirmatively falsifying evidence.'" *Id*. (citing *Costino v. Anderson*, 786 F. App'x 344, 348 (3d Cir. 2019); *Burgess v. DeJoseph*, 725 F. App'x 36, 39–40 (2d Cir. 2018)). *See also Martin v. Maurer*, 581 F. App'x 509, 512 (6th Cir. 2014) (Rejecting plaintiff's argument that the probable-cause presumption was rebutted by evidence that officers withheld crucial exculpatory evidence because "the government has no duty to provide potentially exculpatory evidence to the grand jury.")

Under *King v. Harwood*, "concomitant misleading omissions" by officers who set a prosecution in motion are relevant in determining whether a plaintiff has rebutted the probable-cause presumption established by an indictment. However, they are only considered when evaluating the *materiality* of any false statements or falsified or fabricated evidence that a law

enforcement officer presents to the grand jury. *King*, 852 F.3d at 587-88. Anderson has not established that the officers made any false statements or falsified or fabricated any evidence against him that was presented at the preliminary hearing or grand jury proceedings. Accordingly, any evidence that the officers failed to present to the grand jury is irrelevant to rebutting the probable-cause determination.

### 4) Information after the Indictment

Anderson cites evidence that he argues would have dissolved probable cause to believe that he was involved in Wiggins' murder. After a grand jury has indicted a defendant, law enforcement officials can be liable for the continued detention of the defendant if they withhold exculpatory information that would have dissolved probable cause if it had been disclosed. *Gregory v. City of Louisville*, 444 F.3d 725, 750 (6th Cir. 2006). For this argument, Anderson cites 1) comments Sizemore made in recordings of jailhouse conversations he had after he was incarcerated on December 3, 2011; 2) forensic testing results; 3) a Lowe's video and receipt; and 4) evidence that a man named Terrance Spencer said Sizemore told Spencer that he, not Anderson, stabbed Wiggins. (DE 193, Response at 38-45.)

With the exception of Spencer's statement, however, Anderson does not allege that the officers withheld this evidence from him or from the prosecutor. He cannot assert a claim for continued detention without probable cause based on any evidence that was disclosed.

Moreover, none of the cited evidence dissolved probable cause. The jailhouse recordings do not exculpate Anderson from involvement in Wiggins' murder. The actual transcripts of the recordings are not in the record. Instead, Anderson points to testimony about the recordings at Anderson's murder trial. (DE 193, Response at 38-39.) The defendants do not argue that the trial testimony is inaccurate as to the content of the recordings. Accordingly, the Court assumes the

trial transcript accurately reflects the portions of the recordings quoted at trial.

Both the prosecutor and defense counsel at Anderson's trial cited only portions of the recordings. Taken out of context, the meaning of some of the statements cited at the trial is not clear. Anderson relies on statements that implicate Sizemore's uncle Jeffrey Gray in some kind of illegal activity. (DE 193-11, Trial Tr. at 42-43; DE 193, Response at 39.) At trial, when asked about the recordings, Sizemore stated that Gray was involved in a drug enterprise. (DE 193-11, Trial Tr. at 53.) This is not disputed. Gray confirmed in a recorded phone call with Anderson's counsel in this litigation that he has engaged in drug trafficking. (DE 139-50, Gray Recorded Call at 18-19, 20.)

Moreover, the prosecutor pointed out at Anderson's trial that Sizemore stated multiple times in the jailhouse recordings that Anderson stabbed Wiggins. Sizemore stated during these phone calls that Anderson stabbed Wiggins 18 times and cut him from ear to ear; that Anderson went alone to bury Wiggins' body and said he would come back later to put lime on the body; and that Anderson "did it. Stabbed him 18 times." (DE 193-11, Trial Tr. at 49-51.) Thus, the recordings do not exonerate Anderson.

As to the forensic evidence, Anderson points to the fact that no blood was found on Wiggins' pocketknife (DE 193-4, Johnson Dep. at 64) or on any of the swabbed areas of the Messers' ATV. (DE 193-4, Johnson Dep. at 62.) In addition, the DNA found on Wiggins' fingernails and a belt and shoes found near Wiggins' body did not match Anderson's DNA profile. (DE 193-4, Johnson Dep. at CM-ECF pp. 74, 75-76.) While all of this evidence may have been favorable to Anderson, none of it ruled out his involvement in Wiggins' murder. He could have washed the Rhino and the knife. As to the DNA evidence, there is no evidence that any of it matched Sizemore's DNA either, and Sizemore admitted he was involved in the murder. (DE 204, Reply

at 4; DE 176-7, Forensics at CM-ECF p. 7.)

As to Anderson's argument that the officers obtained evidence implicating Gray[5] in Wiggins' murder, the evidence that Anderson points to on this issue consists of a video recording and a receipt from a Lowe's store in Corbin, Kentucky. This evidence shows that, on November 25, 2011, Gray and Sizemore purchased several items including bags of pulverized lime, a flashlight, and a shovel. (DE 193-47, Anderson Trial, Johnson Dep. at 54-55, 59-60.) As to the relevance of it, Anderson cites page 182, lines 3-23 of the transcript of Detective Johnson's testimony at the murder trial. (DE 193, Response at 43 (citing DE 193-4, Trial Tr. at 182.) In that portion of the transcript, however, Detective Johnson states that Sizemore told him that he gave the items purchased to Anderson. Regardless, the fact that that Gray was with Sizemore when he purchased these items does not exculpate Anderson.

As to Anderson's evidence that Sizemore told a man named Terrence Spencer that he, not

---

[5] As to why the law enforcement officials would have decided to falsely implicate Anderson in Wiggins' murder, in his response brief, Anderson argues that both Sheriff Pickard and KSP Detective Jason York wanted to protect Gray. He argues that Detective York is married to Gray's cousin, which he argues provides Detective York with "a motive to protect" Gray. (DE 193, Response at 42.) He also makes a very serious allegation that Sheriff Pickard had a "motive for framing" Gray because Gray had been paying Sheriff Pickard in order to continue his drug-trafficking activities without interference from law enforcement. (DE 193, Response at 42.) The evidence does not support either charge.

Anderson submits the transcript and audio of a phone conversation between Gray and Anderson's lawyer, which the lawyer recorded. The conversation far from supports a protective relationship between Gray and York. In the conversation, Gray states that York is a "first-class ass." (DE 193-50, Gray Phone Call Tr. at 3.) Referring to York, Gray states that "he come to my house…threatening on beating my brains out at my home" after Gray's grandmother's funeral. (DE 193-50, Gray Phone Call Tr. at 10.) Gray said he recorded the altercation and sent it to York's supervisor. (DE 193-50, Gray Phone Call Tr. at 11-12.) Gray said he does not "have much to say to Jason. I don't like him. I don't hide the way I feel and he don't hide the way – we went to high school together. We never did like one another." (DE 193-50, Gray Phone Call Tr. at 14.) This is not evidence of a protective relationship between the two.

As to Sheriff Pickard, Anderson alleges that, on the phone call, "Gray admits to making monthly payments to Defendant Pickard for the freedom to conduct criminal activity in Eastern Kentucky without fear of prosecution." (DE 193, Response at 4.) Gray does make some serious allegations in the phone call, but they are not about Sheriff Pickard. Gray states, "I'm in a case right now over trafficking drugs, and yes, I paid officers that come to my house to collect their money. It's went on for years and I just got to the point that I wouldn't do it." (DE 193-50, Gray Phone Call Tr. at 18.) He states, "I paid them $1,000 a month for a long time, for about five years." (DE 193-50, Gray Phone Call Tr. at 18.) However, Gray specifically states, "I never personally nary time paid John Pickard. I never talked to John Pickard. . . . " (DE 193-50, Gray Phone Call Tr. at 14.)

While Gray's claims of corruption are serious, they are irrelevant to this lawsuit.

Anderson, stabbed Wiggins, Detectives Johnson and York obtained this information in May 2014 in connection with an investigation into the murder of Donald Mills. The Messers' son, Elijah, was ultimately charged with Mills' murder. (DE 193, Response at 44.) During that investigation, Detectives Johnson and York interviewed Spencer. Detective Johnson told Spencer that the Messers were also involved in some way in Wiggins' murder. He asks Spencer what the "word on the street" is about Wiggins' murder. Spencer's response not only does not exonerate Anderson. It places Anderson at the murder scene and implicates him in the murder.

Spencer responds that he heard that Anderson "didn't really have too much to do with it but [Sizemore] scared them into doing it" and that Elijah Messer helped "them." Spencer stated that Sizemore said that he told Anderson that, if Anderson did not help him, "he was gonna be the next one laying in the ditch. . . ." Spencer stated that Sizemore told him that Sizemore slit Wiggins' throat and that "they" buried Wiggins alive. (DE 193-73, Spencer Statement at 22.)

This statement cannot defeat probable cause. First, the statement indicates that Anderson *was* involved in Wiggins' murder. It is contrary to Anderson's testimony in this case and at his murder trial that he was not present at the time that Wiggins was killed, had never met him, and was not involved in the murder at all. Second, there is no indication that Spencer's testimony was more credible than Sizemore's.

**B.  State Law Malicious Prosecution Claim**

A claim for malicious prosecution under Kentucky law requires the plaintiff to produce evidence of the following:

> 1) the defendant initiated, continued, or procured a criminal or civil judicial proceeding, or an administrative disciplinary proceeding against the plaintiff;
> 2) the defendant acted without probable cause;
> 3) the defendant acted with malice, which, in the criminal

> context, means seeking to achieve a purpose other than
> bringing an offender to justice; and in the civil context,
> means seeking to achieve a purpose other than the proper
> adjudication of the claim upon which the underlying
> proceeding was based;
>
> 4) the proceeding, except in ex parte civil actions,
> terminated in favor of the person against whom it was
> brought; and
>
> 5) the plaintiff suffered damages as a result of the
> proceeding.

*Martin v. O'Daniel*, 507 S.W.3d 1, 11–12 (Ky. 2016)

As with federal law, "a grand jury indictment raises a presumption of probable cause, [but] this presumption can be rebutted by the plaintiff." *Davidson v. Castner-Knott Dry Goods Co.*, 202 S.W.3d 597, 607 (Ky. Ct. App. 2006). As with his federal claim, to rebut the presumption of probable cause established by the indictment, Anderson relies on an argument that the officers involved in the investigation of Wiggins' murder forced Sizemore, Fox, and Evans to implicate him in the murder. As explained, only Sizemore's statement was presented at the preliminary hearing and grand jury proceedings. There is no evidence from which a reasonable juror could conclude that the officers forced Sizemore to implicate Anderson in Wiggins' murder. Thus, Anderson has failed to rebut the presumption of probable cause established by the indictment. His state-law malicious prosecution claim fails.

**C. Fabrication Claim**

"A Fourth Amendment claim for fabricated evidence lies where a defendant knowingly manufactures probable cause, thereby effecting a seizure." *Robertson v. Lucas*, 753 F.3d 606, 616 n.5 (6th Cir. 2014). To survive summary judgment on this claim, Anderson must produce evidence that the defendants knowingly fabricated evidence against him and that there is a reasonable likelihood "that the false evidence would have affected the decision of the jury."

36

*Gregory*, 444 F.3d at 737 (citing *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir.1997)). Anderson must show that the fabrication of evidence caused his alleged injury, *i.e.*, his detention. *McDonough v. Smith*, 139 S.Ct. 2149, 2156 (2019). In all § 1983 cases, "the plaintiff must prove that the defendant's action was a proximate cause of the plaintiff's injury." *Gierlinger v. Gleason*, 160 F.3d 858, 872 (2d Cir. 1998).

As discussed, no reasonable juror could conclude that the officers forced or coerced Sizemore to implicate Anderson in Wiggins' murder. Thus, no reasonable juror could conclude that Sizemore's testimony amounted to fabricated evidence.

As to the testimony of Fox[6] and Evans[7], their testimony was not presented until Anderson's

---

[6] Anderson argues that the officers' "clear objective" in the second interview of Fox was "to get Fox to falsely state" that 1) Anderson left the Messer residence during the day and 2) Anderson was with Wiggins earlier the day Wiggins was killed. (DE 193, Response at 30.) Fox never made the second statement. Despite intense questioning by law enforcement officers during the second interview, Fox never stated that he saw Anderson with Wiggins. No juror could find that the officers fabricated a statement never made.

As to the first statement – Fox's statement about Anderson's whereabouts on November 23rd – Fox stated about Anderson, "I mean, I wasn't with him all day long. No ma'am." (DE 193-45, Fox Statement 2 at 86-87.) He continued, "I mean, he might have slipped off and wasn't there, and there was a time frame that I was unaware of . . . . " (DE 193-45, Fox Statement 2 at 87.) No reasonable juror could find that the officers forced Fox to make this statement.

First, despite Anderson's insistence in this litigation that Fox provided him with an "iron-clad" alibi for November 23rd in his first interview, Fox did not state in that interview that he was with Anderson all day on November 23, 2011. (DE 193-25, Fox Statement.) Fox was not even asked if he was with Anderson all day on the 23rd. When the officers first interviewed Fox, neither Fox nor Anderson was suspected of murder. The officers were not investigating a murder at that point. They were investigating a missing person.

More importantly, not even Anderson testified that he was with Fox all day on the day of Wiggins' murder. In his deposition in this matter and at his murder trial, Anderson testified that he left the Messers' house during the day. He testified that he may have gone to his house and then back to the Messers' house. (DE 193-7, Anderson Trial Test. at 81.) When asked if he went anywhere else that afternoon, he stated he could not recall, but that he went to the store a lot when Elijah was sick, and he would also go out to pick up lunch. (DE 193-2, Anderson Trial Test. at 81.) He testified in his deposition in this action that he went to the store in the Messers' red Rhino that day around lunch. (DE 193-2, Anderson Dep. at 158.)

Second, at the time Fox made the statement that he could not account for Anderson's whereabouts all day on the 23rd, only Sgt. Joseph was conducting the interview. Fox had stated that he "could not think of a time that [Anderson] was not present that day." (DE 193-45, Fox Statement 2 at 83.) This was not a clear statement as to Anderson's whereabouts the day of the murder. To clarify it, Sgt. Joseph told Fox she was concerned that Anderson had asked Fox to "cover up for him." She states that if that is what Fox is doing, he could be liable as Anderson's accomplice. (DE 193-45, Fox Statement 2 at 84.) This is accurate and a proper method of ensuring that a witness is telling the truth. It was at this point that Fox stated he could not say he was with Anderson all day long. No reasonable juror could find that Sgt. Joseph forced Fox to make that statement.

The Court notes that Fox appeared to be very comfortable with Sgt. Joseph. He told her that he was "hitting on"

trial. Anderson was acquitted after that legal proceeding. Thus, their testimony could not have caused Anderson to suffer any deprivation of liberty.

### D.  Remaining Claims

The Court has determined that Anderson has not produced evidence to support his constitutional claims of fabrication of evidence or malicious prosecution or his state-law claim of malicious prosecution.

Anderson's remaining constitutional claims – civil conspiracy to violate his constitutional rights, failure to intervene, supervisory liability (against Sgt. Joseph and Sheriff Pickard), and failure to train and supervise (against Knott County) – depend upon evidence of an underlying constitutional violation and injury. *See Wiley v. Oberlin Police Dep't*, 330 F. App'x 524, 530 (6th Cir. 2009) ("Wiley cannot succeed on a conspiracy claim because there was no underlying constitutional violation that injured her."); *Stiles ex rel. D.S. v. Grainger Cty., Tenn.*, 819 F.3d 834, 856 (6th Cir. 2016) ("As with supervisory liability, a municipality can be liable under § 1983 only if there is some underlying constitutional violation for which it could be held

---

her and that she was "very pretty." (DE 193-45, Fox Statement 2 at 20.) He asked if she was married and stated again he thought she was "very pretty." (DE 193-45, Fox Statement 2 at 106-07.) At Anderson's murder trial, Fox testified that Sgt. Joseph was very nice and professional. (DE 193-11, Trial Tr. at 97-98.) He testified that he had no issue with how Sgt. Joseph treated him. (DE 193-11, Trial Tr. at 104.) He had no complaints at all with her treatment of him. (DE 163-5, Trial Tr. at 109.)

Moreover, Fox has never recanted his statement regarding Anderson's whereabouts on the day that Wiggins was murdered. At Anderson's murder trial, he testified that he did not know Anderson's whereabouts the entire day. (DE 163-5, Trial Tr. at 82-83.) He testified at his deposition in this action that this was true. (DE 193-12, Fox. Dep. at 163.) He testified that "all I ever told was the truth from day one." (DE 193-12, Fox. Dep. at 80, 86.) He testified that, in every interview with law enforcement officials, he told the officers the same thing and it was the truth to the best of his knowledge. (DE 193-12, Fox. Dep. at 91.)

[7] As to Evans, again he testified at the murder trial that Anderson told him he was present when a "Mexican" killed a man in Bell County with a rock and a knife and that Anderson took some of the victim's clothes and pills and helped bury him and burn his car. (DE 193-8, Trial Tr. at 150-54.) Evans now states in an affidavit (DE 193-3, Evans Aff.) that the county prosecutor and law enforcement officials forced him to say this at trial, knowing it was not true. He states Anderson always told him he was innocent. Evans' charges are serious. The Court notes, however, that it is odd that these state officials would have forced Evans to testify in a manner that was contrary to the state's theory of the case at trial. Regardless, Evans testified only at the trial after which Anderson was acquitted.

responsible."); *Simmons v. Napier*, 626 F. App'x 129, 139 (6th Cir. 2015) ("Thus, the jury's verdict established that there was no conduct that any of the defendant officers had the obligation to stop or prevent, and they simply could not have been found liable for failing to prevent unlawful conduct that did not occur."); *Gierlinger*, 160 F.3d at 872 (stating that, in all § 1983 cases, the plaintiff must prove that the defendant's action was a proximate cause of the plaintiff's injury.)

Likewise, Sizemore's remaining state law claim for negligent supervision depends upon the viability of the underlying state-law malicious prosecution claim. *Grego v. Meijer, Inc.*, 187 F. Supp. 2d 689, 694 (W.D. Ky. 2001) ("The tort of negligent supervision is a second[ary] tort that derives from a tort committed by the person negligently supervised.") *See also Ten Broeck Dupont, Inc. v. Brooks*, 283 S.W.3d 705, 730 (Ky. 2009) ("There must be a finding of a tort to support liability and damages under a theory of negligent hiring/retention."

Accordingly, the Court will grant the defendants' motions for summary judgment on these claims.

### E. Defendant Mark Mefford

 Anderson has pointed to no evidence that Detective Mark Mefford did anything other than apply for a warrant for Anderson's arrest based on information provided to him and arrest Anderson. He points to no evidence that Detective Mefford was involved in any other aspect of the investigation or prosecution. Accordingly, judgment will be entered in his favor on that basis as well as for all the above reasons.

### III. Conclusion

For all these reasons, the Court hereby ORDERS as follows:

1) the motion for summary judgment (DE 162) by Knox County, John Pickard, and Derek

Eubanks is GRANTED;

2)  the motion for summary judgment (DE 176) by Brian Johnson, Mark Mefford, Jackie Joseph, Tyson Lawson, and Jason York is GRANTED;

3)  the motions to exclude (DE 163, 164) are DENIED as moot; and

4)  the Court will enter a judgment consistent with this opinion.

This 31st day of March, 2022.


KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY